IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-1350-WJM-BNB

**ANDY KERR**, COLORADO STATE REPRESENTATIVE;
**NORMA V. ANDERSON**;
**JANE M. BARNES**, MEMBER JEFFERSON COUNTY BOARD OF EDUCATION;
**ELAINE GANTZ BERMAN**, MEMBER STATE BOARD OF EDUCATION;
**ALEXANDER E. BRACKEN**;
**WILLIAM K. BREGAR**, MEMBER PUEBLO DISTRICT 70 BOARD OF EDUCATION;
**BOB BRIGGS**, WESTMINSTER CITY COUNCILMAN;
**BRUCE W. BRODERIUS**, MEMBER WELD COUNTY DISTRICT 6 BOARD OF
EDUCATION;
**TRUDY B. BROWN**;
**JOHN C. BUECHNER**, PH. D., LAFAYETTE CITY COUNCILMAN;
**STEPHEN A. BURKHOLDER**;
**RICHARD L. BYYNY, M.D.** ;
**LOIS COURT**, COLORADO STATE REPRESENTATIVE;
**THERESA L. CRATER**;
**ROBIN CROSSAN**, MEMBER STEAMBOAT SPRINGS RE-2 BOARD OF EDUCATION
**RICHARD E. FERDINANDSEN**;
**STEPHANIE GARCIA**, MEMBER PUEBLO CITY BOARD OF EDUCATION;
**KRISTI HARGROVE**;
**DICKEY LEE HULLINGHORST**, COLORADO STATE REPRESENTATIVE;
**NANCY JACKSON**, ARAPAHOE COUNTY COMMISSIONER;
**WILLIAM G. KAUFMAN**;
**CLAIRE LEVY**, COLORADO STATE REPRESENTATIVE;
**MARGARET (MOLLY) MARKERT**, AURORA CITY COUNCILWOMAN
**MEGAN J. MASTEN**;
**MICHAEL MERRIFIELD**;
**MARCELLA (MARCY) L. MORRISON**;
**MONISHA MERCHANT**, MEMBER UNIVERSITY OF COLORADO BOARD OF
REGENTS
**JOHN P. MORSE**, COLORADO STATE SENATOR;
**PAT NOONAN**;
**BEN PEARLMAN**, BOULDER COUNTY COMMISSIONER;
**WALLACE PULLIAM**;
**FRANK WEDDIG**, ARAPAHOE COUNTY COMMISSIONER;
**PAUL WEISSMANN**; and
**JOSEPH W. WHITE**,

      Plaintiffs,

v.

**JOHN HICKENLOOPER**, GOVERNOR OF COLORADO, in his official capacity,

    Defendant.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS

---

Plaintiffs respectfully submit the following brief in opposition to the Motion to Dismiss (the "Motion"), ECF No. 18, submitted August 15, 2011, by Defendant, John Hickenlooper, Governor of Colorado, in his official capacity.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.   THIS COURT MUST ACCEPT PLAINTIFFS' ALLEGATIONS AS TRUE UNDER THE STANDARD OF REVIEW APPLICABLE TO FACIAL CHALLENGES TO SUBJECT MATTER JURISDICTION UNDER RULE 12(b)(1). ................................................. 5

II.  PLAINTIFFS HAVE STANDING TO CHALLENGE TABOR UNDER THE CONSTITUTION AND THE ENABLING ACT. ......................................................... 7

    A.   Plaintiffs Suffered an Injury-in-Fact as a Consequence of TABOR's Radical Impact on the General Assembly's Power to Tax and Authority to Spend. ................................................. 7

    B.   Plaintiffs Pleaded a Causal Connection Between TABOR and Their Injury. .............. 12

    C.   A Decision Finding TABOR Invalid Would Redress Plaintiffs' Injury. ...................... 13

III. PLAINTIFFS HAVE PRESENTED JUSTICIABLE CLAIMS. ......................................... 14

    A.   This Court Has the Authority to Adjudicate Plaintiffs' Enabling Act Claim  as a Routine Claim that Seeks Redress for Violation of a Federal Statute. ..................................... 14

    B.   Defendant's PQD Argument Fails Because Plaintiffs' Claims Raise No Political Questions. ................................................................................................................ 18

        1.   Most of Plaintiffs' Counts Present No Political Questions At All............................... 18
        2.   The PQD Does Not Apply to Consideration of this Case Under the Enabling Act...... 22
        3.   Plaintiffs' Invocation of the Guarantee Clause Is Not Barred by Any of the Six *Baker* Tests. ........................................................................................................... 24

IV. A MAJORITY'S ATTEMPT TO USE THE INITIATIVE TO IMPOSE AN UNCONSTITUTIONAL MEASURE ON the PEOPLE VIOLATES THE EQUAL PROTECTION CLAUSE. ............................................................................................. 33

V.   TABOR VIOLATES ORIGINAL AND CONTROLLING PROVISIONS OF COLORADO CONSTITUTION THAT EMPOWER THE GENERAL ASSEMBLY TO FULFILL ITS ESSENTIAL DUTIES. .............................................................................................. 36

CONCLUSION…………………………………………………………………………..38

Appendix A.................................................................................................................. 41

## INTRODUCTION

> State legislatures are, historically, the fountainhead of representative government in this country. . . . With the birth of our National Government, and the adoption and ratification of the Federal Constitution, state legislatures retained a most important place in our Nation's governmental structure. But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies.

*Reynolds v. Sims*, 377 U.S. 533, 564-65 (1964).

\* \* \*

Plaintiffs' claims present  a targeted challenge to a specific amendment to the Colorado Constitution – the so-called Taxpayer Bill of Rights ("TABOR"), Colo. Const. art. X § 20.  That amendment was proposed and adopted through the state's initiative process, as provided in Article V, Section 1 of the Colorado Constitution.[1] *See* Colo. Const. art. V § 1. In the Motion, Defendant misreads this narrow challenge and argues as though the case were a frontal attack on the initiative process.  It is not.

With the approval of TABOR in 1992, Colorado became the only state to strip its legislature of one of its the core functions – the power to tax.  This case presents the limited question of whether, by depriving the Colorado General Assembly (and every other governmental body in Colorado) of the fundamental power to raise revenue, Colorado no longer has the Republican Form of Government (the "Republican Form of Government") required

---

[1] This case involves the initiative process.  Article V, Section 1 of the Colorado Constitution also provides for lawmaking by referendum, *i.e.*, by action of the General Assembly referring a proposed law to the state's voters.  *See* Colo. Const. art. V § 1. This brief will refer to the "initiative" or the "initiative process."  In each instance, the use of the referendum would be available as an alternative to the initiative as a method of seeking a vote of the people.

under both Article IV, Section 4, of the United States Constitution (the "Guarantee Clause"), *see* U. S. Const. art. IV, § 4, and the Colorado Enabling Act, act of March 3, 1875, 18 Stat. 474[2] (An Act To Enable the People of Colorado to Form a Constitution and State Government, and for the Admission of the Said State Into the Union on an Equal Footing With the Original States) (the "Enabling Act"), by which Congress authorized Colorado to join the Union.   TABOR made Colorado the first and the only state to adopt a radical new form of government in which the initiative became the *exclusive* means for enacting tax law.   TABOR removed from the General Assembly a power fundamental to fulfilling its broader responsibilities to provide for a host of public services, including education, and mandated that this power be exercised only through the initiative.

With both its adoption *by* initiative and its requirement *for* future initiatives in perpetuity, TABOR is initiative *compounded*.   It has no parallel in the corpus of initiated laws in the United States.

Defendant inexplicably ignores the narrow focus Plaintiffs' case on the specifics of TABOR and, instead, seeks dismissal of a lawsuit that Plaintiffs did not file.   Defendant's arguments rest on a flagrant misreading of Plaintiffs' legal theories.   Plaintiffs do *not*, as Defendant suggests, challenge the right to initiative embodied in the Colorado Constitution. Further, Defendant fails to address the legal principles applicable to Plaintiffs' standing to bring this case.   Plaintiffs have suffered direct individualized harm and, for the Plaintiffs who are

---

[2] The text of the Enabling Act appears immediately preceding the text of the Colorado Constitution in the Colorado Revised Statutes.

legislators or hold other public office, from the diminished authority of their offices resulting from TABOR. *See infra* pp. 7-14.

More generally, the benefits of the Republican Form of Government mandated by the Guarantee Clause and the Enabling Act inure to every citizen, and the loss of such Constitutional protection is a loss for which any citizen may seek redress. In contrast, under Defendant's theory, no plaintiff could ever be heard to complain even if his or her state abolished its legislature entirely and adopted Athenian-style direct democracy.[3]

Defendant incorrectly invokes the jurisprudence of justiciability under the political question doctrine ("PQD") as a bar to adjudicating this case. In arguing against justiciability, Defendant focuses exclusively on the Guarantee Clause and ignores Plaintiffs' second key argument – that TABOR cannot be squared with the Enabling Act. The ability and the duty of federal courts to interpret and to enforce federal statutory law is unquestioned. No federal court has ever declined to adjudicate a claim arising under a state's enabling act. *See infra* pp. 14-18. Plaintiffs' statutory claim therefore adequately answers Defendant's jurisdictional attack on

---

[3]The Independence Institute presents this very argument in its *amicus* brief. *See* Brief of the Independence Institute as *Amicus Curiae* in Support of Def.'s Mot. to Dismiss, ECF No. 21, submitted August 22, 1011, at 7-13. According to the Institute, the Guarantee Clause merely bars states from crowning kings. *See id.* at 5. In narrowly focusing on eighteenth century dictionaries and similarly stale sources, *see id*. at 6-10, the Institute halts its research at the time of George III and ignores subsequent Guarantee Clause jurisprudence. This oversight includes *Reynolds v. Sims*, 377 U.S. 533, 564-65 (1964), which by itself is fatal to the Institute's argument. While the Institute's affection for ancient references may interest academics, the courts have long recognized the fundamental role legislatures play in the Republican Form of Government. *See id.* The case precedents cited below trump any purported historical citations to the contrary. In any event, the Institute's historical exegesis is irrelevant to Defendant's arguments regarding subject matter jurisdiction.

justiciability.  Similarly, federal courts do not shrink from determining the constitutionality of state laws.

