IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-1350-WJM-BNB

ANDY KERR, et al.,
      Plaintiffs,

      v.

JOHN HICKENLOOPER, GOVERNOR OF COLORADO,
in his official capacity,
      Defendant.

---

## REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant John Hickenlooper, Governor of Colorado, by and through undersigned counsel, hereby files its brief in reply to the Brief in Opposition the Defendant's Motion to Dismiss (the "Opposition").

### INTRODUCTION

Plaintiffs' Opposition brief reinforces, rather than refutes, the reasons this Court has not been presented with a justiciable case.

The First Amended Substitute Complaint for Injunctive and Declaratory Relief (the "Complaint") contains few, if any, material factual allegations. What the Opposition tries to characterize as "facts" are generally either mere restatements of legal conclusions the Plaintiffs would like the Court to reach or are insufficient to state any cognizable legal claim. Their substantive arguments highlight that their case would require the Court to decide whether direct democracy is sufficiently republican or not, and which powers are truly important to state

1

governments (and thus cannot be subject to citizen oversight) and which are not – the epitome of political questions. In the process they mischaracterize or ignore their own Complaint, the Defendant's Motion to Dismiss (the "Motion"), and relevant precedent.

Ultimately, whether this case is meant to "present[] for resolution the contest between direct democracy and representative democracy,"[1] as the Complaint declares, or only to relieve Plaintiffs of the burdens of democratic participation in the area of taxation, as the Opposition asserts, the question cannot be resolved in litigation in federal court and must be dismissed.

## ARGUMENT

### I.     Plaintiffs are correct that the Court must accept any material factual allegations as true for purposes of the Motion to Dismiss.

Section I of the Opposition adds nothing relevant to the Court's consideration of the Motion, which, like the Opposition, stated that in these circumstances "the [C]ourt must accept all of the facts pleaded in Plaintiffs' Complaint as true." Motion at 3-4. The problem for the Plaintiffs is that they have not pled any material facts sufficient to establish either standing or a justiciable case.

### II.     Plaintiffs have not pled facts establishing standing.

Plaintiffs must prove three elements to establish standing: a concrete, particularized injury, causation, and redressability. *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 560 (1962). In addition, "[f]ederal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 97 (1968).

---

[1] Complaint ¶ 1. *See* Motion to Dismiss at 2 n.1.

**A. The Opposition does not reveal any facts showing an actual injury in fact; like the Complaint, it presents either restatements of legal conclusions or allegations previously held not to be sufficient to create a case or controversy.**

Perhaps nothing reveals the insufficiency of the Complaint more than the attempt in Section II of the Opposition to explain the facts that Plaintiffs argue are sufficient to meet their "burden of establishing [the] existence" of federal court jurisdiction. *See Steel Co. v.Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

Section II.A. is the heart of Plaintiffs' efforts to meet this burden, and for the most part, like the Complaint, it simply reasserts the legal conclusion they ask the Court to reach, which is that Article X, Section 20 of the Colorado Constitution (TABOR) is unconstitutional. *See, e.g.*, Opp'n at 4, 7, 13, 19; Compl. ¶ 8. To the extent other possible injuries can be inferred from the Plaintiffs' arguments, they might include difficulties elected officials might have in imposing their policy goals, and an alleged difficulty in obtaining government funding for projects Plaintiffs support. None of these allegations is sufficient to confer standing.

**1. The Court "is not bound to accept as true a legal conclusion couched as a factual allegation."**

In accepting all the well-pleaded facts as true, the Court must still discern what constitutes an actual fact, and distinguish it from Plaintiffs' characterization of a fact or a legal conclusion. The quote in the heading above is from *Papasan v. Allain*, 478 U.S. 265, 286 (1986), upon which the Supreme Court relied in *Iqbal* and *Twobley*, cases whose relevance the Plaintiffs find "mystifying." *See* Opp'n at 6. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Iqbal v. Ashcroft*, 129 S. Ct at 1949, is hardly a novel concept, as *Papasan* shows, and is not limited, as Plaintiffs

suggest, to issues under Rule 8(a), but is uniformly applicable on motions to dismiss. *See Papasan*, 478 U.S. at 285 (citing *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir. 1981), aff'd on other grounds, 460 U.S. 325 (1983); 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.07, p. 12-64, and n.6 (1985). *See also Hall v.Bellman*, 935 F.2d 1106, 1109-10 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based."); *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976) ("A motion to dismiss under Fed.Rules Civ.Pro., rule 12(b) admits all well-pleaded facts in the complaint as distinguished from conclusory allegations.").

The bulk of the Opposition highlights the lack of any alleged material facts in the Complaint – it simply points the Court to Plaintiffs' contentions that "TABOR deprives them of their right to the Republican Form of Government in that TABOR stripped the General Assembly of its exclusive and plenary power on matters of taxes and appropriations." Opp'n at 7 citing Compl. at ¶¶ 7-8. This is not a fact – it is the ultimate legal question the Plaintiffs ask the Court to answer.

"While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 129 S. Ct at 1950. Here, the legal argument that direct democracy is unconstitutional frames the Complaint, but it is unsupported by factual allegations. Though Plaintiffs say a lot, they assert only a few actual facts. Taking all of Plaintiffs' pleaded facts as true, they do not support any claims that would entitle the Plaintiffs to relief, and must be dismissed.

>    **2.  The Plaintiffs' official frustrations do not give them standing under Article III.**

The Plaintiffs' reliance on the alleged inability of the "the half of plaintiffs who hold public office," Opp'n at 8, to fulfill their official responsibilities because of citizen participation is irrelevant for two reasons, one procedural and one substantive.

First, the Complaint specifically disclaims any relevance of the official roles of any of the Plaintiffs. Compl. ¶ 9 ("The listing of offices does not imply that governmental bodies have themselves taken any official position regarding this litigation nor that these plaintiffs speak for those governmental bodies regarding this litigation."). Having chosen to bring the suit solely as a group of private citizens, Plaintiffs may not now rely on any official duties to justify their suit. *See Hayes v. Whitman,* 264 F.3d 1017, 1925 (10th Cir. 2011) (noting "a court may not consider allegations that are inconsistent with those pleaded in the complaint"). Second, even if the Complaint had not waived the relevance of the public official Plaintiffs' official roles, it would not give them standing.

