### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-1350-WJM-BNB

ANDY KERR, Colorado State representative, *et al.*,

    Plaintiffs,

v.

JOHN HICKENLOOPER, in his official capacity as Governor of Colorado,

    Defendant.

---

### Defendant's Supplemental Brief on Standing
### in Support of the Motion to Dismiss

---

Plaintiffs attempt to undo the results of a statewide election that occurred nearly twenty years ago, and they seek to invoke this Court's jurisdiction to accomplish that end. But a federal court, with limited jurisdiction under Article III of the Constitution, is not forum for rehashing political arguments. It is a tribunal for resolving the "cases" or "controversies" of specific litigants: disputes involving personal, concrete, and particularized injuries that a court has power to redress. Because Plaintiffs have not suffered a concrete injury caused by the TABOR amendment that this Court can remedy, they lack standing to maintain this suit. The case must be dismissed.

## BACKGROUND

After holding oral argument on the Governor's Motion to Dismiss, which the parties have fully briefed (*see* Doc. 18, 21, 30, 51, 61, 63, and 65)[1], the Court ordered the parties to submit supplemental briefs on the issue of Plaintiffs' standing to maintain this suit. (*See* Doc. 70.) The Court requested that the parties focus on five questions, which can be paraphrased as follows:

- Does *Raines v. Byrd*, 521 U.S. 811 (1997), preclude Plaintiffs from basing standing on the fact that some Plaintiffs are current or former state legislators? (*See* Section II.B.)

- Does *Lance v. Coffman*, 549 U.S. 437 (2007), preclude Plaintiffs from basing standing on their status as citizens of Colorado? (*See* Section II.A.)

- Are Plaintiffs arguing that they have standing because some of them are current or former educators? (*See* Section III.)

- What legal authority supports Plaintiffs' argument that educators have special rights to maintain suits like this one? (*See* Section III.)

- If Plaintiffs lack standing based on their current allegations, should they be allowed to again amend the complaint, or must this case be dismissed? (*See* Section VI.)

As this brief explains, the answers to these questions confirm that Plaintiffs lack standing.

---

[1] The Governor incorporates into this brief the arguments raised in the Motion to Dismiss (Doc. 18), in the Reply in Support of the Motion to Dismiss (Doc. 51), and at the oral argument of February 15, 2012. Although this brief focuses on Plaintiffs' standing, this case must be dismissed for all the reasons previously raised.

## SUMMARY OF ARGUMENT

Plaintiffs' opposition to TABOR, despite being "phrased in constitutional terms," does not meet the Article III requirements of injury, causation, and redressability. *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 485–86 (1982). The thirty-three Plaintiffs[2] have asserted a multitude of "interests" related to the conduct of state government. (*See, e.g.*, First Am. Substitute Compl., Doc. 36 ¶ 43.) But none of them—whether as citizens, legislators, or educators—has established the kind of "personal, particularized, concrete, and otherwise judicially cognizable" injury that is necessary to invoke this Court's jurisdiction. *Raines*, 521 U.S. at 820.

Even construed generously, the complaint raises only two interests that potentially encompass allegations of injury. The first is a diminution in legislative power in the area of taxation; the second is allegedly insufficient public spending. Again, however, neither of these purported injuries confers standing. As Plaintiffs have pointed out (*see, e.g.*, Pls.' Br. in Opp'n to Mot. To Dismiss, Doc. 30 at 4), an individual may, in appropriate circumstances, sue in federal court to invalidate a provision of a state constitution. But before he can do so, he must have suffered a concrete, particularized injury. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 625 (1996) (individual plaintiffs alleged "immediate and substantial risk of discrimination" and municipal plaintiffs alleged an inability to enforce anti-discrimination rules).

---

[2] The original complaint named thirty-four plaintiffs (Doc. 1), but one has since withdrawn from the case (Doc. 31).

Because the potential injuries raised in this case are "undifferentiated" and "generalized," they are insufficient to establish that Plaintiffs have a "particularized stake in the litigation" that would grant them standing. *Lance*, 549 U.S. at 442.

Assuming, however, that Plaintiffs could establish an injury in fact under Article III, they still fail to satisfy the second and third elements of standing: causation and redressability. These related concepts prevent an exercise of judicial power that would be merely symbolic, ensuring that the asserted injury is "fairly traceable" to the unlawful conduct and is "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Plaintiffs' allegations that Colorado has slipped into "fiscal dysfunction" (Doc. 36 ¶ 3) and the General Assembly suffered a loss of political power (*id*. ¶ 74) fails to establish that TABOR was the cause or that this Court can fix the alleged problems.