The policy reasons underlying the PQD – that adjudication of the claim would offend the separation of powers by addressing an issue that the Constitution commits to the federal political branches; or that there are no judicially discoverable and manageable standards; or that a decision requires the type of policy determination not intended for the judiciary – simply do not apply here.  *See infra* pp. 18-33.  The legislative branch cannot address the dilemma TABOR presents, if only because a popular vote would be needed to repeal, or even to modify, TABOR.

TABOR represents delegation to the voters run amok.  As the Supreme Court has instructed the populace of Colorado at least twice (*see Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713, 736-37 (1964), and *Romer v. Evans*, 517 U.S. 620, 623, 635 (1996)), a popular initiative amending the state Constitution in terms that violate the fundamental law of this nation cannot stand.  And so with TABOR.

TABOR is unique in having dismantled a core legislative power forever.  For this reason, this legal challenge is factually and legally vastly different from the cases cited by Defendant that deal with a single, limited enactment by initiative.  TABOR was not an ordinary law that addressed some issue of public policy, required a legislative supermajority to raise revenue, or prescribed some area of state spending.  Rather, for the first time in the history of the United States, a state so fundamentally altered the nature of its government that it no longer satisfied the requirement for a Republican Form of Government.  The federal courts are empowered to addresses these types of blows to the United States Constitution and federal statutes.

For these reasons, as addressed further below, the Motion to Dismiss should be denied and this case should proceed on the merits.

## ARGUMENT

I. **THIS COURT MUST ACCEPT PLAINTIFFS' ALLEGATIONS AS TRUE UNDER THE STANDARD OF REVIEW APPLICABLE TO FACIAL CHALLENGES TO SUBJECT MATTER JURISDICTION UNDER RULE 12(b)(1).**

By citing to both Rules 12(b)(1) and 12(b)(6), *see* Motion at 3-4, Defendant obscures the key distinction between these authorities. Because Defendant contends that Plaintiffs present "nonjusticiable political questions" and that Plaintiffs "lack standing to bring their complaint," *see id.* at 5, Defendant's arguments for dismissal rest squarely on Rule 12(b)(1) only. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979-80 (9th Cir. 2007) (motion to dismiss attacking the jurisdictional basis of a complaint is to be considered under Rule 12(b)(1)). Therefore, the Motion must be decided solely pursuant to Rule 12(b)(1).

Moreover, Defendant presents only one of the two possible Rule 12(b)(1) arguments – a facial attack on Plaintiffs' allegations regarding subject matter jurisdiction.[4] *See Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (Rule 12(b)(1) motions may take two forms – a *facial* attack on the complaint's allegations as to subject matter jurisdiction or a *factual* attack that goes beyond the allegations of the complaint and challenges the facts upon which subject matter jurisdiction

---

[4] Defendant's cite to *McDonald v. Kinder Morgan, Inc.*, 287 F.3d 992 (10th Cir. 2000), *see* Motion at 4, cited the incorrect page. More importantly, as authority for the Rule 12(b)(1) standard, *McDonald* is inapplicable to this case. *McDonald* concerned a *de novo* review of a district court's dismissal under Rule 12(b)(6) and had nothing to do with Rule 12(b)(1). *See McDonald*, 287 F.3d at 997.

depends).  Defendant has not challenged the facts pleaded in Plaintiffs' Substituted Complaint (the "Complaint") to support subject matter jurisdiction.

In reviewing a facial attack on subject matter jurisdiction, "a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss."  *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325.  Under the Rule 12(b)(6) standard, the court must accept the complaint's allegations "as true and must construe them in the light most favorable to the plaintiff."  *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991). "The Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim."  *Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488, 1496 (10th Cir. 1995) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).  Dismissal is proper *only* if "it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief. *Id.* (quoting *Jacobs Visconsi & Jacobs Co. v. City of Lawrence*, 927 F.2d 1111, 1115 (10th Cir. 1991)); *see also Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) ("[T]o the extent that factual questions are raised and are material to the result, dismissal is improper unless there is no reasonable view of the facts which could support the claim.").

Defendant's inclusion of *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), in the discussion of the standard of review is mystifying.  *See* Motion at 4. The *Twombly* line of cases address a plausibility pleading standard imposed by Rule 8(a). *See Iqbal*, 129 S. Ct. at 1950.  In describing the *Twombly* standard, the *Iqbal* Court noted:

> Twombly does not require a court at the motion-to-dismiss stage to
> consider whether the factual allegations are probably true.  We

6

> made it clear, on the contrary, that a court must take the allegations
> as true, no matter how skeptical the court may be. . . .  The sole
> exception to this rule lies with allegations that are sufficiently
> fantastic to defy reality as we know it: claims about little green
> men, or the plaintiff's recent trip to Pluto, or experiences in time
> travel.  That is not what we have here.
>
> Under *Twombly*, the relevant question is whether, assuming the
> factual allegations are true, the plaintiff has stated a ground for
> relief that is plausible.

*Id.* at 1959 (internal citations omitted).  As explained below, under the applicable case law, this

Court possesses subject matter jurisdiction to consider Plaintiffs' challenge to TABOR.

## II.     PLAINTIFFS HAVE STANDING TO CHALLENGE TABOR UNDER THE CONSTITUTION AND THE ENABLING ACT.

Plaintiffs have presented a "case or controversy" that meets the Tenth Circuit's three-part

test for standing:  (1) they have suffered an injury-in-fact to a legally protected interest, (2) a

causal connection exists between TABOR and Plaintiffs' injury, and (3) a favorable decision on

their claims would redress Plaintiffs' injury.  *See Branson School Dist. RE-82 v. Romer*, 161

F.3d 619, 630 (10th Cir. 1998); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992).

### A.     Plaintiffs Suffered an Injury-in-Fact as a Consequence of TABOR's Radical Impact on the General Assembly's Power to Tax and Authority to Spend.

TABOR's deprivation of the General Assembly's power to tax creates an ongoing injury-

in-fact to all Plaintiffs by depriving them of the Republican Form of Government guaranteed

under both the U.S. Constitution and the Enabling Act.  *See supra* pp. 1-2. Plaintiffs allege that

TABOR deprives them of their right to the Republican Form of Government in that TABOR

stripped the General Assembly of its exclusive and plenary power to legislate on matters of taxes

and appropriations.  *See* Complaint at 4-5 ¶¶ 7-8.  TABOR imposed similar limitations on all

political subdivisions of the State.  *See id.* at 15 ¶ 75.   For the half of the plaintiffs who hold

public office, TABOR directly impacts their ability to fulfill their official responsibilities.  *See*

*id.* at 9 ¶ 45.  Success in establishing standing for any one of the Plaintiffs (a group consisting of

legislators, educators, and citizens) would result in standing for all plaintiffs.  *See Vill. of*

*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 263-64 (1977).

The Plaintiffs' interests find their legal source in the guarantee of a Republican Form of

Government  found in both the Guarantee Clause,  U.S. Const. art. IV, § 4, and the Enabling Act.

Colorado Enabling Act, § 4, 18 Stat. 474.  Curiously, Defendant does not address the Enabling

anywhere in its Motion.

Several cases in which legislators sought redress for limits imposed on their inherent

authority undercut Defendant's argument that Plaintiffs lack standing.  In *Michel v. Anderson*, 14

F.3d 623 (D.C. Cir. 1994), the District of Columbia Circuit granted standing to Members of the

House of Representatives whose voting power had been diluted through a House voting rule that

allowed representatives of U.S. territories to vote in committee elections.  *See id.* at 626-27.  The

court found that even the plaintiffs' constituents had standing because their representatives' votes

had been diluted – notwithstanding that citizens of all states shared the same injury.  *See id.* at

626.

The *Michel* court concluded that the widespread nature of the constituents' harm was not

determinative of standing because each person suffered a distinct and concrete – if widely shared

– harm.  *Id.*  The *Michel* ruling applies with even greater force to the legislator-Plaintiffs here

because TABOR does not merely dilute their votes; it prohibits them.   Unlike the rule that

watered down the Representatives' voting power in *Michel,* TABOR completely stripped the General Assembly of the ability to vote on taxing measures.

*Coleman v. Miller*, 307 U.S. 433 (1939), further illustrates why the legislator-Plaintiffs have standing to challenge TABOR.  In *Coleman*, the Kansas State Senate was tied in voting on whether to approve an amendment to the United States Constitution.  *See id.* at 435-36.  The twenty Senators who voted against the amendment claimed their votes were nullified when the Lieutenant Governor broke the tie and cast the deciding vote in favor of the amendment.  *See id.* at 438.  The losing Senators sued to challenge the validity of the tie-breaker vote.  *See id.* at 436.  The Court found the Senators had standing because they had a "plain, direct, and adequate interest in maintaining the effectiveness of their votes."  *See id.* at 438.

Like the legislators in *Coleman*, the legislator Plaintiffs here have suffered a direct attack on their power to legislate.  Although the harm alleged in *Coleman* concerned only a single vote in the Kansas State Senate, TABOR eliminates the power of the General Assembly to enact revenue measures.[5]

---

[5]*Raines v. Byrd*, 521 U.S. 811 (1997), does not impact the legislator-Plaintiffs' standing to challenge TABOR.  *Raines* involved a premature suit involving the line-item veto, which the Court later struck down in  *Clinton v. New York,* 524 U.S. 417 (1998).  In holding that the plaintiffs could not proceed with their case at such time, the *Raines* court noted that the transfer of power from the executive branch to the legislative branch at issue was contingent, had not yet been exercised, and, in any event, would only occur occasionally, if and when the President used the new veto power.  In contrast, the impact of TABOR on the General Assembly's core budget and taxing powers is both complete and permanent.  Unlike in *Raines*, there is nothing abstract about the "dilution of institutional legislative power," *see id.* at 826, resulting from TABOR.