The diminution of an elected official's political power is not a particularized, cognizable injury. *See Raines v. Byrd*, 521 U.S. 811, 819, 821 (1997) ("[A]ppellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete.").

In *Raines*, the Court held that individual members of Congress did not have a sufficient "personal stake" in the dispute and did not allege a sufficiently concrete injury to establish Article III standing to challenge the line-item veto. *Id*. at 830. The Court held that plaintiffs "alleged no injury to themselves as individuals and the institutional injury they allege is wholly abstract and widely dispersed, and, their attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Id*. at 829 (internal citations omitted).

Plaintiffs' effort to distinguish *Raines* simply by calling it no more than a "premature" suit is disingenuous at best.[2] *See* Opp'n at 19 n.8. To begin with, *Raines* all but explicitly overturned the main case upon which Plaintiffs rely, *Coleman v. Miller*, 307 U.S. 433 (1939). *See Raines*, 521 U.S. at 821-26 & n.8. The *Raines* Court held that "[i]t is obvious, then, that our holding in *Coleman* stands (at most, see n.8, infra) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id*. at 823. The *Raines* Court noted that *Coleman* "repeatedly emphasized that if these legislators (who were suing as a bloc) were correct on the merits, then their votes not to ratify the amendment were deprived of all validity." *Id*. at 822.[3]

There are simply no such allegations here. The Plaintiffs are either (as the Complaint alleged) a group of citizens or (as the Opposition argues) a group of public officials who wish it were easier to raise taxes. They have not alleged any votes that they took in their official capacities that have been or would be "completely nullified" or "deprived of all validity" by the People. Like the plaintiffs whose standing was rejected in *Raines*, these Plaintiffs "cannot show that their vote was denied or nullified as in *Coleman* (in the sense that a bill they voted for would

---

[2] The implication from the Opposition that *Clinton v. City of New York*, 524 U.S. 417 (1998), was a similar case that resolved whatever "prematurity" issues got in the legislators' way in *Raines* is false; in fact the *Clinton* case did not involve legislative standing at all. *See Clinton*, 524 U.S. at 430 (holding that, unlike the legislators in *Raines*, the City of New York alleged a "'personal stake' in having an actual injury redressed rather than an 'institutional injury' that is 'abstract and widely dispersed' . . . the moment that the President used the Line Item Veto . . . and deprived [it] of the benefits of the [vetoed] law") (internal citation omitted).

[3] The *Raines* Court also noted that *Coleman* was the only case in which the Supreme Court has held that legislators have standing to sue for an alleged injury to their legislative power. *Id*. at 821. So, in contrast to their substantive arguments, which ask this Court to do something entirely unprecedented in holding that a law is overly democratic, this argument at least has one precedent.

have become law if their vote had not been stripped of its validity).” *Id*. at 824. For the same reason, it is not necessary for this Court, as it was not for the *Raines* Court, to decide whether *Coleman* may be distinguished for any of the other reasons discussed in *Raines*, such as that “Coleman has no applicability to a similar suit brought in federal court,” or that there was no underlying decision of the state Supreme Court to take jurisdiction. *See Raines*, 521 U.S. at 824 n.8.[4] *See Schaffer v. Clinton,* 240 F.3d 878, 885 (10th Cir. 2001) (recognizing that *Raines* rejected legislative standing to challenge the line-item veto).

Plaintiffs seek to distinguish their arguments from those at issue in *Raines*, but the heart of their argument is literally identical to that rejected in *Raines*: “Appellees, relying heavily on this case, claim that they, like the state legislators in *Coleman*, ‘have a plain, direct and adequate interest in maintaining the effectiveness of their votes,’ sufficient to establish standing.” *Id*. at 821-22 (internal citation omitted). Page 9 of the Opposition quotes this very same language from *Coleman*, and this Court should recognize, as the Supreme Court did in *Raines*, that is insufficient to confer standing.

       3. **The Complaint contains no allegations of concrete, particularized injury**.

---

[4] “It should be obvious, then,” *Raines*, 521 U.S. at 823, that Plaintiffs’ effort to have the Court rely on *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), is misplaced. *Michel* is a District of Columbia Circuit decision that predates *Raines* and thus adds nothing to the analysis of that controlling case. Indeed, the lower courts in *Raines* relied on *Michel*, a choice the Supreme Court effectively renounced. *See Raines*, 521 U.S. at 816-17 (reversing the district court’s reliance on *Michel* and similar cases when it had recognized that “[T]he Supreme Court has never endorsed the [Court of Appeals'] analysis of standing in such cases.”). *See also Kucinich v. Obama*, --- F. Supp. 2d ---, 2011 WL 5005303 (D.D.C. Oct. 20, 2011) (holding that under *Raines*, members of Congress lacked standing to challenge President’s use of military force violated War Power Act).

As noted above, the Complaint contains no actual facts showing an injury in fact that a decision in their favor would redress. The closest it comes is the allegation that direct democracy, in the form of TABOR, has somehow caused Colorado to suffer from "fiscal dysfunction" that makes it difficult to spend as much money on programs the Plaintiffs support as they would prefer. Even if this is viewed as a factual allegation rather than a statement of opinion or unsupported generality, it is insufficient to support standing. The Opposition seeks to invoke a specific area they believe citizen participation has impacted: education. *See* Opp'n at 19 n.8, 36-37.[5] But even if the Plaintiffs' mischaracterization of the defense position in *Lobato* were accurate, it does not give the Plaintiffs standing. The Court may assume that Colorado spends less on public education than the Plaintiffs and indeed many others would like. This is precisely the sort of widespread injury that the Supreme Court has repeatedly held is insufficient to bring a