Finally, while Article III provides ample reason to dismiss this case, prudential limits on federal jurisdiction also require that Plaintiffs' "generalized grievance" be left to the political process, where it originated.

In the more than six months since the Governor filed the motion to dismiss, Plaintiffs have not sought leave to amend the complaint to fix the obvious Article III problems it presents.[3] Nor have they alleged any additional facts that would satisfy the requirements of standing. This underscores that Plaintiffs have no legally cognizable injury that differentiates them from the millions of Coloradans whose

---

[3] Plaintiffs did, however, amend the complaint to avoid problems of state government immunity under the Eleventh Amendment. (*See* Doc. 9 at 1–2.)

will Plaintiffs seek to frustrate. Allowing Plaintiffs to amend the complaint would be futile, and the case should be dismissed now.

## ARGUMENT

### I.   Plaintiffs, as citizens, legislators, and educators, allege no injuries, only two "interests" they wish to pursue: legislative voting power and increased public spending.

#### A.   The groups of plaintiffs.

Standing is a function of both the plaintiff and the claim: it "is gauged by the specific common-law, statutory or constitutional *claims* that a *party* presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (emphasis added). Here, Plaintiffs fall into three overlapping groups: citizens (*i.e.*, Colorado voters and taxpayers); current and former legislators or government officials (including officials of political subdivisions); and public educators (or others who have an interest in public education). An understanding of the contours of these groups clarifies the "interests" Plaintiffs have asserted in this case.

*Citizens*. All thirty-three of the Plaintiffs are "citizens of the State of Colorado" (Doc. 36 ¶¶ 10–42, 46, 47) and assert an "interest in assuring that their representatives can discharge the inherently legislative function of taxation and appropriation and an interest in assuring that the State of Colorado has a Republican Form of Government" (*id.* ¶ 46). They claim that, "[s]ince the passage of TABOR in 1992, the State of Colorado has experienced a slow, inexorable slide into fiscal dysfunction" (*id.* ¶ 3) and that Colorado has suffered a "reduction in the

ability of the state to defray the necessary expenses of state government" (*id*. ¶ 78). They further assert that they, as voters and taxpayers, have been denied an "effective" legislature and "effective" local governments. (*E.g.*, *id*. ¶¶ 3, 7, 46, 74, 77, 78, 79, 80, 82, 83, 91, 92.)

***Legislators.*** Twenty of the Plaintiffs have some connection to state or local government. (Doc. 36 ¶¶ 10, 11, 16, 19, 20, 22, 25, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41.) They include current and former members of the General Assembly, city council members, county commissioners, and former directors of the Regional Transportation District. Because, as Plaintiffs allege, local governments depend on the state government "to tax and appropriate" (*id*. ¶ 43), the interests of the state legislators and local government officials coincide. Each of these Plaintiffs claim that their various offices are "relevant to their standing in this case," although they specifically disclaim "that the governmental bodies have themselves taken any position regarding this litigation" or that Plaintiffs can "speak for those governmental bodies." (*Id*. ¶ 9.)

Assuming these Plaintiffs' connection to government is even relevant—given their admission that they "have not been authorized to represent their respective Houses of [the General Assembly] in this action"[4]—they claim a "direct and specific

---

[4] *Raines*, 521 U.S. at 829 & n.10; *see also id*. (holding that legislators, who "had not been authorized to represent their respective Houses of Congress," did not have standing to challenge the constitutionality of the Line Item Veto Act and noting that "The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the

interest in securing to themselves, and to their constituents and to the state, the legislative core functions of taxation and appropriation." (*Id.* ¶ 43.) These claims amount to an allegation that the voting power of state legislators in the area of taxation has been diminished. (*E.g.*, *id.* ¶¶ 74, 76, 77, 79, 80, 82, 91, 92.)

*Educators*. Finally, fifteen Plaintiffs have some connection to public education. They include teachers, school board members, college professors, and "parents of school-age children." (Doc. 36 ¶¶ 10, 12, 13, 14, 15, 17, 19, 21, 23, 24, 26, 27, 33, 35, 42.) They assert that they "have a specific interest in assuring that the legislature of the state can discharge its responsibilities to tax for the purpose of adequately funding core education." (*Id.* ¶ 45; *see also id.* ¶ 81.)