Defendant's argument against standing rests entirely on the "concrete and particularized" requirement of *Lujan*. *See* Motion at 15-16 (citing *Lujan,* 504 U.S. at 560). Defendant's assertion that Plaintiffs' injury is not differentiated from that of the public at large cannot be squared with the legislator-plaintiff cases noted above. It also runs afoul of *Flast v. Cohen*, 392 U.S. 83 (1968). Although *Flast* has been narrowly construed, *see Hein v. Freedom from Religion Foundation, Inc.,* 551 U.S. 587, 602 (2007) (noting that *Flast* "carved out a narrow exception to the general constitutional prohibition against taxpayer standing"), it shows that a plaintiff may have standing to challenge a constitutional violation that affects any one individual no differently from the public at large. *See Flast*, 392 U.S. at 105-06 (conferring standing to allow lawsuit premised on violation of the Establishment Clause).

One of the cases cited in the Defendant's Motion illustrates the parallel between the Establishment Clause and the Guarantee Clause for purposes of standing:

> First, the defendants argue that the plaintiffs lack standing because, at most, they share an undifferentiated harm with other voters. . . . But . . .[i]f the plaintiffs are correct that the Guarantee Clause extends rights to individuals in at least some circumstances, then the usual standing inquiry – which distinguishes between concrete injuries and injures that are merely abstract and undifferentiated – might well be adjusted to the nature of the claimed injury.

*Largess v. Supreme Judicial Court for the State of Mass.*, 373 F.3d 219, 224-25 (1st Cir. 2004) (citing *Flast*, 392 U.S. at 105-06) (internal citations omitted). The *Largess* court recognized the importance of conferring standing in Guarantee Clause cases. *See id.* By citing *Flast* in the context of standing in a Guarantee Clause case, the First Circuit recognized that both the Guarantee Clause and the Establishment Clause would be unenforceable if subject to an

inflexible standing inquiry, because every citizen suffers the harm caused by a violation of either clause. *See id.*

The *Michel* court rejected the identical argument Defendant presents here regarding the allegedly generalized harm at issue. *See Michel*, 14 F.3d at 626 (rejecting allegation that the plaintiffs complained of a harm that was "suffered by every American voter who resides in any state" and thus presented only a generalized, abstract grievance). The court rejected this flawed reasoning: "That an injury is widespread . . . does not mean that it cannot form the basis for a case in federal court so long as each person can be said to have suffered a distinct and concrete harm." *Id.* The court further observed:

> That all voters in the states suffer this injury, along with the appellants, does not make it an "abstract" one. Suppose, for sake of analysis, the House were to prevent all congressmen from the State of Georgia from voting in the House. It is obvious that the Georgia voters would have suffered an injury. The same would be so if every state but Georgia were given an extra vote in the House. In the case at bar, the voters in every state are in the same legal position as Georgia voters in the hypotheticals. The difference is one of degree rather than kind.

*Id.*

Likewise, in this case, although every Colorado citizen is harmed by TABOR's violation of the Guarantee Clause, and – with the exception of officeholders – no one person's harm can be differentiated from the rest, each citizen "can be said to have suffered a distinct and concrete harm." *See id.* In any case, neither the Establishment Clause nor the Guarantee Clause can be enforced unless a citizen can have standing despite his inability to distinguish his harm from that suffered by others. Yet both clauses guarantee certain constitutional rights that would be meaningless if they cannot be enforced.

**B.      Plaintiffs Pleaded a Causal Connection Between TABOR and Their Injury.**

The causal connection requirement for standing under *Lujan* is satisfied because TABOR directly prohibits the General Assembly from legislating on matters involving new taxes or tax increases and, through its spending limitations, also limits the legislature and subordinate political subdivisions in funding government.  TABOR achieves this deprivation of legislative power through five requirements.  *See* Anna-Lisa Mullis, *Dismantling the Trojan Horse*, 82 U. Colo. L. Rev. 259, 267-71 (2011).

First, TABOR requires prior voter approval of any tax increase, directly displacing the legislature's power to tax. *Id.* Second, TABOR limits the amount of revenue state and local governments can collect and keep through a mandate that all revenue in excess of the TABOR limit must be refunded to the taxpayers.[6] *Id.*   Third, TABOR directly limits the amount of revenue state and municipal governments can spend. *Id.* Fourth, it prevents the weakening of other limits on government spending by subjecting any changes to prior limits must also to voter approval. *Id.* Finally, TABOR flatly and permanently prohibits any new taxes in three areas: transfer taxes on real property, state real property taxes, and local income taxes. *Id*; s*ee also* Colo. Mun. League, *TABOR: A Guide to the Taxpayer's Bill of Rights*, chs. 3-4 (revised 2011) (containing a detailed explanation of TABOR's spending and revenue collection limitations). Shortly after TABOR's passage, the Colorado Supreme Court explained the effect of TABOR on the power of the General Assembly to both collect and spend revenue:

---

[6] The TABOR limit is a formula in the amendment that limits the growth of the government's revenue collection to inflation plus population growth over the previous year.  *See* Colo. Const. Art. X, § 20(7).

> [N]ot only does [TABOR] attempt to limit the amount that the
> state spends, it also attempts to limit the amount that the state does
> not spend, but collects, and keeps in reserve. If state revenues
> increase in a given year, then even if the state does not spend the
> additional money, it may violate the spending limits of [TABOR]
> by putting that money in reserve.  In order to assure that it
> complies with [TABOR], it is therefore necessary that the General
> Assembly provide not only for its expenditures, but also for its
> collection of revenues.  If for any reason its collection of revenues
> should increase beyond the limits set by [TABOR], then the state
> would be required by [TABOR] to refund the surplus to the
> taxpayers.

*Submission of Interrogatories in Senate Bill 93-74*, 852 P.2d 1, 12 (Colo. 1993).  The direct

effect of TABOR's restrictive revenue and spending requirements is to deprive the legislature of

power to make decisions regarding taxes, which are left to the exclusive direction of the voters.

This stripping of legislative power denies the Plaintiffs of their right to a representative

government that is republican in form.

### C.    A Decision Finding TABOR Invalid Would Redress Plaintiffs' Injury.

Invalidation of TABOR would redress Plaintiffs' injury by lifting TABOR's

encumbrances on taxing and spending powers and re-investing the legislature (and subordinate

political subdivisions) with the power to determine the need for additional taxes and to allocate

all state revenue to cover state expenses.  The requirements in subsection 20(4) of TABOR for

elections to enact taxes would be enjoined, as would the spending limits in subsection 20(7).  *See*

Colo. Const. art. X § 20.

Defendant, however, argues that Plaintiffs' claims are conjectural or hypothetical because

Plaintiffs have neither shown nor alleged that the legislature would be more amenable to raising

taxes or spending if TABOR were invalidated.  *See* Motion at 16, n.8.  Once again, Defendant

mischaracterizes Plaintiffs' argument.

Plaintiffs argue that TABOR violates their right to representative government itself. Plaintiffs' claim neither include nor depend on any assumption that, once that right is restored, government will actually exercise the power to tax and spend.  Defendant misses the point of Plaintiffs' arguments when it claims Plaintiffs fail to meet the redressability prong of *Lujan*.  *See id.* at 17-18.  Repeal of TABOR would automatically reinvest the legislature with the power to "defray the estimated expenses of the state government for each fiscal year," as required by Article X, Section 2 of the Colorado Constitution.  *See*  Colo. Const. art. X, § 2.  Plaintiffs seek the restoration of republican governance through this return of *power* to the legislature – not through any actual tax increases.

The foregoing analysis establishes that Plaintiffs fully satisfy the three criteria for standing set out in *Branson School District v. Romer*, 161 F.3d 619, 630 (10th Cir. 1998); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

## III.   PLAINTIFFS HAVE PRESENTED JUSTICIABLE CLAIMS.

### A.   This Court Has the Authority to Adjudicate Plaintiffs' Enabling Act Claim as a Routine Claim that Seeks Redress for Violation of a Federal Statute.

Defendant fails to notice or to address the independent federal statutory basis for the case:  a claim under the Enabling Act.  Jurisdiction of such a claim is clear. 28 U.S.C. § 1331. Thus Defendant also has avoided the absurd assertion that a federal court lacks authority to resolve claims arising from violation of a federal statute.  In this Circuit, it is clear that Enabling Act "law" is controlled by the Tenth Circuit decision in *Branson*.

"The Enabling Act is the paramount law of this state and all constitutional provisions of our fundamental state document must be consistent with it.  In the event of a conflict the constitution must yield to the Enabling Act."  *Colo. Power Co. v. Pub. Utilities Comm'n*, 159

Colo. 262, 298-99, 411 P.2d 785, 804 (1966).   The Enabling Act established the terms under which the Territory of Colorado could be admitted as a new state in the federal Union.   The Enabling Act required, *inter alia*, that Colorado adopt the Constitution of the United States and adopt a state constitution that "shall be republican in form."   *Id.*[7]   *See, also, Lobato v. State of Colorado*, 218 P.3d 358, 368 (Colo. 2009).

Defendant's justiciability argument turns a blind eye to the Enabling Act and relies exclusively on case law dealing with variations on the PQD, starting with *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), and continuing with *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912), and their progeny.   (Plaintiffs address Defendant's PQD argument below.   *See infra* pp. 18-33.)   Yet the Motion to Dismiss must fail unless this Court somehow lacks the authority to rule on Plaintiffs' claim that TABOR violates the Enabling Act.   As Defendant appears to recognize, neither *Luther* nor *Pacific States Telephone* represents controlling law in this case. For that, we must look to *Baker v. Carr,* 369 U.S. 186 (1962); *see infra* pp. 24-33.