---

[5]  Citing to a defense motion in *Lobato v. State of Colorado*, 05CV4794, Plaintiffs say "Defendant has directly and unequivocally admitted" that "the General Assembly is unable to carry out other state constitutional obligations, such as the provision of education." Opp'n at 19. Plaintiffs also write that in the same motion, the Colorado General Assembly has "conced[ed] that TABOR precludes [it] from exercising fundamental duties under the Education Clause of the Colorado Constitution." Opp'n at 37. Plaintiffs are wrong. The Attorney General made no "admissions" about the General Assembly's education "obligation," which is disputed in *Lobato*, and the Attorney General did not "concede" the amount of state education funding is caused by TABOR. In the cited motion, the Attorney General, which, contrary to Plaintiffs' assertion, does not represent the General Assembly in *Lobato* or this case, highlighted two consequences of constitutional harmonization: the Education Clause must be construed with the entire Constitution, and in the event of a conflict, TABOR controls. *See* 05CV4794, Defs.' Mot. for Determination of Questions of Law Pursuant to C.R.C.P. 56(h) at 6 (citing, *inter alia*, *Town of Frisco v. Baum*, 90 P.3d 845, 847 (Colo. 2004)). *See, e.g.*, 05CV4794, Defs.' Trial Brief at 4–5; *cf., e.g.*, 05CV4794, Defs.' Opp. to Pls.' Mot. *in Limine* to Exclude Evidence at 3 ("The legislature's appropriations to other essential state services as directed and limited by the Colorado Constitution are facts of consequence having a tendency to show the legislature has acted rationally when funding K–12 education.").

policy question into the courts. *See United States v. Richardson*, 418 U.S. 166, 173-74 (1974); *Flast v. Cohen*, 392 U.S. 83, 114 (1968).

The Opposition admits that "no one person's harm can be differentiated from the rest," Opp'n at 11, but argues that *Michel* and the Court's Establishment Clause cases should be used to justify their standing here. As described above, however, *Raines* has rejected the *Michel* Court's analysis,[6] and that Plaintiffs have turned to *Flast v. Cohen*, 392 U.S. 83 (1968), to save their case exposes their desperation. To begin with, *Flast* is a "narrow exception" to the usual standing analysis, and it has only been narrowed in recent years. *See Arizona Christian Sch. Tuition Org. v. Winn*, 131 S. Ct 1436, 1445 (2011); *Hein v. Freedom From Religion Foundation*, 551 U.S. 587, 593 (2007).

*Flast* certainly does not stand for the proposition urged upon the Court by Plaintiffs, that any time a Plaintiff alleges a generalized harm the courts should find standing because otherwise the claim would be "unenforceable" in court. Opp'n at 10. Such an exception would completely devour the rule against standing for generalized harms.

The *Flast* exception is much narrower and more sensible than that. "*Flast* turned on the unique features of Establishment Clause violations" and the Supreme Court has "'declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause.'" *Winn*, 131 S. Ct at 1445, quoting *Hein*,551 U.S. at 609 (plurality opinion); see also *U.S v. Richardson*, 418 U.S. 166 (1974) (Statement and Account Clause); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U. S. 208 (1974) (Incompatibility

---

[6] As the quotations from *Michel* in the Opposition show, *see* Opp'n at 10-11, the court's analysis of the individuals' standing was entirely derivative of the legislators' standing, which *Raines* rejected.

Clause). So here again, the Plaintiffs ask the Court to do something unprecedented and contrary to recent Supreme Court precedent.

Moreover, it is not true that it would not be possible for a plaintiff to properly allege a concrete, particularized injury to satisfy this prong of the inquiry. One could easily imagine a complaint containing allegations from a plaintiff who, for example, alleges that a vote of the people deprived her of a particular government benefit to which she was otherwise entitled, or a student whose school was closed because, allegedly, voters rejected a tax increase. Such claims might still fail under the causation and redressability prongs, but they would likely satisfy the injury in fact prong. There are no such allegations here – simply generalized complaints about the nature of Colorado's government and a desire to have it conform to Plaintiffs' anti-initiative and anti-referenda view of the federal constitution.

In that way, Plaintiffs' case is much like another Establishment Clause case, in which the Supreme Court said

> Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III . . . . It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. '[T]hat concrete adverseness which sharpens the presentation of issues,' is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485-86 (citations omitted). It is evident that that these Plaintiffs are firmly committed to the principle that it is un-republican to allow citizens to participate in direct democracy, at

least if it interferes with the ability of officials to raise taxes. But simply claiming that the

Constitution has been violated, and that they have a legal interest in seeing the  Guarantee Clause

enforced, *see* Opp'n at 8-10, is not a legally cognizable injury sufficient to give them standing.

**B.**    **The Complaint fails to explain how any concrete injury was caused by direct democracy or would be redressed by a favorable ruling.**

It is true that a ruling in Plaintiffs' favor (if confined to TABOR, which, as the Motion

shows, is unsupportable) would relieve them of the "psychological consequence" of having to

live in a state in which the People have more direct influence on the government than the

Plaintiffs would like. At most, the allegations are that Plaintiffs are harmed by the state's alleged

"fiscal dysfunction" and perhaps insufficient funding for government programs Plaintiffs

support. The Plaintiffs cannot show, however, that either of these was caused by direct

democracy or that a decision in their favor here would redress them.

Here again, Plaintiffs' reliance on the *Flast* line of cases is instructive. It is true that this

case is in some sense a mirror image of the taxpayer standing cases on which Plaintiffs rely, in

that here Plaintiffs' goal is to make it easier to raise taxes, where in *Flast* the plaintiffs were

seeking to prevent tax expenditures. Plaintiffs also are correct to recognize that that line of cases

provides their best hope (as well as a useful analytical framework). But they are wrong to argue

that it actually supports ruling in their favor. To begin with, in *Winn*, the Supreme Court noted

that "more recent decisions have explained that claims of taxpayer standing rest on unjustifiable

economic and political speculation. When a government expends resources or declines to impose

a tax, its budget does not necessarily suffer. On the contrary, the purpose of many governmental

expenditures and tax benefits is to spur economic activity, which in turn *increases* government

revenues." 131 S. Ct. at 1443 (internal quotations and citations omitted).