## B.     The Plaintiffs' two interests.

The three groups of Plaintiffs in this case allege miscellaneous "interests"—not injuries—that they seek to pursue in court. (Doc. 36 ¶¶ 43, 45, 46.) Those interests include protecting the virtues of "representative democracy" and a "Republican Form of Government" (*id.* ¶ 1); preventing "fiscal dysfunction" (*id.* ¶ 3); maintaining an "effective legislative branch" (*id.* ¶ 7); "securing . . . the legislative core functions of taxation and appropriation" (*id.* ¶ 43); "adequately funding core education responsibilities" (*id.* ¶ 45); preventing the "arrogation of [legislative] power to popular vote of the people" (*id.* ¶ 76); avoiding "a gradual, continuing reduction in

---

members who compose the body . . . ." (quoting *United States v.Ballin*, 144 U.S. 1, 7 (1892))).

the ability of the State to defray the necessary expenses of state government" (*id.* ¶ 78); and ensuring legislators can increase taxes (*id.* ¶ 80).

None of these interests amount to "personal, particularized, concrete, and otherwise judicially cognizable" injuries. *Raines*, 521 U.S. at 820. For example, the legislator-Plaintiffs cite no revenue law that they voted for and that would have been enacted in the absence of TABOR. They provide no examples of specific government services to which they are entitled but that TABOR eliminated. Instead, Plaintiffs' interests are broad concepts related to "the contest between direct democracy and representative democracy" (Doc. 36 ¶ 1) that have been shoehorned into a federal lawsuit. These are public policy debates, not injuries under Article III. *See Valley Forge*, 454 U.S. at 473 ("[T]he 'cases and controversies' language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums.").

Nonetheless, if the First Amended Substitute Complaint is construed generously[5] these interests can be logically reduced to two potential allegations of "injury in fact," although neither of them differentiates Plaintiffs from the public at large. *See United States v. Richardson*, 418 U.S. 166, 177 (1974) (a grievance that is "undifferentiated and 'common to all members of the public'" is not justiciable).

---

[5] Because this is not a *pro se* case, the Court need not read the complaint liberally. *See Nasious v. Two Unknown BICE Agents*, 492 F.3d 1158, 1160–61 (10th Cir. 2007). But even if it does so, the complaint still fails to present a justiciable case.

The first putative injury is a reduction in legislative voting power in the area of taxation. Both the citizen-Plaintiffs and the legislator-Plaintiffs raise this allegation. When the complaint speaks in terms of the Guarantee Clause, the promise of a "Republican Form of Government," and the need for an "effective" legislature (*e.g.*, Doc. 36 ¶¶ 1, 2, 71, 82), Plaintiffs are in essence alleging that the power of state legislators to vote on issues of taxation has been diminished. (*See* Doc. 30 at 9 ("TABOR eliminates the power of the General Assembly to enact revenue measures."))

The second "interest" that, if properly pleaded, could lead to an allegation of injury is a negative impact on Colorado's fiscal condition. Each group of Plaintiffs approaches this issue from a different perspective, but the implied injury is the same. The citizen-Plaintiffs assert that the legislature cannot "provide services that are essential for a state." (Doc. 36 ¶ 3.) The legislator-Plaintiffs claim that they cannot "defray the necessary expenses of state government." (*Id.* ¶ 78.) And the educator-Plaintiffs claim that "the State can no longer fulfill another critical constitutional obligation, namely the requirement that it educate its children." (*Id.* ¶ 81.) These allegations amount to a claim that Colorado requires higher tax revenue and increased public spending to fund various public projects.

## II.   Plaintiffs' first potential injury—alleged interference with unfettered legislative power—does not confer standing.

The first potential allegation of injury that Plaintiffs have raised—a reduction in state legislative voting power in the area of taxation—lacks concreteness and is too

generalized to provide a basis for Article III standing. As the Court has implied, this asserted "injury" is foreclosed by both *Lance v. Coffman* and *Raines v. Byrd*. (*See* Doc. 70.)

A. ***Lance v. Coffman*: the alleged elimination of legislative power does not confer standing on citizens.**

In *Lance*, the Supreme Court dismissed a constitutional claim brought by four Colorado citizens, a claim that closely resembles the one Plaintiffs have attempted to assert here. The citizen-plaintiffs in *Lance* argued that Colorado's judicially-created congressional districts, drawn after legislators were unable to agree upon new district boundaries after the 2000 census, deprived the General Assembly of its powers and responsibilities under the Elections Clause of the U.S. Constitution. 549 U.S. at 437–38, 442. According to the Court, the citizens lacked Article III standing to bring this "generalized grievance":

> The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.

*Id.* at 442.

As did the Colorado citizens in *Lance*, Plaintiffs here assert that a specific domain of the General Assembly's power has been invaded. But they attempt to distinguish *Lance*—and many other cases—by emphasizing the alleged *magnitude* of this diminution in state legislative power. At oral argument, counsel for Plaintiffs asserted that "there has been a complete elimination of Colorado's legislators' right

to conduct a vote on taxes." (Doc. 71 at 27:10–11; *see id.* at 27:12 ("Voting here isn't diluted, it's eliminated."); Doc. 30 at 9 ("TABOR eliminates the power of the General Assembly to enact revenue measures.").)