Plaintiffs seek redress for a violation of the requirements of this federal statute.   The court has jurisdiction to decide this claim as a federal question under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   28 U.S.C. § 1331.   Plaintiffs also invoke jurisdiction under the All Writs Act, 28 U.S.C. § 1651, and the Declaratory Judgment Act, 28

---

[7]This provision was designed to comply with the requirement of Article IV, Section 4 of the United States Constitution by which "[t]he United State shall guarantee to every State in this Union a Republican Form of Government . . . ."   *See* Colorado Enabling Act, Act of March 3, 1875, 18 Stat. 474, § 4.

U.S.C. § 2201.  *See* Complaint at 10 ¶¶ 50, 55 (citing 28 U.S.C. §§ 1651 & 2201).  Put simply, this case presents a straightforward question of interpretation and enforcement of a federal statute – standard fare for federal courts.

A search of federal cases involving claims under the several states' enabling acts has found no instance in which jurisdiction has ever been denied on the basis of an assertion of nonjusticiability or PQD.  (A listing of the enabling act cases reviewed is submitted herewith as Appendix A.)  These federal enabling act cases cover a wide range of subjects. They involve school trust lands determinations, *see, e.g., Case v. Bowles*, 327 U.S. 92 (1946); *Utah ex rel. Div. of State Lands v. Kleppe,* 586 F.2d 756 (10th Cir. 1978); rights and limitations pertaining to Indian trust lands, *see, e.g., Lassen v. Ariz. ex rel. Ariz. Highway Dep't*, 385 U.S. 458 (1967); *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295 (1976); *Indian Country, U.S.A., Inc. v. State of Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967 (10th Cir. 1987); transfers of jurisdiction from territorial to the new states' federal courts, *see, e.g., Draper v. United States*, 164 U.S. 240 (1896); boundary disputes, *see, e.g., St. Louis v. Rutz*, 138 U.S. 226 (1891), and *Texas v. Louisiana,* 410 U.S. 702 (1973); and a variety of other topics, such as tax liability of transactions on Indian lands, *see Crow Tribe of Indians v. Montana*, 469 F.Supp. 154 (D. Mont. 1979); determining extent of trust lands with mineral deposits, *see Dunbar Lime Co. v. Utah-Idaho Sugar Co.*, 17 F.2d 351 (8th Cir. 1926); and susceptibility of personal income earned on Indian lands to state garnishment, *see Joe v. Marcum*, 621 F.2d 358 (10th Cir. 1980).

In many of these cases, even though the interpretation and enforcement of an enabling act may not have been the principal issue, it necessarily arose in connection with the resolution of the principal issue.  For example, in *Moore v. United States*, 85 F. 465 (8th Cir. 1898) a federal

criminal conviction was invalidated in the wake of Utah statehood and the expiration of the federal criminal jurisdiction over Utah territory.  In *Helvering v. Mountain Producers Corp.,* 303 U.S. 376 (1938), the issue was whether certain transactions were taxable depending on the characterization of the source of income as derived from Indian lands reserved under the terms of Wyoming's statehood act.

In several cases, a state enabling act (or acts) was directly at issue.  For example, several Supreme Court cases determined state boundaries as stated in enabling acts.  *See, e.g.*, *Minnesota v. Wisconsin*, 252 U.S. 273 (1920).  Another category of decisions where enabling acts are front and center involved determination of mineral rights in newly established states.  *See, e.g.*, *United States v. Sweet*, 245 U.S. 563 (1918).

Indeed, the rights and responsibilities granted and imposed by a state enabling act are subject to direct enforcement by the United States on behalf of the intended beneficiaries in the case of school trust lands, *see, e.g., Branson*, 161 F.3d at 626, and of lands set aside for other designated beneficiaries.  *See, e.g., United States v. New Mexico*, 536 F.2d 1324 (10th Cir. 1976) (United States successfully sued to enforce the requirement of the New Mexico enabling act that a grant of lands be used to provide  a hospital for miners).

The federal courts have, without exception, adjudicated cases that require the court to interpret and to enforce the provisions of state enabling acts.  *See* cases cited in appendix A. Procedural challenges to adjudicating enabling act claims have not been raised under Rule 12 (or under procedural requirements that predate the Federal Rules of Civil Procedure) in any of the cases examined.  These authorities teach that Plaintiffs' claim under the Enabling Act presents a

question of statutory interpretation and enforcement that this Court has the authority and the duty to decide. *See Japan Whaling Assn v. American Cetacean Soc'y,* 478 U.S. 221, 230 (1986).

Plaintiffs' Enabling Act claim survives Defendant's Rule 12(b)(1) challenge because it involves nothing more than a federal court's adjudication of a claim arising under a federal statute.

**B.      Defendant's PQD Argument Fails Because Plaintiffs' Claims Raise No Political Questions.**

Defendant asks this court to dismiss Plaintiffs' five-count Complaint because, in Defendant's view, the PQD bars this action.  The heading to section I of Defendant's Motion recites that "[a]ll the claims asserted by Plaintiffs present political questions. . . ." *See* Motion at 5.  Defendant makes no attempt to associate each of Plaintiffs' counts with the PQD, but simply asserts that the PQD bars litigation of any claim predicated on the Guarantee Clause.

Defendant appears to focus its PQD argument on Plaintiffs' first claim, which arises under the Guarantee Clause.  As Plaintiffs demonstrate below, not all Guarantee Clause claims are nonjusticiable due to a mere assertion of "political questions." *See infra* pp. 18-33.  In this case, the challenge to TABOR presents *no* political questions at all.  As noted above, this case does not represent an attack on the initiative and referendum process generally. *See supra* pp. 1-2.  Nor is there anything about this case that seeks to "hold unconstitutional all forms of direct citizen lawmaking." *See* Motion at 2.

**1.      Most of Plaintiffs' Counts Present No Political Questions At All.**

TABOR was a effort on the part of Colorado voters – unique in the nation – to straight-jacket the General Assembly so it could no longer enact tax legislation nor have full authority to fund the operations of the state. *An Analysis of 1992 Ballot Proposals*, Leg. Council of Colo.

Genl. Assembly (1992) pp. 5-9. As a result of the loss of these fiscal powers, the General Assembly is unable to carry out other state constitutional obligations, such as the provision of education and the management of state institutions, as Defendant has directly and unequivocally admitted[8] and as other evidence clearly demonstrates.[9]  No other state in the Union has deprived its legislature of the power to tax.  In so doing, TABOR  deprived the citizens of the state of a fully effective legislative branch and thus of a component of republican governance that is guaranteed by the Guarantee Clause and by the Enabling Act.   This forms the basis for Counts I and II of Plaintiffs' Complaint.  *See* Complaint at 18 ¶¶ 83-84.

---

[8]In a pleading in *Lobato v. State*, District Court, City & County of Denver, No. 05 CV 4794, pending before the District Court in and for the City and County of Denver, the State – obviously not considering the impact on this litigation – made the extraordinary statement that "[w]hatever the meaning of the Education Clause [of the State Constitution] as originally adopted, its reach has been limited by the People's subsequent actions. . . .  This maxim precludes reading the Education Clause in isolation; rather, it must be construed in concert with . . . the TABOR amendment. . . . .  Even if this Court were to find an irreconcilable conflict between these constitutional provisions, TABOR prevails."  *See* Def.'s Mot. for Determination of Questions of Law, filed February 25, 2011, in *Lobato v. State* at 6.  In considering a Rule 12(b)(1) challenge to standing, a court may consider evidence outside the four corners of the Complaint to resolve disputed facts without converting the motion to one for summary judgment.  *See Davis v. United States*, 343 F.3d 1282, 1296  (10th Cir. 2003).  Only when the court must resolve an aspect of a substantive claim to decide the jurisdictional question can a Rule 12(b)(1) motion be converted to one under Rule 12(b)(6) or Rule 56.  *See id.*  At this preliminary stage of the instant case, the Court has not been presented with the parties' arguments on the merits and, therefore, cannot resolve any of Plaintiffs' substantive claims.   In any event, this Court need not adjudicate whether TABOR violates Plaintiffs' rights under the Guarantee Clause or the Enabling Act to determine the threshold issue of whether Plaintiffs may have their day in Court to present such arguments.

[9]*See* Charles S. Brown et al., *Financing Colorado's Future: An Analysis of the Fiscal Sustainability of State Government*,  U. of Denver Center for Colo.'s Economic Future, August 31, 2011, *available at*  http://www.du.edu/economicfuture/Phase2Summary.pdf.

Count III of Plaintiffs' Complaint alleges that the violations of *both* the Guarantee Clause and the Enabling Act implicate the Supremacy Clause of the United States Constitution. *See* Complaint at 18 ¶ 85 (citing U.S. Const. art. VI, § 2). "When there is an unavoidable conflict between the Federal and State Constitution, the Supremacy Clause of course controls." *Reynolds*, 377 U.S. at 585. Whether viewed in light of Plaintiffs' Count I (Republican Form of Government), Count II (Enabling Act), Count IV (Equal Protection), or Count V (violation of the Colorado Constitution), the obligations of the Supremacy Clause must prevail.

In Count IV of the Complaint, Plaintiffs allege that their individual rights to the benefits of republican government as expressed through a functioning legislature have been compromised in violation of the equal protection provision of Amendment XIV to the Constitution and that they have, thereby, been deprived of the equal protection of the laws. *See* Complaint at 19 ¶¶ 86-87; *infra* pp. 33-36 (discussing equal protection in the context of Defendant's PQD argument).