The Court recognized that these problems "persist even if one assumes that an expenditure or tax benefit depletes the government's coffers. To find injury, a court must speculate" about the legislative response to a ruling in Plaintiffs' favor. *Id.* "[T]o find redressability, a court must assume that, were the remedy the taxpayers seek to be allowed, 'legislators will pass along the supposed increased revenue in the form of tax reductions.'" *Id.* (citation omitted). It would require "'pure speculation' to conclude that an injunction against a government expenditure or tax benefit would result in any actual tax relief for a taxpayer-plaintiff." *Id.* (internal quotations and citations omitted).

The specifics of the issues addressed in *Winn* are instructive.

> Even assuming the [Arizona] tax credit has an adverse effect on Arizona's annual budget, problems would remain. To conclude there is a particular injury in fact would require speculation that Arizona lawmakers react to revenue shortfalls by increasing respondents' tax liability. A finding of causation would depend on the additional determination that any tax increase would be traceable to the [] tax credits, as distinct from other governmental expenditures or other tax benefits. Respondents have not established that an injunction against application of the [] tax credit would prompt Arizona legislators to pass along the supposed increased revenue in the form of tax reductions. Those matters, too, are conjectural.

*Id.* at 1444 (internal quotations omitted).

The same is at least as true of the Plaintiffs' arguments. Even if one assumes that democratic participation has an adverse effect on Colorado's budget, finding any particular injury in fact would require speculation that Colorado lawmakers would react to revenue shortfalls by increasing taxes.[7] There has been no allegation showing that the legislature has sought to increase taxes or would increase taxes in the absence of TABOR. Plaintiffs have not

---

[7] Such an assumption is itself choosing sides in a political fight over how best to solve an unbalanced budget—raise taxes or cut spending. Here Plaintiffs ask the Court to decide that the correct answer is raising taxes, when cutting spending is the opposite side of the political debate. *Cf. Winn*.

established that removing citizen oversight from the legislative process would prompt Colorado legislators to resolve the supposed fiscal dysfunction by increasing taxes. Those matters, too, are conjectural.

Thus, as in *Winn*, "[e]ach of the inferential steps to show causation and redressability depends on premises as to which there remains considerable doubt. The taxpayers have not shown that any interest they have in protecting the State Treasury would be advanced. Even were they to show some closer link, that interest is still of a general character, not particular to certain persons." *Id*.

Plaintiffs fail to show that their inability to raise taxes will be redressed by judicially repealing TABOR. Plaintiffs already have the power to redress their alleged injury without seeking a judicial repeal of TABOR. Plaintiffs can vote to increase taxes, they can repeal TABOR, and they can repeal the right to initiative and referendum entirely. It is unwarranted for the Court to disregard binding precedent when Plaintiffs presently have several options available to redress their injury. *See e.g., Kucinich v. Obama*, --- F. Supp. 2d ---, 2011 WL 5005303 (D.D.C. Oct. 20, 2011) (dismissing claim that President Obama's use of military force violated War Power Act, the court held members of Congress lacked standing to bring the challenge, as they had ample legislative means at their disposal to oppose the President's use of military force).

### III.   Even if they had standing, Plaintiffs have not presented the Court with justiciable claims upon which relief can be granted.

Assuming, arguendo, that the Court proceeds beyond the standing inquiry, it will nevertheless find that it cannot entertain the claims put forth in the Complaint. The Opposition attempts to evade the fact that Plaintiffs ask the Court to do something unprecedented in

American history, but the truth is that their case would be the first to rule that the U.S. Constitution Guarantee Clause forbids citizens of a State from voting, either in general or on a particular subject. The Plaintiffs' position—that some things are too important to be entrusted to mere citizens and must only be the province of politicians—is just the sort of political dispute that the Supreme Court has long admonished federal courts not to try to resolve.

The Opposition seeks to retreat from the Complaint's statements that this case "presents for resolution the contest between direct democracy and representative democracy" and instead tries to limit the Court's consideration solely to direct democracy as practiced in TABOR, rather than the myriad other areas it is practiced in Colorado and elsewhere. As the Motion notes, there is no principled way to do so, and indeed the Plaintiffs' efforts only highlight why this is a political question to be resolved through the democratic and republican institutions of the state, not a legal one to be resolved by the federal judiciary.

### A.  Plaintiffs fail to present any justiciable claims.

Beginning with *Luther v. Borden,* 48 U.S. (7 how.) 1 (1849), well over 150 years ago, the Supreme Court has been clear that claims based on the Guarantee Clause are nonjusticiable political questions to be resolved by Congress and the People of the States. It has never deviated from that holding. *See Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912); *Baker v. Carr*, 369 U.S. 186 (1962). It is unnecessary to repeat in detail the extensive precedent establishing that the Guarantee Clause cannot be used by federal courts to overthrow state laws as overly democratic. The Motion explains this in section I.

The Opposition tries to distinguish this case from the unbroken line of cases rejecting such claims in two ways. First, they argue that *Pacific States* is distinguishable. Second, they

argue that the power to raise taxes is somehow so much more important that it overcomes the considerations that have uniformly led courts to recognize that these kinds of cases cannot be resolved by federal judges. The Court should not be led astray by either.

### 1. *Pacific States* **requires the Court to dismiss all of Plaintiffs' claims.**

It is easy to understand Plaintiffs' need to minimize *Pacific States*. This seminal case is fatal to *all* of Plaintiffs' claims. *Pacific States* is regularly cited by the United States Supreme Court, and is as solidly grounded now as it was in 1912. *See, e.g., Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004); *New York v. United States*, 505 U.S. 144, 184 (1992); *Baker*, 369 U.S. 186, 223 (1962).

In *Baker*, the Court reaffirmed that claims brought under the Guarantee Clause are not justiciable, and distinguished the equal protection apportionment claim before it[8] from that in *Pacific States*: "We hold that the claim pleaded here neither rests upon nor implicates the Guarantee Clause and that its justiciability is therefore not foreclosed by our decisions of cases involving that clause." *Baker*, 369 U.S. at 209.

Even when it suggested that, in theory, a claim could be justiciable in *New York v. United States*, the Supreme Court cited and reaffirmed *Pacific States*:

> In most cases where the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the "political question" doctrine. *City of Rome*, 446 U.S. 156 (1980) (challenge to the preclearance requirement of the Voting Rights Act), *Baker v. Carr*, (challenge to apportionment of State Legislative Districts); *Pacific States* (challenge to initiative and referendum provisions of State Constitution).