This is simply untrue. Under TABOR, the General Assembly may still vote and initiate a tax increase; TABOR simply requires that the People also have a voice in the legislation. This situation is little different than it was before 1992. The Colorado Constitution reserves to the people "power at their own option to approve or reject at the polls any act or item, section, or part of any act of the general assembly." Colo. Const. art. V, § 1, cl. 1. Unless Plaintiffs are calling into question the entire initiative process in Colorado—a position they have disclaimed at oral argument and in briefing (*see* Doc. 30 at 2)—it is hard to see how TABOR "injures" them, while the People's power of initiative does not.

Moreover, Plaintiffs' assertions that the General Assembly's voting power has been "eliminated" do nothing to distinguish *Lance*. There, a group of citizen-plaintiffs also alleged a wholesale invasion of the General Assembly's power. They claimed that a judicially-drawn voting district nullified the legislature's constitutional authority to prescribe the "Manner of holding Elections for Senators and Representatives" under Art. I, § 4, cl. 1. *Lance*, 549 U.S. at 437–38, 441. In light of the Supreme Court's rejection of that claim, Plaintiffs' similar assertion that TABOR "eliminated" the General Assembly's power to legislate in areas of taxation fails to create an injury in fact. Plaintiffs must still establish some concrete,

particularized injury apart from the argument that TABOR is unconstitutional. *See id.* at 442. Because they, like the *Lance* plaintiffs, cannot do so, they lack standing.

*Lance* is not alone in requiring this result. For example, citizens have no standing to remedy an alleged violation of the Incompatibility Clause, which prohibits current members of Congress from holding other offices of the United States. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974). Any conflict of interest created through violation of the Clause "would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury." *Id.* at 217. Other cases in which plaintiffs assert the general unlawfulness of government meet a similar end. *See, e.g., Valley Forge*, 454 U.S. at 489 (rejecting "the philosophy that the business of the federal courts is correcting constitutional errors"); *Carroll v. Nakatani*, 342 F.3d 934, 947 (9th Cir. 2003) (plaintiff lacked standing to bring an equal protection claim because he "present[ed] only a generalized grievance, requesting the State to comply with his interpretation of the United States Constitution").

Plaintiffs' disagreement with TABOR is likewise based upon a bare allegation of unlawful government conduct. It is akin to arguments that the President is not a "natural-born citizen." While proponents of this argument—including legislators— may debate the matter in the political sphere,[6] they cannot bring the debate to

---

[6] *See, e.g.*, Josh Lederman, *Longtime GOP Lawmaker Questions Legitimacy of Obama Birth Certificate*, THE HILL (Mar. 12, 2012, 3:59 PM),

court. Any harm caused by the purported constitutional violation is "shared . . . with all voters." *Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009). The citizen-Plaintiffs here similarly fail to present anything more than the sort of generalized grievance *Lance* and myriad other cases reject, and they therefore lack Article III standing.[7]

### B. *Raines v. Byrd*: the legislator-Plaintiffs' alleged institutional harm does not transform this political debate into a justiciable case.

The alleged diminution in the General Assembly's voting power also fails to confer standing on the legislator-Plaintiffs. These Plaintiffs "have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that [TABOR] causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Kucinich v. Obama*, No. 11-1096, 2011 WL 5005303, at *5 (D.D.C. Oct. 20, 2011). As was the case in *Raines*, the Plaintiffs here have asserted that the legislature has suffered a generalized loss of political power—an "institutional" injury insufficient to establish standing. 521 U.S. at 829.

---

http://thehill.com/blogs/ballot-box/house-races/215545-rep-stearns-questions-legitimacy-of-obama-birth-certificate.

[7] Although Plaintiffs assert, without factual support, that TABOR deprives voters of "full and complete facts" about tax initiatives (Doc. 36 ¶ 75), this alleged "deprivation" cannot confer standing. In *Bishop v. Bartlett*, the Fourth Circuit denied standing to voter-plaintiffs who complained that ballot language summarizing a constitutional amendment was misleading: they pleaded only an "abstract, generalized interest [that] clearly fail[ed] to meet the requirement that an injury be concrete and particularized." 575 F.3d 419, 424 (4th Cir. 2009).