Count V of the Complaint asks this Court to find that TABOR violates the express and paramount constitutional undertaking of the People of the State of Colorado to create and to maintain a Republican Form of Government, including a viable legislative branch, and that this undertaking and other obligations of the legislature (especially to fund education) render TABOR unconstitutional as a matter of state law. *See* Complaint at 19-20 ¶¶ 88-93. This count calls upon this Court to address TABOR in terms of the Constitution of the State of Colorado, and to determine whether the primacy of terms within the Colorado Constitution and their derivation from the Federal Constitution and the Enabling Act invalidate TABOR. *See id.*

A number of cases addressing the PQD have also involved Guarantee Clause questions, most notably *Baker v. Carr*, 369 U.S. 186, 217-29 (1962). The six *Baker* tests, upon which most

courts and both parties here rely, *see* Motion at 7, does not require dismissal of this action under the PQD because none of the six tests that would bar consideration of this case is applicable. *See infra* pp. 24-33.

While the authority of the courts to address arguments that litigation under the Guarantee Clause is precluded by the PQD has infrequently been the subject of Federal court litigation in recent decades, it has far more frequently reached the state courts.[10]  For the most part, the state supreme courts have had little difficulty sorting through political questions and those questions of foundational importance in the maintenance of constitutional governance.  Our own Colorado Supreme Court, in overturning a state constitutional amendment, provided a very pointed observation on this point:

> The framework of our republican form of government is created by the Guarantee Clause of Article IV, Section 4.  It is the Guarantee Clause that assures the role of elected representatives in our system.  A republican form of government is one in which the "supreme power rests in all citizens entitled to vote *and is exercised by representatives elected, directly or indirectly, by them and responsible to them.*" (quoting *Webster's New World Dictionary* 1207 (2d College ed. 1986). The power delegated to the elected representatives is the hallmark of a republic.

*Morrissey v. State,* 951 P.2d 911, 916-17 (Colo. 1998) (emphasis added). The Colorado Supreme Court has provided the most cogent treatment of the *Baker* tests in *Lobato v. State of Colorado*, 218 P.3d 358, 368-70 (2009).

---

[10]Three representative such decisions are: *In re Initiative Petition No. 348, State Question No. 640*, 820 P.2d 772 (Okla. 1992); *Vansickle v. Shanahan*, 511 P.2d 223 (Kan. 1973); and *Kadderly v. City of Portland,* 72 P. 710 (Or. 1903).

**2.      The PQD Does Not Apply to Consideration of this Case Under the Enabling Act.**

Separately, Plaintiffs allege in Count II that TABOR violates the state's Enabling Act's obligation to establish and to maintain a Republican Form of Government and, necessarily, an effective legislature.  *See* Complaint at 18 ¶ 84. As discussed above, *see supra* pp. 13-16, Plaintiffs have not found a single enabling act case in which the court raised the PQD.  The reason is obvious: the presentation of questions regarding a state's compliance with its enabling act can, in no measure, be swept away on the assumption that such issue is "political," as explained below.

Plaintiffs' challenge to TABOR unquestionably concerns a right with a political dimension – a right embedded in the Enabling Act to republican governance through an effective legislative branch.   But protection of a "political right," and the presence of a "political question," as the *Baker* Court defined the term, *see Baker*, 369 U.S. at 209-17, are different matters. The *Baker* Court stated:  "Of course the mere fact that the suit seeks protection of a political right does not mean it presents a political question.  Such an objection 'is little more than a play upon words.'"  *Id.* at 209 (quoting *Nixon v. Herndon*, 273 U.S. 536, 539 (1927)). The *Baker* court repeated the admonition:  "The doctrine of which we treat is one of 'political questions' not one of 'political cases.'   The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.* at 217.

Defendant's entire Enabling Act argument is found in but two footnotes, in which Defendant tries to deflect this Court's authority to find a violation of that Act by invoking the PQD.  *See* Motion at 2 n.1, at 6 n.4.   The first footnote recites (inaccurately) that Count II of the

Substitute Complaint argues "that by accepting the obligations under its Enabling Act, the State of Colorado and its citizens were obligated to maintain a 'republican form of government' exclusively and without any direct democracy component." *See id.* at 2 n.1.  Count II says nothing of the sort; there is no suggestion of "exclusivity" or the proscription of "any direct democracy component. . . ." *See* Complaint at 18 ¶ 84.  Indeed, the count focuses narrowly on the means by which TABOR violated the Enabling Act by depriving the Plaintiffs of an "effective legislature . . . by removing an essential function, namely the power to tax." *See id.* at 18 ¶ 84.

The second footnote, which appears to constitute the entirety of the Defendant's argument that the PQD somehow precludes consideration of the Enabling Act, contains a serious and gating inaccuracy.  The footnote claims that the *Pacific States Telephone* decision dismissed "the enabling act claim as a nonjusticiable political question because it rests 'upon the theory that the adoption of the initiative and referendum destroyed all government republican in form.'" *See* Motion at 6 n. 4 (quoting *Pacific States Telephone* 223 U.S. at 141).

This statement in footnote 4 is false.  While Oregon Supreme Court raised the Oregon enabling act in *Pacific States Telephone*, the United States Supreme Court did not consider the state's enabling act.  Although a reference to the Oregon enabling act appears in a marginal note prepared by Chief Justice White, *see Pacific States Telephone*,  223 U.S. at 137-39, there is no reference to the Oregon enabling act in the decision itself. Significantly, the quotation from that case appearing in the footnote 4 of the Motion has nothing to do with the Oregon enabling act. *See Pacific States Telephone*, 223 U.S. at 141. By no reasonable construction did the Supreme Court's decision in *Pacific States Telephone* rely upon the Oregon enabling act, and the Court

surely did not draw any connection between a state's enabling act and the PQD.  Defendant's reliance on *Pacific States Telephone* once again demonstrates the Defendant attacks a case that Plaintiffs did not file – an imagined challenge to the initiative process, rather than Plaintiffs' surgical strike against TABOR.

Instead of relying on Defendant's misstatements regarding *Pacific States Telephone* , this Court should look for guidance to the Tenth Circuit's decision in *Branson*, 161 F.3rd 619, which Defendant never mentions even though *Branson* is the seminal standing case in this Circuit. *Branson* treated the standing of both individual plaintiffs and municipal plaintiffs so as to implicate interpretation of the Enabling Act.  *See id.* at 627-31.  Having found that both sets of plaintiffs (municipal and *individual*) had standing, the *Branson* court then addressed the question, substantially the same as that presented here:  Did an amendment to the Colorado Constitution violate an undertaking in the Enabling Act?  *See id.* at 633-43.  PQD is not mentioned anywhere in *Branson*.

3.     **Plaintiffs' Invocation of the Guarantee Clause Is Not Barred by Any of the Six *Baker* Tests.**

Defendant justifiably devotes some substantial energy to *Baker*, which is unquestionably the beginning point for consideration of whether the PQD will bar a court's consideration of counts predicated on the Guarantee Clause.  *See* Motion at 6-11.  The Guarantee Clause was a major, but not the sole, basis for the *Baker* decision, *see Baker*, 369 U.S. at 217-19, and is a key issue in this litigation.  *See* Complaint at 3 ¶ 4; 10 ¶ 50; 11 ¶ 57; 12 ¶ 61; 15 ¶ 72; 18 ¶ 83; 20 ¶ 93.  Defendant correctly quotes the six-part test by which the *Baker* Court assessed whether the PQD would constitute a bar to examination of the merits.  *See Baker*, 369 U.S. at 217.

What Defendant did not bring to this Court's attention was the admonition of the *Baker*

Court that immediately followed:

> Unless one of these [six] formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.  The doctrine of which we treat is one of 'political questions,' not of 'political cases.'  The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority.  The cases we have reviewed show the necessity for *discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.*

*Id.* (emphasis supplied).

After reviewing many of the cases in which claims of violation of the Guarantee Clause

had been rejected *because they embedded political questions*, the Court stated further:

> Finally, we emphasize that it is the involvement in the Guarantee Clause claims of elements thought to define 'political questions,' and no other feature, which could render them nonjusticiable. Specifically, we have said that *such claims are not held nonjusticiable because they touch on matters of state government organization.*

*Id.* at 228-29 (emphasis supplied).[11]

In so defining the PQD,  *Baker* cannot fairly preclude any and all cases predicated on

violations of the Guarantee Clause.  Just two years after *Baker*, the Supreme Court, addressed the

reach and meaning of *Baker*:  "As we stated in *Baker v. Carr*, *some* questions raised under the

Guarantee Clause are nonjusticiable, *where 'political' in nature and where there is a clear*

---

[11]As the First Circuit noted in *Largess*, only twice in the forty years between 1963 and 2003 has the Supreme Court considered PQD at all, *see Largess 37*3 F.3d at 224-25 n.6. The Supreme Court has more recently refused again to entertain the subject.  *See Spectrum Stores v. Citgo Petroleum Corp*., 632 F.3d 938, 948-54 (5th Cir. 2011), cert. denied__ U.S. __ (Oct. 3, 2011).

*absence of judicially manageable standards.*" *Reynolds v. Sims*, 377 U.S. 533, 582 (1964) (emphasis supplied).

Again, in 1992, the Supreme Court addressed the question of whether violations of the Guarantee Clause were justiciable or were barred by the PQD. In *New York v. United States*, 505 U.S. 144 (1968), the Court removed the notion that the PQD precludes all redress of Guarantee Clause claims, circumscribing prior decisions, including *Luther* and *Pacific States Telephone,* on which Defendant relies so heavily:

> We approach the issue with some trepidation, because the Guarantee Clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the "political question" doctrine. . . .

> The view that the Guarantee Clause implicates only non justiciable political questions has its origin in *Luther v. Borden*, 7 How. 1 (1849), in which the Court was asked to decide, in the wake of Dorr's Rebellion, which of two rival governments was the legitimate government of Rhode Island. The Court held that "it rests with Congress," not the judiciary, "to decide what government is the established on in a State." . . . Over the following century, this limited holding metamorphosed into the sweeping assertion that "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts." . . . .