*New York v. United States*, 505 U.S. at 184 (emphasis added).

---

[8] *See* discussion *infra* Section III.C.

The Supreme Court cited *Pacific States* as foreclosing Guarantee Clause claims as recently as 2004. Holding that political gerrymandering claims are not justiciable because no judicially discernable and manageable standards exist for adjudicating them, the *Vieth* Court cited to *Pacific States. See Vieth*, 541 U.S. at 277 ("Sometimes . . . the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights."). Citing to *Pacific States*, the *Vieth* Court held that "[s]uch claims under the Guarantee Clause are said to be 'non-justiciable,' or 'political questions.'" *Id.*

As explained below, nothing distinguishes the claims made in *Pacific States* from those made here by Plaintiffs. *Pacific States* governs Plaintiffs' claims and requires the dismissal of all of them.

    **2.   There is no reason to treat the power to raise taxes differently than any other state power that can be limited or altered by the People of a sovereign State.**

TABOR was an initiative brought by and approved by the people in accordance with the Colorado Constitution. *See* Colo. Const. art. V § 1; *McKee v. City of Louisville*, 200 Colo. 525 (1980) (reserving the right of the people to legislate); *Colo. Project-Common Cause v. Anderson*, 178 Colo. 1, (1972) (recognizing that all political power is vested in the people and derives from them, including the power to bring an initiative).

Thus, Plaintiffs' complaint is really about the use of the initiative power to constrain the power of the General Assembly. If the Court agrees to repeal this citizen initiative because it interferes with important state powers, what are the limits of that decision? Plaintiffs have

offered no principled, non-political, non-ideological basis for asserting that raising taxes is a

power more important to state governments than any other of their plenary powers.

The taxing power is one of many plenary powers of the State that the People have

reserved through initiative. *Mesa County Bd. of County Comm'rs v. State*, 203 P.3d 519,

527 (Colo. 2009) quoting *Pueblo Jr. College Dist. v. Donner,* 154 Colo. 26, 31, 387 P.2d 727,

730 (1963) ("Subject to the fundamental or organic limitations on the power of the state ... the

legislature has plenary power, and is vested with a wide discretion, with respect to taxation.").

The principles advanced by Plaintiffs against TABOR affect and undermine all other citizen-

based initiatives and other forms of direct democracy in Colorado and in other states. *See Pacific

States*, 223 U.S. at 140-41 (describing effects of holding initiatives unconstitutional under the

Guarantee Clause).[9] TABOR is not unique just because it involves citizens exercising taxing and

spending authority. Other amendments involving taxing and revenue are exercised by the People.

*See* Colo. Const. art. IX, § 17 (Amendment 23, added by initiative in 2000); art. X, § 3(1)(b)

(Gallagher); art. XXIV, § 7 (Health Care); art. X § 21 (Tobacco Tax, added by initiative in

2004). But again, even if this weren't so, Plaintiffs have offered no principled basis for the

federal judiciary to say that raising taxes is a more important part of republican government than

any other state police power.

---

[9] Certainly nothing in the opinion suggests that the political question doctrine applies differently
to votes to increase taxes than to votes to not increase taxes; it rests entirely on the nature of a
claim about direct democracy under the Guarantee Clause. The *Pacific States* Court recognized
that inserting the federal courts into such questions of how states make policy for themselves is
unjustifiable. *Pacific States*, 223 U.S. at 141-42 (describing "the inconceivable expansion of the
judicial power and ruinous destruction of legislative authority in matters purely political which
would necessarily be occasioned by giving sanction to the doctrine").

Plaintiffs have failed to provide any legal support for the concept that the ability to raise taxes without first obtaining voter approval is the single "core power" that politicians *must* be able to exercise without citizen input in order to maintain a republican form of government. Nowhere do Plaintiffs cite a case holding that the ability to raise taxes is the defining hallmark of what constitutes a republican form of government.

Even if all Plaintiffs' claims are assumed to be true, they have failed to show that direct democracy in general or TABOR in particular has done anything approaching the sort of fundamental alteration of the nature of government that courts have suggested might implicate the Guarantee Clause. *See Largess v. Supreme Judicial Court for State of Massachusetts*, 373 F.3d 219, 229 (1st Cir. 2004) (holding that "absent extreme cases such as the establishment of a monarchy by a state," "our federal constitutional system simply does not permit a federal court to intervene in the arrangement of state government under the guise of a federal Guarantee Clause question") *cert. denied* 125 S. Ct. 618. Plaintiffs' claims must be dismissed.

### 3. Each of the six independent *Baker* tests shows that this case presents quintessential political questions.

Plaintiffs generally deny that their claims satisfy any of the *Baker* tests, but cite little, if any, legal authority to support their denials. This is because there is no case law that supports their position. The Guarantee Clause fits all of the hallmarks indicating the presence of a political question, even though meeting just one of the six *Baker* tests is sufficient to denote a political question.

### a. First *Baker* Test – Resolution of this issue is committed to Congress.

The Supreme Court has long been clear that the question of what constitutes a republican form of government is committed to Congress.

> Under [the Guarantee Clause] it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine if is republican or not.

*Luther v. Borden*, 48 U.S. at 42; *Pacific States*, 223 U.S. at 151 (holding "the issues presented in their very essence, are, and have long since by this court been, definitively determined to be political and governmental and embraced within the scope of the powers conferred upon Congress, and not, therefore within the reach of judicial power").

The text of the Guarantee Clause and the United States Supreme Court's interpretation of that text definitively commit this question to Congress. Besides making general denials, Plaintiffs do not cite any legal support that contradicts this Supreme Court precedent and establishes that the question is *not* committed to Congress.[10] Plaintiffs' claims—all of which depend on the guarantee to a republican form of government—fail the first *Baker* test. They are political questions that must be dismissed by the Court.