TABOR's effect on the General Assembly and Colorado's government as a whole is precisely the kind of diluted harm that precludes an Article III court from exercising jurisdiction. Importantly, Plaintiffs here, like the plaintiffs in *Raines*, "have not been authorized to represent their respective [legislative bodies] in this action," a fact the Supreme Court found "important." *Id.* And the legislator-Plaintiffs have failed to satisfy the narrow exception, created by *Coleman v. Miller*, 307 U.S. 433 (1939), to the ban on legislative standing: they cannot claim that their "votes would have been sufficient to defeat (or enact) a *specific* legislative Act" or that "their votes have been completely nullified" because that same specific Act went into effect (or did not go into effect). *Raines*, 521 U.S. at 823 (emphasis added). Instead, Plaintiffs' alleged "injury" is simply TABOR's policy choice to give Colorado voters a direct voice in matters of taxation. No matter how negatively this policy choice is characterized by its opponents—whether as an "arrogation of power" (Doc. 36 ¶ 76) or as a "contest between direct democracy and representative democracy" (*id.* ¶ 1)—it is not a justiciable case or controversy.

There is an additional reason *Raines* applies here. Not only does this case present a non-justiciable generalized grievance about the General Assembly's institutional power, it threatens to invade an area of state authority and to violate principles of federalism. Unlike the circumstances in *Coleman*, here there is no preceding state court decision that might arguably create a "basis for entertaining and deciding the federal questions." *Raines*, 521 U.S. at 824 n.8. "[F]ederalism

concerns" are therefore paramount in this case because Plaintiffs ask a federal court to invalidate a structural element of Colorado's government. *Id.*

In decision after decision, federal courts have recognized that they lack jurisdiction to insert themselves into the political wars waged by legislators. In *Alaska Legislative Council v. Babbitt*, the Court of Appeals for the D.C. Circuit dismissed claims brought by a group of Alaska legislators. 181 F.3d 1333 (D.C. Cir. 1999). Although a federal law "had the effect of rendering the Alaska Legislature unable to control hunting and fishing on federal lands within the State," the legislator-plaintiffs' "supposed injury [was] nothing more than an 'abstract dilution of institutional legislative power.'" *Id.* at 1338 (quoting *Raines*, 521 U.S. at 826).

Similarly, in *Daughtrey v. Carter*, the same court dismissed a claim that the executive branch had "usurped" congressional power by failing to enforce certain immigration laws. 584 F.2d 1050, 1057 (D.C. Cir. 1978). The court held that "[a]lthough injuries suffered by legislators may be different from those of other litigants, the manner of analyzing such injuries for standing purposes is the same"—so, the legislators' "generalized interest . . . in proper administration of the law lack[ed] the specificity essential for standing." *Id.* at 1057–58.

Finally, and most recently, the U.S. District Court for the District of Columbia refused to hear a claim that the President's "unilateral commitment of U.S. military forces in Libya [] deprived [members of Congress] of an opportunity to exercise their constitutionally prescribed role in initiating war." *Kucinich*, 2011 WL 5005303, at

*5. Because the alleged injury "deprived *each* of the 435 members of the House of Representatives of a vote," the injury was institutional rather than personal, and therefore nonjusticiable—notwithstanding the plaintiffs' assertion that the constitutional balance of power had been disrupted. *Id*. (emphasis added).

Like cases that have come before it, this case is also an attempt to entangle a federal court in a political disagreement. But the allegations here are even more extreme. Instead of a squabble between legislators and the executive (or state legislators and federal executive entities), this case pits a few current and former state legislators against the thousands of citizens who enacted TABOR. The case therefore calls into question the fundamental power of Coloradans to "approve or reject at the polls any act . . . of the general assembly." Colo. Const. art. V, § 1, cl. 1. In these circumstances, federal court intervention is even more problematic. "Despite [legislator-Plaintiffs'] protestations to the contrary," *Kucinich*, 2011 WL 5005303, at *5, and no matter how fervently they argue against TABOR, the legislator-Plaintiffs' putative "injury" is the kind the Supreme Court in *Raines* held is insufficient to confer Article III standing.

## III.  The allegation of inadequate taxes and public spending is insufficient to grant standing, notwithstanding that some Plaintiffs are educators.

Plaintiffs' second alleged injury fares no better than their first. The level of public spending in Colorado affects *all* state citizens, and nothing about the thirty-three Plaintiffs here allows them to further their own policy preferences in federal

court. The fact that some Plaintiffs are educators does not make their "injury" any more concrete, nor does it differentiate them from the public at large.

The educator-Plaintiffs assert that they "have a specific interest in assuring that the legislature of the state can discharge its responsibilities to tax for the purpose of adequately funding core education responsibilities of the state." (Doc. 36 ¶ 45.) But none of the Plaintiffs, including those with a connection to public education, have established that their generalized concern over public spending—which is normally insufficient to grant *any* class of plaintiffs Article III standing—is somehow particular to them. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 344 (2006) (an injury "based on the asserted effect of [an] allegedly illegal activity on public revenues" is too generalized to create standing). A group of plaintiffs is not exempted from the requirements of Article III simply because it asserts an interest in the funding of public education.