> This view has not always been accepted. In a group of cases decided before the holding of *Luther* was elevated into a general rule of nonjusticiability, the Court addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable. . . .

> More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticable political questions. *See Reynolds v. Sims,* 377 U.S. 533, 582 (1964) ("[S]ome questions raised under the Guarantee Clause are nonjusticiable"). Contemporary commentators have likewise

suggested that courts should address the merits of such claims, at least in some circumstances. *See, e.g., L. Tribe, American Constitutional Law* 398 (2d ed. 1988); J. Ely, Democracy and Distrust: A Theory of Judicial review 118, n., and 122-123 (1980); W. Wiecek, The Guarantee Clause of the U.S. Constitution 287-289, 300 (1972); Merritt, 88 Colum. L. Rev., at 70-78; Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn. L. Rev. 513, 560-565 (1962).

*Id.* at 184-5.

Further, contrary to the assertions and implications Defendant draws from *Largess, see* Motion at 17 (citing *Largess*, 373 F.3d at 225 n.5), the court in *Largess* found standing to consider issues raised under the Guarantee Clause and under circumstances significantly paralleling the instant case.  There, the complaint was that the state court was intruding upon the province of the legislature and thereby compromising the legislative function in violation of the Guarantee Clause.  *See Largess*, 373 F.3d at 222-23.

While the *Largess* court found against the plaintiffs *on the merits*, it had no trouble rejecting the notion, based on *Luther*, that Guarantee Clause claims are never justiciable because of the PQD.  *See id.* at 225 (citing *Luther*, 48 U.S. at 42).  Rather, the court easily dealt with both standing and the justiciability of Guarantee Clause cases, noting its authority on appropriate, albeit limited facts, to determine the case on its merits.  *See id.* at 225-26.  Having found that the plaintiffs had standing, *see id.* at 224-25, the First Circuit then addressed the defendant state's objection that "Guarantee Clause claims are *always* non-justiciable under the political question doctrine and related case law."  *See id.* at 225.  The Circuit pointed out that the Supreme Court, in the forty years preceding 2003, "had found a case non-justiciable on the basis of the PQD only twice, and it has explicitly rejected the doctrine in a number of cases."  *See id.* at 225 n.6.

*Baker* establishes that *any* Guarantee Clause case must be examined on its facts to determine whether any of the six "formulations is inextricable from the case at bar . . . ." *See Baker*, 369 U.S. at 217.  Where no such finding can be made, "there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.*  The *Baker* Court noted that the political question doctrine "is one of political questions, not one of 'political cases.'" *See id*. The admonition is especially appropriate here.

Virtually all of the Guarantee Clause cases involved contests *between* the established branches of the government, generally between those of the federal government, but occasionally also between branches of state governments. This was certainly true, for example, in *Largess*. *See Largess*, 373 F.3d at 219, 222-23.   The instant case presents no such questions.

Here, the dispute is *not* between two of the branches of the Colorado government; it is between the voters, one group expressing a determination to limit the constitutional powers of their own legislature (even though such powers are prescribed in the Colorado founding constitution and approved by the federal government pursuant to the Enabling Act) and another group (the Plaintiffs here) insisting that the Republican Form of Government be maintained. While citizen voters create governments, under a Republican Form of Government they are not at liberty to liquidate any branch of that government any more than they are at liberty to liquidate their government entirely. By the well-accepted institutions of initiative and referendum, they may make many modifications to the balances of powers among the three branches of government, but they do not have the power to eliminate any one of those branches.  We are bound by our Federal Constitution, and we Coloradoans are also bound by our own Constitution, to maintain a government of three branches, consistent with our contract and promise in our

Enabling Act, to ensure that each branch remains viable to carry on the work that is foundational to governance.

In determining whether it may hear *this* Guarantee Clause case, this court must examine each of the six *Baker* tests.  *See, e.g., Lane v Halliburton*, 529 F.3d 548, 557-64 (5th Cir. 2008). Much recent comment has been made regarding the overlapping nature of the six tests and the resulting confusion in their administration.  *See, e.g., Al-Aulaqi v. Obama*, No. 10-1469, 2010 WL 4941958, at *35 (D.D.C.  2011); *see also Lobato,* 218 P.3d at 369.

> a.   The First *Baker* Test:  This Case Does Not Require Resolution of a Question Committed by the Text of the Constitution to a Coordinate Branch of Government.

Defendant has not even addressed whether, under the first *Baker* test, this Court would have to resolve a question committed by the *text of the Constitution* to a coordinate branch of government to adjudicate Plaintiffs' claims.  *See Baker* 369 U.S. at 218.  The question presented in this case is whether the citizens of the state can render their own legislative branch incapable of meeting its constitutional obligations that are predicated on its power to tax and appropriate. There is no suggestion anywhere in the Motion that such a question has been committed to another branch of government, whether by reference to the text of the Constitution of the United States or the Constitution of the State of Colorado.

> b.   The Second *Baker* Test:  Plaintiffs' Claims Involve Judicially Discoverable and Manageable Standards.

The second *Baker* test is "judicially discoverable and manageable standards," *see id.* In this context, the substantive question is whether TABOR has so far compromised the General Assembly that it cannot fulfill its basic legislative role because it cannot tax.  Surely this question is well within this Court's expertise, even if it may necessitate the taking of evidence.  In this

regard, it is noteworthy that a comparable set of questions has been the subject of a trial before a

Colorado state court in *Lobato v. State*, District Court, City & County of Denver, No. 05 CV

4794. *See supra* p. 19 n.8.

> c.     The Third *Baker* Test:  This Matter Does Not Involve an Initial
> Policy Determination Clearly for Nonjudicial Discretion.

The third *Baker* test asks if the case involves "an initial policy determination of a kind

clearly for nonjudicial discretion. . . . ."  *See Baker* at 217.  Defendant transmogrifies this test

into the question of whether "direct democracy is unconstitutional."  *See* Motion at 8.  This

attempt to reframe the entire case seeps through all of Defendant's arguments but no such claim

is any part of this litigation.  Plaintiffs are entitled to pursue their theory of the case, not the

Defendant's distorted interpretation of Plaintiffs' claims.

The instant case requires no "policy determination" of any kind.  It presents a crucial

question of whether the State of Colorado continues to have an adequately functioning

legislature when that legislature cannot tax and cannot fulfill the other constitutionally mandated

objectives that are dependent on the ability to tax.  No policy determination needs to intrude on

this plainly mixed question of law and fact.

The term "policy determination" has had a singular meaning since first enunciated by the

Baker court: it refers to "policies" enunciated by another branch of government; it has that, and

only that, meaning.  That factor can have no application where, as here, there are no "policy"

determinations at issue, at all; no "branch" of the Colorado government has had any involvement

in the creation of TABOR. *See Baker*, 369 U.S. at 226.

To suggest that demolishing a state's legislative branch is a matter to be left to the

discretion of the state's voters casts aside the very principles established in *Baker*, *Reynolds*, and

*Lucas*. No number or majority of Colorado voters have license to disable their own legislative branch.

As noted above, this case does not challenge the ability of Colorado citizens to use the process of initiative (or referendum) to enact laws and amendments to the state Constitution, and many other changes that might rebalance the three branches of state government. *See supra* pp. 1-2.

> d.    The Fourth *Baker* Test:  Adjudication of Plaintiff's Claims Would Not Demonstrate a Lack of Respect Due Coordinate Branches of Government.

The fourth *Baker* test, "lack of respect due coordinate branches of government," is a test like the third designed for those cases in which the challenged actor is one of the three branches of government. *See Baker*, 369 U.S. at 217.  In this case, Defendant apparently realizes that the voters of the State of Colorado are not a "branch" of state government. Defendant's discussion of this test has nothing to do with any "branch" of the Colorado government. *See* Motion at 9. Rather, it simply retreats again to a protection of "direct democracy."

> e.    The Fifth *Baker* Test:  This Litigation Does Not Implicate an Unusual Need for Unquestioning Adherence to a Prior Political Decision.

This test requires the court to consider whether the case implicates an " unusual need for unquestioning adherence to a political decision already made. . . ." *Baker,* 396 U.S. at 217. Defendant's argument on this test says absolutely nothing about TABOR. *See* Motion at 10. Instead, Defendant launches into another irrelevant tirade about the sanctity of the initiative process. *See id.*

This fifth Baker test is simply inapposite.  It is quite plain, even from the PQD cases cited by Defendant, that this test is directed to decisions made by other branches of government.  *See Baker,* 396 U.S. at 211-12.  Second, Defendant neither offers not conceives of any "unusual need" for the Court to refrain from questioning the constitutionality of TABOR.  While enactment of TABOR may have been a "political decision," it was not one made by a coordinate branch of government (sensibility about which is the intended objective of this test).

> f.      The Sixth Test:  Resolution of Plaintiffs' Claims Does Not Create Any Potentiality of Embarrassment from Multifarious Pronouncements by Various Departments on One Question.

This part of the test concerns the "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *See Baker*, 369 U.S. at 217.  The test's wording itself shows that it has no application to this case or to TABOR.  Defendant appears to have realized this conclusion, as Defendant starts by addressing "the views of various state and federal departments. . . ." *See* Motion at 10.  Defendant presents another lecture on the importance – nationally – of "citizen-initiated or approved laws" and ends by citing several court decisions none of which considered the constitutionality of TABOR but, rather, were limited to assessing some specific application or impact of TABOR.  *See id* at 10-11.  *Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1403 (10th Cir. 1992), cited last, had nothing to do with TABOR but, as Defendant concedes, was addressed to the legislative process in general.  *See id.*

The fourth through sixth Baker tests address the relationship of the court to the political branches of the government, and nothing else.  TABOR does not involve decisions made by a "coordinate branch of government" or a "political decision already made," presumably by a coordinate and political branch of government, or a "multifarious pronouncement," by which this

court might derogate the work of another branch of government.  Nothing in these last three Baker tests has anything to do with the "decision" made in enacting TABOR, a decision by the voters of Colorado not by any of the three branches of government.