> **b.  Second *Baker* Test – No judicially discoverable and manageable standards exist to evaluate Plaintiffs' claims.**

Plaintiffs' focus on the second *Baker* test, "judicially discoverable and manageable standards," is misguided. The issue is whether there are discoverable and manageable standards

---

[10] In other words, the duty imposed by the Guarantee Clause is a duty of the United States, it is not a duty imposed on the defendant the Plaintiffs have chosen to sue, the governor of the State. Whether the Plaintiffs could bring a claim against the United States for failing to fulfill this duty is perhaps an interesting question but it is not present in the case they did choose to bring.

to determine what constitutes a republican form of government not whether Tabor creates fiscal

dysfunction by creating a check on legislative action.[11]

The *Baker* Court confirmed this when it explicitly declared "that the Guarantee Clause is

not a repository of judicially manageable standards which a court could utilize independently in

order to identify a State's lawful government." *Baker*, 369 U.S. at 223. Plaintiffs have not cited

any cases that hold otherwise. Binding jurisprudence holds that no judicially discoverable and

manageable standards exist to determine Guarantee Clause-based claims like Plaintiffs'. *Baker,*

*supra*. Plaintiffs' claims must be dismissed because they fail the second *Baker* test.

### c.  Third *Baker* Test – Plaintiffs' claims require the Court to make a policy determination.

Plaintiffs admit in the first paragraph of their Complaint that this matter requires the

Court to make a policy determination. Compl. ¶ 1. ("This case presents for resolution the contest

between direct democracy and representative democracy."). Plaintiffs ask the Court to determine

how much democracy is too much democracy. This is a clear policy determination committed to

the People, the States, and if necessary, to Congress. Plaintiffs have not cited any legal authority

holding that these claims present a legal question and *not* a policy determination. Plaintiffs'

claims must be dismissed because they fail the third *Baker* test.

Plaintiffs' efforts to elevate the power to raise taxes to a special status that cannot be

reached by the citizens only highlights the political choice they are asking the Court to make. As

noted above, the power to increase taxes is no more important in the plenary power of a state

---

[11] Plaintiffs' argument that evidence will show that the General Assembly "cannot fulfill its basic legislative role because it cannot tax" simply compounds the problem. Not only are there no judicial standards for determining what constitutes a republican government, but there are none for when a government is fiscally dysfunctional, and Plaintiffs suggest none.

than any other power, such as the power to protect the health of citizens through regulation of various professions, for example, or the power to improve the general welfare by encouraging business development. Plaintiffs acknowledge that any of those other areas of state power may be limited or even eliminated by citizen initiative. The relative importance of the power to raise taxes versus the power to regulate business or the power to provide for libraries or the power to provide roads and bridges, or the power to promote economic development is a profoundly disputed ideological question that this Court cannot answer without making a political, rather than legal, judgment.

>    ### d.  Fourth *Baker* Test – Adjudicating Plaintiffs' claims demonstrates a lack of respect due to coordinate branches of government.

Plaintiffs attempt to argue that because TABOR is a citizen initiated measure, and was not passed by the General Assembly, this test is irrelevant. The Plaintiffs' positions in this case are nothing if not audacious, but this assertion—that federal courts must show respect for State legislators but should feel free to disrespect the Citizens of the same State acting in their reserved legislative role[12]—is perhaps the most remarkable of all.

Be that as it may, the argument is, like so many others, without legal support. It also misses *Baker*'s point entirely. This factor is meant, like *Baker* in general, to remind federal courts that they are not empowered to be roving enforcers of their personal view of good government, that they must respect the fact that they are but one part of a government of divided power, and that the other institutions within that framework deserve their respect. The institutions in question here include both the State of Colorado itself (not just its elected officials) and Congress. Like many other states, *see* Motion at 10, Colorado has chosen to allow

---

[12] *See* U.S. Const. art IV, §§ 1, 2.

its legislative power to be exercised both by representatives and by the People themselves.[13] *See*

Colo. Const. art. V, § 1 (reserving to the People "the power to propose laws and amendments to

the constitution and to enact or reject the same at the polls independent of the general

assembly."); *Bickel v. City of Boulder*, 885 P.2d 215, 226 (1994) *cert. denied* 115 S. Ct. 1112

(1995) (The Colorado Constitution "does not comprise a grant of power to the legislative branch,

but rather a restriction on that power. All legislative power which is not limited by the Colorado

Constitution is vested in the people."). When the people act in their legislative capacity through

an initiative measure their enactments are as much "law" as those enacted by the legislature.

It is the State itself, not a particular group of individuals acting on its behalf, that is a

coordinate unit of government that *Baker* recognizes must be accorded respect in our federalist

system.[14] *Pacific States*, 223 U.S. at 150-51.

Even setting aside the lack of respect for a sovereign state, ruling in Plaintiffs' favor

would also show a clear lack of respect for the U.S. Congress, undeniably a coordinate branch.

The Supreme Court has repeatedly held that issues under the Guarantee Clause are committed to

Congress, not the Courts.

> Congress must necessarily decide what government is established or not. And
> when the senators and representatives of a State are admitted into the councils of
> the Union, the authority of the government under which they are appointed, as

---

[13] It is worth noting that Plaintiffs claim that they recognize the validity of this common and
longstanding practice. Opp'n at 2, 36. Yet this argument reveals that they do not believe the
courts should respect it.

[14] Even if Plaintiffs are right that only elected politicians are due respect from the federal courts,
they fail *Baker's* test on this point. The claims in this case ask the federal courts to do something
none of the three branches of Colorado's government have ever done: call into question the
validity of TABOR; all three have sought to enforce it and follow it to the best of their abilities.
*See, e.g.*, *Zaner v. City of Brighton*, 917 P.2d 280 (Colo. 1996); *Bickel v. City of Boulder*, 885
P.2d 215, 226 (1994).

> well as its republican character, is recognized by the proper constitutional
> authority. And its decision is binding on every other department of the
> government, and could not be questioned in a judicial tribunal. . . . [T]he right to
> decide is placed there, and not in the courts.

*Luther v. Borden*, 48 U.S. at 42. As such, a decision by this Court to adjudicate Plaintiffs' claims

not only ignores binding Supreme Court precedent, but it also demonstrates a lack of respect for

Congress, the branch that the highest Court in the land says has the power to define and establish

what is a republican form of government. For that reason, Plaintiffs' Guarantee Clause claims are

"futile" and must be dismissed. *Baker*, 369 U.S. at 226.