In *ASARCO, Inc. v. Kadish*, Justice Kennedy, writing for four Justices of the Court,[8] determined that a group of educators alleging an "adverse economic impact" as a result of a state law were still required to suffer a particular, individualized injury to establish standing. 490 U.S. 605, 614–15 (1989) (Kennedy, J., 4–4 decision). When examined critically, the teachers' claims (as well as the claims of taxpayer-plaintiffs) amounted to broad arguments about "the quality of education in

---

[8] Justice O'Connor did not participate. The other four Justices thought it was unnecessary to decide the standing issues. *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 614–15 (1989) (Brennan, J.).

Arizona," which were "the kind of generalized grievances brought by concerned citizens that we have consistently held are not cognizable in the federal courts." *Id.* at 616. Although a group of educators "might argue that they have a special interest in the quality of education," this "special interest does not alone confer federal standing" because it "does not succeed in distinguishing the [educators] in this regard from students, their parents, or various other citizens." *Id.* (internal citation omitted).

Justice Kennedy's reasoning in *ASARCO* is relevant here and Plaintiffs cite no authority that would excuse educators, or those with educational interests, from the Constitutional requirement that they "distinguish" themselves from the general public for purposes of standing. Parents of schoolchildren faced with a discriminatory school choice regime can satisfy standing because they have a concrete, personal, and particularized interest in avoiding discrimination. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007). But when a group of plaintiffs alleges only that school funding is in jeopardy, which might generally affect "building plans," "renovations," and "capital outlay projects," that group of plaintiffs lacks standing. *Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 v. Kirk*, 91 F.3d 1240, 1245 (9th Cir. 1996). Without establishing some concrete injury—such as "a program that affects [the plaintiff] as an individual that will be scaled back" or "a chronic problem with the [school's] boiler that additional

funds might fix"—the plaintiffs cannot satisfy the Constitutional requirement that the plaintiffs "suffer[ed] particularized harm or distinct injury." *Id.*

Plaintiffs in this case can allege no such concrete, particularized injury. They assert that TABOR has, on a system-wide basis, restricted funding for public schools and has therefore violated the "thorough and uniform" clause of the Colorado Constitution. (*E.g.*, Doc. 36 ¶ 81.) But broadly attacking TABOR is not the proper route for determining whether school funding is adequate in Colorado. As Plaintiffs point out, a case is already pending in state court to determine whether the state's system of school funding complies with the Colorado Constitution. (*Id.*) Here, the alleged systemic problems with Colorado's overall public spending are not particularized injuries that establish federal jurisdiction.

## IV. Plaintiffs cannot establish that TABOR is the cause of their purported injuries, nor can they establish that the Court can provide relief.

While Plaintiffs claim that TABOR is the villain that has "arrogated" the General Assembly's voting power (Doc. 36 ¶ 76) and sunk Colorado into "fiscal dysfunction" (*id.* ¶ 3), they have not alleged facts establishing that TABOR is the cause of any injury they could claim to suffer, or that this Court could redress it.

No specific set of events triggered this lawsuit. Plaintiffs' political and philosophical disagreements with TABOR existed in 1992 just as they exist now. This is the reason Plaintiffs have found it difficult to articulate a plausible theory of standing. Plaintiffs' inability to assert concrete injuries, and to satisfy the causation

and redressability requirements of Article III, might be resolved if, for example, the General Assembly passed a tax bill that that would have prevented a state employee from being laid off, but the People voted the law down under TABOR.[9] In those circumstances, the individual who lost her job might plausibly claim that she suffered an injury in fact, that TABOR caused the injury, and that a court could remedy it by reviving the revenue law (and the lost job) by overruling TABOR. Plaintiffs have not and cannot make such showings here because no such thing has happened. Plaintiffs have not cited a single law that would have been enacted but for TABOR,[10] or a law that will be enacted if TABOR is abolished. Instead, they seek judicial endorsement of their theory of an "effective legislative branch" that should exercise its "own powers to tax and appropriate" to cure Colorado's alleged "fiscal dysfunction." (Doc. 36 ¶¶ 3, 4, 43.)

Thus, as Plaintiffs have framed their dispute, overturning TABOR would be only a symbolic act—this Court could not order the General Assembly to exercise its taxation power to raise revenue and fix Colorado's alleged "fiscal dysfunction" even if TABOR were overturned. *Cf. Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1226 (9th Cir. 2008) (denying standing to plaintiffs who challenged

---

[9] These allegations could not, however, resolve the other problems with this suit, addressed in the Motion to Dismiss.