Plaintiffs have demonstrated that none of the Baker tests apply to prevent considering a challenge to TABOR under the Guarantee Clause and its requirement for a Republican Form of Government.  With the six tests satisfied, there is no political question to keep this court from addressing these critical constitutional issues.

## IV.    A MAJORITY'S ATTEMPT TO USE THE INITIATIVE TO IMPOSE AN UNCONSTITUTIONAL MEASURE ON THE PEOPLE VIOLATES THE EQUAL PROTECTION CLAUSE.

The United States Supreme Court has not hesitated to strike down, under the Equal Protection Clause, a majority's efforts to impose an unconstitutional law on a state's entire population.  Common to the three United States Supreme Court decisions that benchmark this case, *Baker*, 369 U.S. 186, *Reynolds*, 377 U.S. 533, and *Lucas*, 377 U.S. 713, is the Court's reliance on an equal protection analysis to redress the harm resulting when a legislature or a voting majority rigs legislative boundaries at the cost of minority rights.  *See Baker,* 369 U.S. at 228-30; *Reynolds*, 377 U.S. at 565-66, 577; *Lucas*, 377 U.S. at 734-37.

Under both standing and substantive elements of jurisdiction, the federal courts have seen fit to reach into state governance to consider whether elected officials or voters have unconstitutionally remade their legislatures.  *Baker*, *Reynolds*, and *Lucas* stand for the proposition that the federal courts may indeed address the constitutionality of efforts to remake a state legislature and, upon complaint from a minority under precepts of equal protection, protect those minority interests:

> A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be. We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause . . . .

*Lucas*, 377 U.S. at 736; *see Baker*, 369 U.S. at 228-30; *Reynolds*, 377 U.S. at 565-66. *Lucas* is particularly critical because it involved adoption of an initiated amendment to the Colorado Constitution that, like TABOR, violated more fundamental constitutional rights.

This case so closely parallels *Lucas* that it must be decided on the same terms. For this court to allow state voters to compromise the fundamental operations of their own legislature would pull the constitutional rug out from under *Baker*, *Reynolds*, and *Lucas* by enabling the electorate to do precisely what those three decisions prohibited: manipulate their legislatures to promote the interests of particular groups. By so significantly limiting the authority of the state legislatures – or indeed by abolishing them entirely (a right absurdly suggested by the Defendant's *amicus*) – the Republican Form of Government would be made subject to the very kinds of intrusions that those three decisions precluded.

Even though the *Baker*, *Reynolds*, and *Lucas* cases presented the Supreme Court with important issues of equal protection rights, this case is of far greater significance. While the apportionments in *Baker* and *Reynolds* were accomplished by the state legislature, in *Lucas*, the unconstitutional apportionment had been effectuated through the same initiative process by which TABOR was adopted. The Supreme Court reversed a three-judge panel's willingness to allow the voting majority to impose an inequitable apportionment plan on the entire state. That panel had expressed disdain for the suggestion that it could override the will of the majority:

34

> The actions of the electorate are material to the application of the criteria.  The contention that the voters have discriminated against themselves appalls rather than convinces.  Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary.

*Lisco v. Love*, 219 F. Supp. 922, 932 (D. Colo. 1963) (three-judge panel), *rev'd sub nom. Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713 (1964).  The Supreme Court rejected the panel's willingness to uphold the action of the majority in the face of constitutional infirmity.  *See Lucas*, 377 U.S. at 736-37.  Applying the Equal Protection Clause, the *Lucas* Court held that the minority was entitled to the protections of strict population ratios in structuring the Colorado House of Representatives, *see id.* at 734-37, as the Court had articulated in *Reynolds*, decided the same day.  *See Reynolds*, 377 U.S. at 568-81.

Just as with the unconstitutional reapportionment plan stricken in *Lucas*, this case concerns a minority's attempt to vindicate rights lost through the will of the majority.  The constitutional principle at stake here is, if anything, far more fundamental than the right to strict population ratios adjudicated in *Lucas*.  Plaintiffs have an equal protection right  to constitutional governance, even against the will of a majority that would arrogate to itself the opportunity to manipulate the finances of the state and thereby avoid the constitutionally prescribed filter of a legislature.  The presence of a functional legislature is critical to preclude the "mass behavior" that *Lucas* emphatically struck down.

Plaintiffs, be they a minority of the population and voters within the state, are constitutionally entitled to an effective, well-functioning legislature.  The Equal Protection

Clause is a constitutional barrier to a majority's attempt to so restructure the General Assembly as to place in its own hands the critical functioning of the state legislature.

## V. TABOR VIOLATES ORIGINAL AND CONTROLLING PROVISIONS OF COLORADO CONSTITUTION THAT EMPOWER THE GENERAL ASSEMBLY TO FULFILL ITS ESSENTIAL DUTIES.

For the same reasons that Plaintiffs have standing to challenge TABOR under the Guarantee Clause and the Enabling Act, *see supra* pp. 7-14, Plaintiffs have the right to prosecute their claim arising under the Colorado Constitution. *See* Complaint at 19-20 ¶¶ 88-93. This Court has authority under 28 U.S.C. § 1367, Supplemental Jurisdiction, to adjudicate claims alleging a violation of the Colorado Constitution. Defendant attacks Plaintiffs' Colorado Constitution claim by again trotting out *Pacific States Telephone* and alleging once more that Plaintiffs' claim involves nonjusticiable political questions. *See* Motion at 21-22. Plaintiffs have explained above why such arguments fail. *See supra* pp. 14-33.

Defendant further shadowboxes with its imaginary foe by arguing that Plaintiff's claim under the Colorado Constitution runs afoul of the Colorado Supreme Court's cases upholding the right of initiative and referendum. *See* Motion at 22. Once again, this case has nothing to do with the legitimacy of either right, but, instead, focuses exclusively on TABOR's unique attack on the legislative system of government.

Defendant undoubtedly seeks to avoid defending TABOR on the merits after the State conceded in the *Lobato* litigation that TABOR precludes the General Assembly from fulfilling its mandate to provide adequate funding for public education – echoing Plaintiffs' argument that TABOR has unconstitutionally stripped the legislature of core powers. At the same time that Defendant, through the office of the Colorado Attorney General, seeks to bar Plaintiffs from

challenging TABOR, the Colorado General Assembly, through the office of the Colorado Attorney General, has acknowledged that TABOR trumps the General Assembly's obligation to provide "a thorough and uniform system of free public schools throughout the state . . . ."  *See* Defs' Mot. for Determination of Questions of Law Pursuant to C.R.C.P. 56(h), at 6, filed Feb. 25, 2011, in *Lobato*¸ No. 05 CV 4794.  Answering this assertion, the *Lobato* plaintiffs responded, "[i]f, as  Defendants [the General Assembly] suggest, one of these provisions must be violated, it must be the general provision and not the specific substantive right provision necessary for statehood."  *See* Pls.' Resp. to Defs.' Rule 56(h) Mot. (the "Lobato Response"), at 26, filed May 16, 2011, in *Lobato*.

The parties in *Lobato* have focused with remarkable precision on the identical issue underlying Plaintiffs' Count V.  That Count seeks to determine that, within the obligations of the State's own Constitution undertaken pursuant to the Enabling Act, priority must necessarily be given to the obligations of the General Assembly to fulfill the core functions of a legislative branch.  *See* Complaint at 19-20 ¶¶ 88-93.  Those functions were established by the Colorado Constitution in 1876; those very function at issue in *Lobato* were guaranteed by the state under the Enabling Act.  *See* Lobato Response at 23-26.

By conceding that TABOR precludes the General Assembly from exercising fundamental duties under the Education Clause of the Colorado Constitution, Colo. Const. art. IV, § 2, the General Assembly proves Plaintiffs' case.  The General Assembly's admission logically results in the same argument that Plaintiffs advance here – that TABOR prevents the General Assembly from exercising its constitutionally-mandated authority over taxation and appropriation. Plaintiffs have the right to present this claim in a court of law.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that this Court deny the Motion in its entirety.

Respectfully submitted this 11th day of October, 2011.

Respectfully submitted,
/s/ Lino S. Lipinsky de Orlov
Lino S. Lipinsky de Orlov
Herbert Lawrence Fenster
David E. Skaggs

MCKENNA LONG & ALDRIDGE LLP
1400 Wewatta Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
E-mail:hfenster@mckennalong.com
        llipinsky@mckennalong.com
        dskaggs@mckennalong.com

/s/ Michael F. Feeley
Michael F. Feeley
John A. Herrick
Emily L. Droll

BROWNSTEIN HYATT FARBER SCHRECK LLP
410 17th Street, Suite 2200
Denver, CO  80202-4437
Telephone:  (303) 223-1100
Facsmile:  (303) 223-1111
E-mail:mfeeley@bhfs.com
        jherrick@bhfs.com
        edroll@bhfs.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of October, 2011, a true and correct copy of the foregoing **PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS** was electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following:

Daniel Domenico, Esq.
Colorado Solicitor General
dan.domenico@state.co.us

Bernie Buescher**,** Esq.
Colorado Deputy Attorney General
bernie.buescher@state.co.us

Maurice Knaizer, Esq.
Colorado Assistant Deputy Attorney General
maurie.knaizer@state.co.us

Megan Paris Rundlet
Colorado Assistant Attorney General
megan.rundlet@state.co.us


David B. Kopel
Independence Institute *Amicus Curiae*
david@i2i.org


                                        /s/*David E. Skaggs*
                                          David E. Skaggs, Attorney for Plaintiffs

*APPENDIX A*

*Note:* In the following cases, an interpretation or enforcement of provisions of state "enabling acts" (or their equivalents before that term became standard in the mid-19[th] century) is, taken together, sufficient to support the general proposition that courts have viewed enabling act issues as standard matters for statutory interpretation and enforcement. There are many other cases in which enabling acts have been addressed more tangentially or incidentally. (Counsel for plaintiffs acknowledge that the dividing line between case significance, or not, is a matter of judgment.) In this effort to "prove a negative," i.e., that enabling act interpretation and enforcement has not been viewed as raising questions of justiciability, these cases are encompassing and probative, especially in the absence of any enabling act case that turns on justiciability. They are all quite ordinary and unremarkable as decisions dealing with statutes, which is the point.

*Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295 (1976)
*Alonzo v. United States*, 249 F.2d 189 (10th Cir. 1957)
*Anchor Oil Co. v. Gray*, 256 U.S. 519 (1921)
*Anderson v. Gladden*, 188 F. Supp. 666 (D. Or. 1960)
*Andrus v. Utah*, 446 U.S. 500 (1980)
*Arizona v. Manypenny*, 445 F. Supp. 1123 (D. Ariz. 1977)
*Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545 (1983)
*Arkansas v. Tennessee*, 246 U.S. 158 (1918)
*ASARCO Inc. v. Kadish,* 490 U.S. 605 (1989)
*Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288 (1936)
*Bartkus v. People of State of Ill.,* 359 U.S. 121 (1959)
*Beecher v. Wetherby,* 95 U.S. 517 (1877)
*Begay v. Kerr-McGee Corp.,* 499 F. Supp. 1317, (D. Ariz. 1980)
*Billingsley v. United States,* 178 F. 653 (8th Cir.1910)
*Bd. of Commissioners of Creek County v. Seber*, 130 F.2d 663 (10th Cir. 1942)
*Bd. of County Commissioners of Sweetwater County v. Geringer,* 297 F.3d 1108 (10th Cir. 2002)
*Bolln v. Nebraska,* 176 U.S. 83, 20 S. Ct. 287, 44 L. Ed. 382 (1900)
*Boyd v. Nebraska,* 143 U.S. 135 (1892)
*Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998)
*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007)

*Bryan County, Oklahoma v. United States,* 123 F.2d 782 (10th Cir. 1941)

*Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393 (1932)

*Case v. Bowles,* 327 U.S. 92 (1946)

*Cherokee Nation or Tribe of Indians v. Oklahoma,* 402 F.2d 739, (10th Cir.1968)

*Cherokee Nation v. Oklahoma,* 461 F.2d 674 (10th Cir. 1972)

*City of St. Louis v. Rutz*, 138 U.S. 226 (1891)

*Confederated Salish & Kootenai Tribes of Flathead Reservation, Montana v. Moe, In & For Missoula County, Montana*, 392 F. Supp. 1297 (D. Mont. 1974)

*Coyle v. Smith*, 221 U.S. 559 (1911)

*Crow Tribe of Indians v. Montana*, 469 F. Supp. 154, (D. Mont. 1979)

*Dist. 22 United Mine Workers of Am. v. Utah*, 229 F.3d 982 (10th Cir. 2000)

*Draper v. United States*, 164 U.S. 240 (1896)

*Dunbar Lime Co. v. Utah-Idaho Sugar Co.,* 17 F.2d 351 (8th Cir. 1926)

*Ervien v. U S*, 251 U.S. 41 (1919)

*Ex parte Webb*, 225 U.S. 663 (1912)

*Glaspell v. N. Pac. R. Co.,* 144 U.S. 211 (1892)

*Harris v. Bell*, 250 F. 209 (8th Cir. 1918)

*Helvering v. Mountain Producers Corp.*, 303 U.S. 376 (1938)

*Hendrix v. United States*, 219 U.S. 79 (1911)

*Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U.S. 634 (1876)

*Illinois v. Kentucky*, 500 U.S. 380 (1991)

*Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Tax Comm'n*, 829 F.2d 967 (10th Cir. 1987)

*Iowa v. Illinois*, 147 U.S. 1 (1893)

*Jackson v. Harris*, 43 F.2d 513 (10th Cir. 1930)

*Jefferson v. Fink*, 247 U.S. 288 (1918)

*Jicarilla Apache Tribe v. United States*, 601 F.2d 1116 (10th Cir. 1979)

*Joe v. Marcum*, 621 F.2d 358 (10th Cir. 1980)

*Johnson v. Gearlds,* 234 U.S. 422 (1914)

*Joines v. Patterson*, 274 U.S. 544 (1927)

*Joplin Mercantile Co. v. United States*, 236 U.S. 531 (1915)

*Lassen v. Arizona ex rel. Highway Dept.,* 385 U.S. 458 (1967)

*Martinez v. S. Ute Tribe of S. Ute Reservation*, 249 F.2d 915, 916 (10th Cir. 1957)

*McCabe v. Atchison, T. & S.F. Ry. Co.,* 186 F. 966, (8th Cir. 1911)

*McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973)

*McCurdy v. United States*, 264 U.S. 484 (1924)

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973)

*Mescalero Apache Tribe v. O'Cheskey*, 625 F.2d 967 (10th Cir. 1980)

*Meyers By & Through Meyers v. Bd. of Educ. of San Juan Sch. Dist.*, 905 F. Supp. 1544 (D. Utah 1995)

*Michigan v. Wisconsin*, 270 U.S. 295 (1926)

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999)

*Minnesota v. Wisconsin*, 252 U.S. 273 (1920)

*Montana v. Rice,* 204 U.S. 291 (1907)

*Montello Salt Co. v. Utah*, 221 U.S. 452 (1911)

*Moore v. United States*, 85 F. 465 (8th Cir. 1898)

*Morton v. Nebraska*, 88 U.S. 660,  22 L. Ed. 639 (1874)

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237 (1985)

*New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976)

*New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185 (D.N.M. 2004)

*New York ex rel. Ray v. Martin*, 326 U.S. 496 (1946)

*Norton v. Whiteside*, 239 U.S. 144 (1915)

*Ohio v. Kentucky*, 410 U.S. 641 (1973)

*Oklahoma Tax Comm'n v. United States*, 319 U.S. 598 (1943)

*Oklahoma v. Atchison, T. & S. F. R. Co.*, 220 U.S. 277 (1911)

*Organized Vill. of Kake v. Egan*, 369 U.S. 60 (1962)

*Osage Nation v. Irby, 597 F.3d 1117* (10th Cir. 2010)

*Phillips v. United States,* 201 F. 259 (8th Cir. 1912)

*Pickett v. United States*, 216 U.S. 456 (1910)

*Potter v. Murray City*, 760 F.2d 1065 (10th Cir. 1985)

*Price v. Magnolia Petroleum Co.*, 267 U.S. 415 (1925)

*Priddy v. Thompson*, 204 F. 955 (8th Cir. 1913)

*Richardson v. Malone*, 762 F. Supp. 1463 (N.D. Okla. 1991)

*Seneca-Cayuga Tribe of Oklahoma v. Oklahoma ex rel. Thompson,* 874 F.2d 709 (10th Cir. 1989)

*Silver v. Babbitt*, 166 F.R.D. 418, 430 (D. Ariz. 1994)

*Sperry Oil & Gas Co. v. Chisholm*, 264 U.S. 488 (1924)

*Sur. Co. v. Oklahoma*, 241 U.S. 582 (1916)

*St. Anthony Falls Water-Power Co. v. Bd. of Water Com'rs of City of St. Paul, Minn.*, 168 U.S. 349 (1897)

*Stearns v. Minnesota*, 179 U.S. 223 (1900)

*Stevens v. United States*, 146 F.2d 120 (10th Cir. 1944)

*Stewart v. Keyes*, 295 U.S. 403, 409-10 (1935)

*Texas v. Louisiana*, 410 U.S. 702 (1973)

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 467 U.S. 138 (1984)

*Tiger v. W. Inv. Co.*, 221 U.S. 286 (1911)

*United States v. Burch*, 169 F.3d 666 (10th Cir. 1999)

*United States v. Chavez*, 290 U.S. 357 (1933)

*United States v. Holt State Bank*, 270 U.S. 49 (1926)

*United States v. McBratney*, 104 U.S. 621 (1881)

*United States v. Morrison*, 240 U.S. 192 (1916)

*United States v. Louisiana*, 339 U.S. 699 (1950)

*United States v. Louisiana, Texas, Mississippi, Alabama & Florida*, 363 U.S. 1 (1960)

*United States v. New Mexico*, 536 F.2d 1324 (10th Cir. 1976)

*United States v. Rickert*, 188 U.S. 432 (1903)

*United States v. Sandoval*, 231 U.S. 28 (1913)

*United States v. Sands*, 968 F.2d 1058 (10th Cir. 1992)

*United States v. Sutton,* 215 U.S. 291 (1909)

*United States v. Sweet,* 245 U.S. 563 (1918)

*United States v. Thomas,* 151 U.S. 577  (1894)

*United States v. Wright*, 229 U.S. 226 (1913)

*United States v. Wyoming,* 331 U.S. 440 (1947)

*Utah v. Babbitt*, 137 F.3d 1193 (10th Cir. 1998)

*Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987)

*Utah Div. of State Lands v. Kleppe*, 586 F.2d 756 (10th Cir. 1978)

*Ward v. Race Horse*, 163 U.S. 504 (1896)

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979)

*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980)

*Wisconsin v. Michigan*, 295 U.S. 455 (1935)

*Wisconsin v. Hitchcock*, 201 U.S. 202 (1906)

*Work v. Braffet,* 276 U.S. 560 (1928)

*Wyoming v. Andrus*, 602 F.2d 1379 (10th Cir. 1979)

*Wyoming v. Udall*, 379 F.2d 635 (10th Cir. 1967)

DN:32216155.10