> **e.   Fifth *Baker* Test – This case implicates an unusual need for
> unquestioning adherence to a prior political decision.**

When the Supreme Court considered the same sorts of claims in *Pacific States*, it

concluded that

> the propositions each all proceed alone upon the theory that the adoption of the
> initiative and referendum destroyed all government republican in form in Oregon.
> This being so, the contention, if held to be sound, would necessarily affect the
> validity, not only of the particular statute which is before us, but of every other
> statute passed in Oregon since the adoption of the initiative and referendum.

*Pacific States*, 223 U.S. at 141. The same is true here, as a ruling in Plaintiffs favor would call

into question all laws passed by referendum or initiative in Colorado and the 25 other states that

provide for the process. These far-reaching consequences implicate an unusual need for

adherence to the constitutional text and binding Supreme Court precedent. So too, does the need

to respect the amendment process set forth in the Colorado Constitution. In its plainest terms,

Plaintiffs request the Court to repeal TABOR and change the constitution against the will of the

People who have voted otherwise. Indeed, in contradiction of the will of the People in bringing

every initiative ever approved or denied! The need to adhere to the constitutional requirements

necessary to amend the Colorado Constitution also implicates this fifth *Baker* test and presents

an unusual need for adherence to a prior political decision.

> **f. Sixth *Baker* Test – There is potential embarrassment from multifarious pronouncements from various entities.**

There is potential embarrassment from multifarious pronouncements from various

entities, although here it is between the many state courts and legislatures that have upheld and

relied upon citizen-initiated or approved laws and the federal courts saying otherwise. *See, e.g.*,

*Bickel* at 226 ("[TABOR] is a perfect example of the people exercising their initiative power to

enact laws in the specific context of state and local government finance, spending and taxation.

Thus, [TABOR's] requirement of electoral approval is not a *grant* of new powers or rights to the

people, but is more properly viewed as a *limitation* on the power of the people's elected

representatives."). These may not be different departments of the federal government, but they

are sovereign entities entitled to the same dignity.

Though satisfying only one test would suffice, Plaintiffs' claims would be classified as a

political question under each of the six independent *Baker* tests. The Court must follow binding

precedent and dismiss all of Plaintiffs' claims because they all present political questions and are

not justiciable.

> **B. Because Plaintiffs' Enabling Act claim is grounded in the guarantee to a republican form of government, the reasons requiring dismissal under the Guarantee Clause also require dismissal of the Enabling Act claim.**

Plaintiffs argue that claims under enabling acts have been litigated and found justiciable.

The Motion never argued otherwise and did not, as Plaintiffs suggest, ignore their Enabling Act

claims. *See* Motion at 6 n.4, 13 n.7, 14. Provisions of a state enabling act certainly might give

rise to a justiciable claim. *See, e.g., Branson School District RE-82 v. Romer,* 161 F.3d 619, 631 (10th Cir. 1998) (involving a breach of trust claim which provided plaintiffs standing as beneficiaries to the trust established by the Enabling Act). But merely invoking the Enabling Act does not make a claim justiciable. The Complaint here does not involve breach of trust claims; it simply cites to the republican government portion of the Enabling Act, raising precisely the same issues raised directly under the Guarantee Clause. *E.g.*, Compl. ¶ 84. Whether grounded on the Guarantee Clause or the Enabling Act, the claim that TABOR's expression of direct democracy is not sufficiently republican is a nonjusticiable political question, for all the reasons outlined above.[15]

For this reason, *Pacific States* dictates dismissal of the Plaintiffs' enabling act claim. Plaintiffs' denial that *Pacific States* invokes Oregon's equivalent of the Colorado Enabling Act is impossible to accept upon reading the Supreme Court's decision in *Pacific States*, the underlying Oregon Supreme Court decision, *State v. Pacific States Telephone & Telegraph*, 99 P. 427 (Or. 1909), and the Act of Congress Admitting Oregon into the Union, Act Cong. Feb. 14 1859, c. 33, 11 Stat. 383.

---

[15] Even if, counterfactually, the state had in fact "admitted" that it was unable to meet the state Constitution's education mandates, that would not make the case justiciable in federal courts. Whether Colorado is violating its own Constitution is an issue for Colorado's People and courts, not this Court. Plaintiffs can muster no support for an argument that a republican form of government, sourced in either the Guarantee Clause or Enabling Act somehow requires the provision of social services like education to state citizens. It is well established that "the Constitution is a charter of negative rather than positive liberties." *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir.1983) (citing, *inter alia*, *Harris v. McRae*, 448 U.S. 297, 318 (U.S.1980) ("It cannot be that because government may not . . . prevent parents from sending their child to a private school, government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to . . . send their children to private schools.").

Plaintiffs' claim is baseless because the Oregon enabling act – the "act of Congress admitting Oregon into the union" – was indeed challenged in *Pacific States*. The sixth claim in *Pacific States* specifically stated: "The provision in the Oregon Constitution for direct legislation violates the provisions of the act of Congress admitting Oregon into the Union." *Pacific States Telephone & Telegraph v. State of Oregon*, 223 U.S. 118, 139 (1912). The Court dismissed this enabling act claim along with the others. *Id*. at 151.

The Supreme Court refuses to hear this type of claim brought under a State's enabling act because it depends on a determination of what constitutes a republican government. Plaintiffs again offer no legal support or justification why this Court should create an exception to the political question doctrine to allow the federal judiciary to resolve guarantee clause-based claims brought pursuant to a State's enabling act. On this point, *Pacific States* is controlling.