[10] Indeed, in 2005, the People *approved* the legislature's request to retain as much as $3.75 billion in excess tax revenue. *See, e.g.,* Referendum C, ch. 355, 2005 Colo. Sess. Laws 2323 (codified as amended at C.R.S. § 24-77-103.6 (2011)). There have been no similar efforts since.

the implementation of a treaty because "we may not order the State Department to withdraw from [the treaty]").

Even assuming Plaintiffs are "injured" because government spending is below the amount they would prefer, Plaintiffs cannot establish that by striking TABOR from the Constitution, this Court could solve Colorado's alleged fiscal problems. If TABOR were abolished—the only "remedy" Plaintiffs seek (*see* Doc. 30 at 14)—there is no reason to believe the General Assembly would respond in the way the plaintiffs want. *See DaimlerChrysler,* 547 U.S. at 344 ("Plaintiffs' alleged injury is also 'conjectural or hypothetical' in that it depends on how legislators respond to a reduction in revenue . . . .").[11] In any event, the economics of public finance are complicated—judicial intervention in this complex area may not have the intended effect. *See Id.* ("[I]t is unclear that tax breaks of the sort at issue here do in fact deplete the treasury: The very point of the tax benefits is to spur economic activity, which in turn *increases* government revenues." (emphasis in original)). Whatever the case, the "sort of speculation" required to determine whether TABOR is the cause of Colorado's alleged fiscal problems fails to support standing. *Id.*

---

[11] Since Plaintiffs have now asserted that their legal theory would leave all other forms of initiative and referendum in place (Doc. 30 at 2), the People of Colorado could respond to the Court's overturning of TABOR by enacting a supermajority requirement for tax legislation, as voters in California have done. Or they could go further, requiring approval from three-quarters of the legislature, or more. All of these measures would be permissible under Plaintiffs' theory, but all would exacerbate their complaints about Colorado's fiscal situation.

Moreover, Plaintiffs make no attempt to show how the legislature's inability to pass tax measures without voter approval has caused the state's alleged "fiscal dysfunction." (Doc. 30 at 12–13.) Nor could they, because this exercise would require them to distinguish Colorado's budget woes from those in nearly every other state, in various local jurisdictions, and in the nation as a whole. *See, e.g., Beyond California: States in Fiscal Peril*, THE PEW CENTER ON THE STATES, http://www.pewcenteronthestates.org/report_detail.aspx?id=56044 ("California's financial problems are in a league of their own. But the same pressures that drove the Golden State toward fiscal disaster are wreaking havoc in a number of states, with potentially damaging consequences for the entire country."). California and New York, for example, cannot blame TABOR for their undeniable fiscal dysfunction.[12]

The analysis of causation and redressability does not change simply because Plaintiffs allege that Colorado's public schools need additional funding. Whether the General Assembly would provide additional school funding if TABOR were nullified depends on many factors. "[I]t is conceivable that more money might be devoted to education" but because school funding comes from numerous sources, the possibility that overruling TABOR will provide the relief Plaintiffs seek "is 'remote, fluctuating

---

[12] *See, e.g.,* Danny Hakim, *Deficits Push N.Y. Cities and Counties to Desperation*, N.Y. TIMES, March 10, 2012, http://www.nytimes.com/2012/03/11/nyregion/deficits-push-municipalities-to-desperation.html?_r=2&ref=nyregion&pagewanted=all; Chris Megerian, *California Needs to Find $3 Billion by March*, L.A. TIMES, Feb. 1, 2012, http://www.latimes.com/news/local/la-me-legislature-20120201,0,6454692.story.

and uncertain.'" *ASARCO*, 490 U.S. at 614 (quoting *Frothingham v. Mellon,* 262 U.S. 447, 487 (1923)). And, even if state funding were to increase, a corresponding increase in the quality of education—however it could be measured—would hardly follow. Local school districts in Colorado are constitutionally guaranteed local control over instruction, Colo. Const. art IX, § 14, which means the causal chain from TABOR to revenue, appropriation, allocation, expenditure, and education outcomes is entirely speculative. Colorado's 178 school districts exercise local control in 178 different ways, with regard to resource allocation; instructional practices; hiring and firing of personnel; and collective bargaining. "The links in the chain of causation between [TABOR] and the asserted injury are far too weak for the chain as a whole to sustain [Plaintiffs'] standing." *Allen*, 468 U.S. at 759.