## C. **Plaintiffs' have not stated a justiciable Equal Protection claim.**

Plaintiffs' argument that their equal protection claim is governed by voter dilution jurisprudence is meritless. Plaintiffs appear to have confused vote-dilution cases under the Equal Protection Clause with the representation-dilution issue dispensed with in *Raines*, *supra*. Neither is of any help to Plaintiffs. Equal Protection vote dilution cases of the sort cited by Plaintiffs are about one thing: ensuring that election districts have essentially the same number of voters so as to preserve the principle of one person, one vote "so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds v. Sims*, 377 U.S. at 579. Nothing in the Complaint or Opposition alleges malapportionment or any other reason that any citizen's vote is weighted differently than any other's, as to TABOR or any other matter in Colorado. The voting rights cases which Plaintiffs cite are inapposite here because the facts

26

alleged by Plaintiffs in the Complaint have nothing to do with "weighting" or "diluting" of citizen votes in this sense. Neither TABOR nor any other manifestation of direct democracy in Colorado however, diverges from the one person, one vote principle, and Plaintiffs have not alleged that it does.[16] It treats all voters within relevant voting districts equally, and all voters have equal opportunity to participate in TABOR elections. The Complaint therefore has not stated any claim under this line of vote-dilution cases.

As discussed above, the Complaint does involve dilution arguments, but they are not akin to the arguments in the *Baker*/*Reynolds* line; they are identical to those discussed in *Michel* and rejected in *Raines*. *See* Section II.A.2, *supra*. But simply because both involve the words "voter" and "dilution" does not mean that the claims raised in *Michel* or *Raines* give rise to Equal Protection arguments. To the extent the dilution of voting influence has been raised in the Complaint, it should be analyzed and rejected under *Raines* as shown in Section II above. There are no facts to support a claim under the Equal Protection Clause.

###   D.  Plaintiffs fail to state a claim for "impermissible amendment" and to establish the Court's jurisdiction over it.

Again, this claim, like Plaintiffs' others, is entirely derivative of their Guarantee Clause claim. It is simply another way of asking the Court to determine whether direct democracy is incompatible with a republican form of government, a nonjusticiable political question. Without such a violation, no impermissible amendment is alleged. The Supreme Court has already determined that this claim is a political question that the Court may not answer. *Pacific States,* 223 U.S. at 138-40, 151 (dismissing claims IV and V that had alleged that "[d]irect legislation is

---

[16] Indeed, since these cases are all about proper apportionment *between* districts, it is difficult to see how a uniform grant of the right to citizen participation *within* a district ever could violate this principle.

therefore repugnant to [a republican] form of government . . . which the state is bound to maintain" and "the federal constitution presupposes the maintenance of a republican form of government and existence of state legislatures which is destroyed by the initiative process" ); *see* Section III.A.1, *supra.*

\* \* \*

Federal courts regularly dismiss Guarantee Clause claims because they are not justiciable. *See, e.g., McNutt v. White*, slip opinion 2011 WL 3902798 (W.D.K.Y. Sept. 6, 2011) (holding "Guarantee Clause presents no justiciable question"); *Corr. v. Metropolitan Washington Airports Authority*, -- F. Supp. 2d --, 2011 WL 2680471 (E.D. Va. July 7, 2011) (finding no violation to a republican form of government); *South Dakota v. U.S. Dept. of Interior*, 787 F. Supp. 2d 981 (D.S.D. March 31, 2011) (dismissing Guarantee Clause claim as justiciable); *Van Allen v. Cuomo*, 621 F.3d 244, 249 n.5 (2nd Cir. 2010) (holding that claims brought under the Guarantee Clause are not justiciable); *Coleman v. Monson*, slip copy, 2010 WL 4038790, \*3 (D.S.C. 2010) (holding plaintiff's challenges based on Guarantee Clause present no justiciable question).

These courts have recognized that they cannot cast aside more than a hundred years of Supreme Court jurisprudence soundly recognizing that federal judges are not empowered to serve as overseers of the operations of State governments. Indeed, the Guarantee Clause is meant not to protect states from democracy, but from monarchy, or similar rule by unelected, unaccountable individuals and entities. *See Largess*, 373 F.3d at 229; Catherine Engberg, *Taking the Initiative: May Congress Reform State Initiative Lawmaking to Guarantee a Republican Form of Government*, 54 Stan. L. Rev. 569, 575-76 (2001); Akhil Reed Amar, *The Central*

*Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem,* 65 U. Colo. L. Rev. 749,758-64 (1994); Deborah J. Merrit, *The Guarantee Clause and State Autonomy: Federalism for a Third Century,* 88 Colum. L. Rev. 1, 25 (1988). By asking the federal judiciary to overthrow a popularly-enacted state Constitutional provision that has been repeatedly upheld by the state's own courts, it is the Plaintiffs who seek to impose on the People of Colorado a regime much more akin to what the Guarantee Clause was meant to prevent.

## CONCLUSION

The Governor respectfully requests that this Court grant the Motion to Dismiss.

*s/Megan Paris Rundlet*

DANIEL D. DOMENICO
Solicitor General
BERNIE BUESCHER
Deputy Attorney General
MAURICE G.  KNAIZER
Assistant Deputy Attorney General
MEGAN PARIS RUNDLET
Assistant Attorney General
Attorneys for Defendants
1525 Sherman Street, 7th Floor
Denver, CO  80203
Telephone:  303-866-5163
FAX:  303-866-5443
E-Mail:  dan.domenico@state.co.us
            bernie.buescher@state.co.us
            maurie.knaizer@state.co.us
            megan.rundlet@state.co.us

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on 18th day of November, 2011, I electronically filed the foregoing Reply to Plaintiff's Opposition to Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the following:

David Evans Skaggs
McKenna Long & Aldridge, LLP-Denver
1400 Wewatta Street #700
Denver, CO 80202-5556

Emily L. Droll
Brownstein Hyatt Farber Schreck, LLP-Denver
410 17th Street #2200
Denver, CO 80202-4432

Herbert Lawrence Fenster
McKenna Long & Aldridge, LLP-Denver
1400 Wewatta Street #700
Denver, CO 80202-5556

John A. Herrick
Brownstein Hyatt Farber Schreck, LLP-Denver
410 17th Street #2200
Denver, CO 80202-4432

Lino S. Lipinsky de Orlov
McKenna Long & Aldridge, LLP-Denver
1400 Wewatta Street #700
Denver, CO 80202-5556

Michael F. Feeley
Brownstein Hyatt Farber Schreck, LLP-Denver
410 17th Street #2200
Denver, CO 80202-4432
303-223-1100

*s/Thomas R. Bovee*
THOMAS R. BOVEE
Public Officials Unit
State Services Section
Colorado Attorney General's Office