Because Plaintiffs can neither articulate nor prove a solid causal chain between TABOR and their purported injuries—and because they have not established that the Court's intervention is likely to provide them with a remedy—they fail to satisfy the causation and redressability requirements of Article III.

## V.   Plaintiffs' political attack against TABOR exceeds prudential limits on standing.

Article III is not the only obstacle Plaintiffs face. Even when a plaintiff has "alleged [a] redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at

474–75. These prudential limits on judicial power exist because "where large numbers of [citizens] suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy . . . ." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998). Plaintiffs' broad-based attack against TABOR fits this mold. Plaintiffs ask this Court to decide a question about the structure of state government (a question the voters have already answered). It should be the People of Colorado as a whole, not a subset of thirty-three, that determine what procedures should govern the passage of tax legislation in this state.

## VI.   Allowing Plaintiffs to amend the complaint would be futile, and this case must be dismissed now.

Standing is a threshold jurisdictional issue, *Lance*, 549 U.S. at 439, and when the pleadings show that a plaintiff cannot satisfy standing, the case must be dismissed. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. . . . [W]hen it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (internal citation omitted)).

Allowing Plaintiffs to amend the current complaint would be futile. Plaintiffs have been on notice of the complaint's jurisdictional defects since the Governor filed the Motion to Dismiss over six months ago. They have not sought leave to amend the complaint, nor have they attempted to allege any additional facts that could establish standing. Their only response has been to say that this case should drag on, embroiling the Governor in an expensive federal trial to determine whether any

facts exist that might support standing. But a trial is not needed here; Plaintiffs cannot even *allege* sufficient facts to create standing. As they acknowledge in their Brief in Opposition to the Motion to Dismiss, their "claim neither include[s] nor depend[s] on any assumption that, once [TABOR is eliminated], government will actually exercise the power to tax and spend." (Doc. 30 at 14.) Because it is clear at this stage of the litigation that the Court lacks jurisdiction, the case must be dismissed.

## CONCLUSION

As the Governor argued in previous briefs, Plaintiffs' generalized grievances against TABOR are not fit for this Court. Their lack of standing only underscores this point: "It can be argued that if [Plaintiffs are] not permitted to litigate this issue, no one can do so. In a very real sense, [this] gives support to the argument that the subject matter is committed . . . to the political process." *Richardson*, 418 U.S. at 179.

The Governor requests that the Court dismiss this case.

Respectfully submitted on March 16, 2012 by

s/ *Megan Paris Rundlet*

DANIEL D. DOMENICO
Solicitor General
BERNIE BUESCHER
Deputy Attorney General
MAURICE G. KNAIZER
Assistant Deputy Attorney General
MEGAN PARIS RUNDLET
Assistant Attorney General
FREDERICK R. YARGER
Assistant Solicitor General

Attorneys for Defendant

1525 Sherman Street, 7th Floor
Denver, CO 80203
Telephone: 303-866-5163
Facsimile: 303-866-5443

E-Mail:
    dan.domenico@state.co.us
    bernie.buescher@state.co.us
    maurie.knaizer@state.co.us
    megan.rundlet@state.co.us
    fred.yarger@state.co.us

*Attorneys for Defendant, Governor of
Colorado*

**CERTIFICATE OF SERVICE**

I certify that on March 16, 2012, I electronically filed **Defendant's**

**Supplemental Brief on Standing in Support of the Motion to Dismiss** with

the Clerk of the Court using the CM/ECF system, which will send notification of the

filing to the following attorneys:

David Evans Skaggs
McKenna Long & Aldridge, LLP
1400 Wewatta Street #700
Denver, CO 80202-5556

John A. Herrick
Brownstein Hyatt Farber Schreck, LLP
410 17th Street #2200
Denver, CO 80202-4432

Emily L. Droll
Brownstein Hyatt Farber Schreck, LLP
410 17th Street #2200
Denver, CO 80202-4432

Lino S. Lipinsky de Orlov
McKenna Long & Aldridge, LLP
1400 Wewatta Street #700
Denver, CO 80202-5556

Herbert Lawrence Fenster
McKenna Long & Aldridge, LLP
1400 Wewatta Street #700
Denver, CO 80202-5556

Michael F. Feeley
Brownstein Hyatt Farber Schreck, LLP
410 17th Street #2200
Denver, CO 80202-4432

David Benjamin Kopel
Independence Institute
13952 Denver W. Pkwy #400
Golden, CO 80401

Melissa Hart
University of Colorado School of Law
University Campus Box 401
Wolf Law Building
Boulder, CO 80309-0401

s/Thomas R. Bovee
THOMAS R. BOVEE
Public Officials Unit
State Services Section
Colorado Attorney General's Office