**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 11-cv-01350-WJM-BNB

ANDY KERR, Colorado State Representative,
NORMA V. ANDERSON,
JANE M. BARNES, Member Jefferson County Board of Education,
ELAINE GANTZ BERMAN, Member State Board of Education,
ALEXANDER E. BRACKEN,
WILLIAM K. BREGAR, Member Pueblo District 70 Board of Education,
BOB BRIGGS, Westminster City Councilman,
BRUCE W. BRODERIUS, Member Weld County District 6 Board of Education,
TRUDY B. BROWN,
JOHN C. BUECHNER, Ph.D., Lafayette City Councilman,
STEPHEN A. BURKHOLDER,
RICHARD L. BYYNY, M.D.,
LOIS COURT, Colorado State Representative,
THERESA L. CRATER,
ROBIN CROSSAN, Member Steamboat Springs RE-2 Board of Education,
RICHARD E. FERDINANDSEN,
STEPHANIE GARCIA, Member Pueblo City Board of Education,
KRISTI HARGROVE,
DICKEY LEE HULLINGHORST, Colorado State Representative,
NANCY JACKSON, Arapahoe County Commissioner,
WILLIAM G. KAUFMAN,
CLAIRE LEVY, Colorado State Representative,
MARGARET (MOLLY) MARKERT, Aurora City Councilwoman,
MEGAN J. MASTEN,
MICHAEL MERRIFIELD,
MARCELLA (MARCY) L. MORRISON,
JOHN P. MORSE, Colorado State Senator,
PAT NOONAN,
BEN PEARLMAN, Boulder County Commissioner,
WALLACE PULLIAM,
FRANK WEDDIG, Arapahoe County Commissioner,
PAUL WEISSMANN, and
JOSEPH W. WHITE,

      Plaintiffs,

v.

JOHN HICKENLOOPER, Governor of Colorado, in his official capacity,

      Defendant.

---

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANT'S MOTION TO DISMISS

---

This action challenges the constitutionality and legality of the Taxpayer's Bill of

Rights ("TABOR"), an amendment to the Colorado Constitution passed by voter initiative

in 1992.  Among other provisions, TABOR prohibits the Colorado General Assembly from

increasing tax rates or imposing new taxes without voter approval.  Plaintiffs allege that,

by taking away the General Assembly's power to tax, TABOR violates Colorado's

constitutional and statutory obligations to maintain a republican form of government.

This matter is before the Court on Defendant's Motion to Dismiss.  (ECF No. 18.)

In the Motion, Defendant argues that Plaintiffs lack standing to bring this action, that

Plaintiffs' claims present non-justiciable political questions, and that Plaintiffs' Equal

Protection claim and "Impermissible Amendment claim"[1] are independently subject to

dismissal.  (*Id.*)  On February 15, 2012, the Court held oral argument on the Motion, and

thereafter requested supplemental briefing from the parties on various issues related to

standing.  (*See* ECF No. 57, 68).  The Motion to Dismiss is fully briefed and now ripe for

adjudication.  (*See* ECF No. 18, 30, 51, 72, 73; *see also* ECF No. 21-1, 61.)

Having carefully analyzed the issues presented, the Court GRANTS IN PART and

DENIES IN PART the Motion to Dismiss.  The Court holds that the Plaintiffs who are

current members of the Colorado General Assembly have standing to bring this action,

---

[1] The Court explains the nature of Plaintiffs' "Impermissible Amendment claim" below.

2

and therefore the action is not subject to dismissal for lack of standing.[2]  The Court also

holds that Plaintiffs' claims are not barred by the political question doctrine.  Further, the

Court holds that Plaintiffs have failed to state an Equal Protection claim, but that their

"Impermissible Amendment claim" is not subject to dismissal.  Therefore, the Court will

allow this action to proceed past the pleading stage on all claims except for the Equal

Protection claim.

## I.  BACKGROUND

### A.    TABOR

TABOR is codified in Article X,[3] Section 20 of the Colorado Constitution.  TABOR

provides,[4] among other things, that:

- A "district" (defined in TABOR as the State of Colorado or any local government in Colorado) "must have voter approval in advance for . . . any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a new tax revenue gain to any district."  Colo. Const. art. X, § 20, cls. (2)(b), (4)(a).[5]

- A district "must [also] have voter approval in advance for . . . creation of any multiple-fiscal year direct or indirect district debt or other financial obligation

---

[2] As explained below, because of this determination, the Court need not consider the standing of the remaining Plaintiffs.

[3] Article X is the Article entitled "Revenue."

[4] The Court properly takes judicial notice of TABOR's provisions.  *See* Fed. R. Evid. 201(b) (providing that judicial notice may be taken of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (stating that, in evaluating a motion to dismiss, a court may take judicial notice of facts that are a matter of public record).

[5] Clause (4)(a) exempts from this limitation "emergency taxes" as defined in clause (6), and also exempts the scenario (described in clause (1)) where "annual district revenue is less than annual payments on general obligation bonds, pensions, and final court judgments."

whatsoever without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years."  *Id.* art. X, § 20, cl. (4)(b).[6]

- "The maximum annual percentage change in state fiscal year spending equals inflation plus the percentage change in state population in the prior calendar year . . . .  The maximum annual percentage change in each local district's fiscal year spending equals inflation in the prior calendar year plus annual local growth . . . .  The maximum annual percentage change in each district's property tax revenue equals inflation in the prior calendar year plus annual local growth . . . .  If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset."  *Id.* art. X, § 20, cl. (7)(a)-(d).[7]

- "New or increased transfer tax rates on real property are prohibited.  No new state real property tax or local district income tax shall be imposed. . . . Any income tax law change after July 1, 1992 shall also require all taxable net income to be taxed at one rate, excluding refund tax credits or voter-approved tax credits, with no added tax or surcharge."  *Id.* art. X, § 20, cl. (8)(a).

Given that TABOR is part of the Colorado Constitution, it cannot be revoked or

amended without voter approval.  *See* Colo. Const. art. XIX, § 2, cl. (1) (provision of

Colorado Constitution explaining how amendments to Constitution are adopted, and

stating that proposed constitutional amendments "shall be submitted to the registered

electors of the state for their approval or rejection [during a general election], and such

as are approved by a majority of those voting thereon shall become part of this

constitution"); *id.* art. XIX, § 1 (constitutional provision explaining how a constitutional

convention is called, providing that voter approval must be obtained to hold the

---

[6] Clause (4)(b) exempts from this limitation "refinancing district bonded debt at a lower interest rate or adding new employees to existing district pension plans."

[7] In 2005, Colorado voters approved Referendum C, which, *inter alia*, allowed the state to retain and spend all excess revenue collected above the TABOR limit for five years (from fiscal year 2005-06 through fiscal year 2009-10), and allowed the state, beginning in fiscal year 2010-11, to retain and spend excess revenue up to a new "excess state revenues" cap.  *See* Colo. Rev. Stat. § 24-77-103.6.

4

convention, and providing that voter approval is required for the adoption of any

revisions, alterations, or amendments to the Constitution resulting from the convention);

*see also id.* art. X, § 20, cl. (1) (provision of TABOR stating that "[o]ther limits on district

revenue, spending, and debt may be weakened only by future voter approval").

**B.     The Operative Complaint**

For purposes of Defendant's Motion to Dismiss, the Court properly accepts as

true the allegations in Plaintiffs' First Amended Substitute Complaint for Injunctive and

Declaratory Relief (the "Operative Complaint").  (*See* "Legal Standards" section below.)

**1.     Plaintiffs**

This action is brought by 33 Plaintiffs.  (*Id.* ¶¶ 10-42.)  Five Plaintiffs are current

members of the Colorado General Assembly, four of whom are members of the Colorado

House of Representatives and one of whom is a member of the Colorado Senate (the

"Legislator-Plaintiffs").  (*Id.* ¶¶ 10, 22, 28, 31, 36.)[8]  Nine Plaintiffs are former members of

the Colorado General Assembly.  (*Id.* ¶¶ 11, 16, 19, 30, 32, 34, 35, 40, 41.)  Other

Plaintiffs include current or former county commissioners, mayors, city councilpersons,

members of boards of education, public university presidents and professors, public

school teachers, and parents of school-age children.  (*See generally id.* ¶¶ 10-42.)  All

Plaintiffs are Colorado citizens.  (*Id.*)

**2.     General Allegations**

Plaintiffs' Operative Complaint states, "The purpose of this case is to seek a ruling

---

[8] The Plaintiffs who are current members of the Colorado House of Representatives are Lois Court, Dickey Lee Hullinghorst, Andy Kerr, and Claire Levy.  Plaintiff John P. Morse is a current member of the Colorado Senate.  (*Id.*)  *See also* www.leg.state.co.us (last visited June 20, 2012); Fed. R. Evid. 201(b); *Grynberg*, 390 F.3d at 1278 n.1.

that [TABOR] is unconstitutional because it deprives the state and its citizens of effective representative democracy, contrary to a Republican Form of Government as required under both the United States and Colorado Constitutions."  (ECF No. 36, ¶ 8.)  Plaintiffs explain their position that "[a]n effective legislative branch must have the power to raise and appropriate funds.  When the power to tax is denied, the legislature cannot function effectively to fulfill its obligations in a representative democracy and a Republican Form of Government."  (*Id.* ¶ 7.)  They allege that TABOR has caused a "slow, inexorable slide into fiscal dysfunction [in Colorado]" (*id.* ¶ 3), and specifically allege that TABOR has constrained the state government's ability to comply with its constitutional obligation to adequately fund public education (*id.* ¶ 81).  After reviewing some of TABOR's provisions (*id.* ¶¶ 75-77, 79), the Complaint states,

> The totality of these TABOR provisions removes entirely from the Colorado General Assembly any authority to change state law concerning taxation to replace or increase revenue, and prohibits the General Assembly from raising funds by any other means, including borrowing.  Moreover, the interactions of the provisions of TABOR may actually force existing taxes to be decreased without any action of the General Assembly.

(*Id.* ¶ 80.)

### 3.   Claims

Plaintiffs bring five claims for relief in the Operative Complaint:

(1)   The "Guarantee Clause claim," alleging that TABOR violates Article IV, Section 4 of the United States Constitution (the "Guarantee Clause").  (*Id.* ¶ 82.)  The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." U.S. Const. art. IV, § 4.  Plaintiffs' Guarantee Clause claim alleges that, "[b]y removing the taxing power of the General Assembly, the TABOR amendment renders the Colorado General Assembly unable to fulfill its legislative obligations under a Republican Form of Government and violates the guarantee of Article IV, Section 4 . . . ."  (ECF No. 36, ¶ 82.)

6

(2)     The "Enabling Act claim," alleging that TABOR violates the Enabling Act of 1875
        (the "Enabling Act"), the U.S. statute granting statehood to Colorado.  (*Id.* ¶ 83.)
        The Enabling Act, *inter alia*, authorized the formation of "a constitution and State
        Government [for Colorado] . . . . *Provided*, That the constitution shall be
        republican in form . . . and not repugnant to the Constitution of the United States .
        . . ." 18 Stat. 474 (1875).  Plaintiffs' Enabling Act claim alleges that "the TABOR
        amendment violates the Enabling Act" because "[t]he Enabling Act's requirement
        for a Republican Form of Government entail[s] having and maintaining a fully
        effective legislature."  (ECF No. 36, ¶ 83.)

(3)     The "Supremacy Clause claim," alleging that TABOR violates Article VI of the
        United States Constitution (the "Supremacy Clause").  (*Id.* ¶ 84.)  The Supremacy
        Clause provides that "[t]his Constitution, and the Laws of the United States which
        shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . .
        any Thing in the Constitution or Laws of any State to the Contrary
        notwithstanding." U.S. Const. art. VI, cl. 2.   Plaintiffs' Supremacy Clause claim
        alleges that TABOR is in "irresolvable conflict" with the Guarantee Clause and
        Enabling Act, and therefore "must yield to the requirements of the 'Guarantee
        Clause' and of the Enabling Act that Colorado maintain a Republican Form of
        Government."  (ECF No. 36, ¶ 84.)

(4)     The "Equal Protection claim," alleging that TABOR violates the Equal Protection
        Clause of the Fourteenth Amendment of United States Constitution.  (*Id.* ¶ 85.)
        The Equal Protection Clause provides that "[n]o State shall . . . deny to any person
        within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §
        1.  Plaintiffs' Equal Protection claim alleges that, because TABOR violates the
        requirement of a Republican Form of Government, TABOR "den[ies] to Plaintiffs
        and others similarly situated the Equal Protection of the Laws . . . ."  (ECF No. 36,
        ¶ 85.)[9]

(5)     The "Impermissible Amendment claim," alleging, *inter alia*, that TABOR
        impermissibly amended the Colorado Constitution in violation of constitutionally
        superior provisions of the Colorado Constitution, specifically Article II, Section 2;
        Article V, Sections 31 and 32; and Article X, Section 2 of the Colorado

---

[9] Despite the fact that paragraph 86 of the Operative Complaint is ambiguous regarding
whether Plaintiffs are attempting to assert a claim under the Fourteenth Amendment separate
and apart from their Equal Protection claim, the Court holds that the Operative Complaint as a
whole is properly interpreted as bringing a claim under the Fourteenth Amendment based only
on the alleged violation of the Equal Protection Clause.  (*See id.* ¶¶ 47, 51, 58.)

Constitution.  (*Id.* ¶¶ 87-92.)[10, 11]

### 4.    Relief Sought

Through this action, Plaintiffs seek an order rendering TABOR "null and void" and

"prohibiting any [Colorado] state officer from taking any action whatsoever to effect the

requirements and purposes of [TABOR]."  (*Id.* at 20-21.)

## C.    Procedural History

Plaintiffs filed this action on May 23, 2011.  (ECF No. 1.)  On June 15, 2011,

Plaintiffs filed an unopposed motion to amend the original Complaint in order to, *inter*

*alia*, replace the State of Colorado as the named defendant with the Governor of

Colorado, John Hickenlooper, in his official capacity.  (ECF No. 9.)  The Court granted

the request (ECF No. 11), and Plaintiffs' Substituted Complaint for Injunctive and

---

[10] To the extent that the Impermissible Amendment claim can be construed as also alleging violations of the Guarantee Clause and the Enabling Act, such allegations are already encompassed within the Guarantee Clause claim and the Enabling Act claim.

[11] Those sections of the Colorado Constitution provide:

- "The people of [Colorado] have the sole and exclusive right of governing themselves, as a free, sovereign and independent state; and to alter and abolish their constitution and form of government whenever they may deem it necessary to their safety and happiness, provided, such change be not repugnant to the constitution of the United States."  Colo. Const., art. II, § 2.

- "All bills for raising revenue shall originate in the house of representatives; but the senate may propose amendments, as in the case of other bills."  *Id.* art. V, § 31.

- "The general appropriation bill shall embrace nothing but appropriations for the expense of the executive, legislative and judicial departments of the state, state institutions, interest on the public debt and for public schools.  All other appropriations shall be made by separate bills, each embracing but one subject."  *Id.* art. V, § 32.

- "The general assembly shall provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year."  *Id.* art. X, § 2.

Declaratory Relief ("Substitute Complaint") was entered on June 16, 2011 (ECF No. 12).

On October 17, 2011, Plaintiffs again filed an unopposed motion to amend their complaint.  (ECF No. 31.)  The only differences between the proposed First Amendment Substitute Complaint for Injunctive and Declaratory Relief and the Substitute Complaint were the removal of one of the 34 Plaintiffs, the addition of a new position for another Plaintiff, and a slight re-ordering of paragraphs.  (*Compare* ECF No. 12, *with* ECF No. 36.)  The Court again granted the request (ECF No. 35), and the First Amended Substitute Complaint for Injunctive and Declaratory Relief (the "Operative Complaint") was entered on October 18, 2011 (ECF No. 36).

On August 15, 2011, Defendant filed the Motion to Dismiss currently at issue. (ECF No. 18.)  On October 11, 2011, Plaintiffs filed their Brief in Opposition to the Motion to Dismiss.  (ECF No. 30.)  On November 18, 2011, Defendant filed a Reply to Plaintiffs' Opposition.  (ECF No. 51.)  The Court has also allowed the filing of two *amicus* briefs, one filed by the Independence Institute (ECF No. 21-1),[12] and one filed by Professors Erwin Chemerinsky, Gene Nichol, and William Wiecek (ECF No. 61).[13]

On February 15, 2012, the Court held oral argument on Defendant's Motion to Dismiss.  (ECF No. 68.)  At the oral argument, the parties formally stipulated that the

---

[12] The *amicus* brief filed by the Independence Institute only addresses the merits issue of what constitutes a republican form of government.  (ECF No. 21-1.)  The Independence Institute argues that, even if this case is justiciable, it should be dismissed on the merits.  (*Id.*)

[13] The *amicus* brief filed by the three Professors (the "*amici* Professors") only addresses the political question doctrine.  (ECF No. 61.)  The *amici* Professors argue that this action does not present non-justiciable political questions.  (*Id.*)

Motion to Dismiss is properly construed as moving to dismiss the Operative Complaint.[14]

Based on this stipulation and the Court's authority to do so, the Court construes

Defendant's Motion to Dismiss as moving to dismiss the Operative Complaint in this

action.  *See Medinger v. City of Ashland*, No. 1:11-CV-00470, 2012 WL 1849667, at *1

(D. Or. May 17, 2012) (construing motion to dismiss as applying to later-filed amended

complaint).

Because the parties in their briefing on the Motion to Dismiss and at oral argument

disproportionately focused on the political question doctrine's applicability *vel non* to this

action, the Court on February 17, 2012 ordered further briefing from the parties on issues

related to Plaintiffs' standing to bring this action.  (ECF No. 70.)  On March 16, 2012,

both sides filed supplemental briefs addressing the standing issues identified by the

Court.  (ECF No. 72, 73.)

Defendant's Motion to Dismiss is now ripe for adjudication.

## II.  LEGAL STANDARDS

### A.    Motion to Dismiss and Parties' Positions

Defendant's Motion to Dismiss is brought pursuant to Federal Rules of Civil

Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a

claim).  There is some dispute between the parties regarding which of these two rules

applies to each of Defendant's purported bases for dismissal.  (*See* ECF No. 18, at 3-4;

ECF No. 30, at 5-7; ECF No. 51, at 2.)  *See also, e.g.*, *Schroder v. Bush*, 263 F.3d 1169,

---

[14] As a technical matter, the Motion to Dismiss was filed in response to the Substitute Complaint, not the Operative Complaint.  However, the Substitute Complaint and Operative Complaint are virtually identical, so from a practical perspective the Motion to Dismiss is properly construed as moving to dismiss the Operative Complaint.

1171 n.1 (10th Cir. 2001) (discussing Rules 12(b)(1) and 12(b)(6), and stating, "Deeply rooted ambiguity in the nature and justification of the political question doctrine has prevented clear classification of the appropriate type of dismissal in political question cases."). However, the parties agree that, no matter which of the two rules applies to each purported basis for dismissal, for every purported basis for dismissal the Court should accept the Operative Complaint's allegations as true. (*See* ECF No. 18, at 3-4; ECF No. 30, at 5-6; ECF No. 51, at 2.)

## B.   Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a claim for lack of subject-matter jurisdiction. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (citation and quotation marks omitted). Where, as here, the defendant's motion to dismiss presents a facial attack on the existence of subject-matter jurisdiction, "the district court must accept the allegations in the complaint as true . . . and construe the complaint in favor of [the plaintiffs]." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). However, "[t]he burden of establishing subject matter jurisdiction is on the party asserting jurisdiction." *Port City*

11

*Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

## C.     Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss

a complaint for "failure to state a claim upon which relief can be granted."  In evaluating

such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual

allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk,*

*L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion,

the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to

relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be

cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also

to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178

(10th Cir. 2009) (quotation marks omitted).

## III.  ANALYSIS

The Court begins its analysis by evaluating Plaintiffs' standing to bring this action,

and then proceeds to discuss whether the political question doctrine bars this action, in

addition to the other arguments raised in Defendant's Motion to Dismiss.  *See*

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974).[15]

---

[15] In *Schlesinger*, the Court stated,

[T]he concept of justiciability, which expresses the jurisdictional limitations
imposed upon federal courts by the 'case or controversy' requirement of Art. III,
embodies both the standing and political question doctrines . . . .  Each of these
doctrines poses a distinct and separate limitation, so that either the absence of
standing or the presence of a political question suffices to prevent the power of
the federal judiciary from being invoked by the complaining party.  The more
sensitive and complex task of determining whether a particular issue presents a

**A.    Standing**

**1.    Operative Complaint's Allegations Regarding Standing**

The Operative Complaint contains the following allegations regarding various

Plaintiffs' purported standing to bring this action:

- "Several plaintiffs . . . hold[] public office in certain state and local governmental bodies.  The offices held by these plaintiffs are relevant to their standing in the case."  (ECF No. 36, ¶ 9.)

- "In [Andy Kerr's] individual capacity as a citizen of the State of Colorado and in his capacity as a State Representative, he has standing to challenge the constitutionality of the TABOR amendment."  (*Id.* ¶ 10.)

- "Certain plaintiffs in this case are past or sitting elected representatives in the General Assembly of the State of Colorado.  As such, they have a direct and specific interest in securing to themselves, and to their constituents and to the state, the legislative core functions of taxation and appropriation.  Other plaintiffs in this case include officers of counties, districts and municipalities which are dependent, under the state constitution, on the power of the legislature and their own powers to tax and appropriate."  (*Id.* ¶ 43.)

- "Certain plaintiffs in this case are past or sitting elected officials of counties, cities, and school districts in the State of Colorado, jurisdictions whose abilities to tax are eliminated by TABOR."  (*Id.* ¶ 44.)

- "Certain plaintiffs in this case are or have been educators employed by the State of Colorado or by various school districts.  In addition to their interests as citizens of the state, they also have a specific interest in assuring that the legislature of the state can discharge its responsibilities to tax for the purpose of adequately funding core education responsibilities of the state as provided in Article IX, Section 2 of the Colorado Constitution."  (*Id.* ¶ 45.)

- "Certain plaintiffs in this case are citizens of the State of Colorado, having a specific, protectable interest in assuring that their representatives can discharge the inherently legislative function of taxation and appropriation and an interest in assuring that the State of Colorado has a Republican Form of Government, as

---

political question causes courts . . . to turn intially, although not invariably, to the question of standing to sue.

418 U.S. at 215 (citations omitted).

13

required by the United States Constitution." (*Id.* ¶ 46.)

## 2.      Summary of Parties' Arguments Regarding Standing

In terms of the Legislator-Plaintiffs, Defendant argues that those Plaintiffs do not have standing to assert their claim that TABOR has caused a diminution of their political power, analogizing this case to *Raines v. Byrd*, 521 U.S. 811 (1997), and distinguishing *Coleman v. Miller*, 307 U.S. 433 (1939). (ECF No. 51, at 5-7.) Plaintiffs, on the other hand, argue that the Legislator-Plaintiff have standing because "TABOR directly impacts their ability to fulfill their official responsibilities." (ECF No. 30, at 8.) The Legislator-Plaintiffs argue that their claim is akin to the claim at issue in *Coleman*, and distinguishable from that in *Raines*. (*Id.* at 8-9 & n.5.) The Court requested further briefing from the parties' regarding *Raines*'s applicability *vel non* to this action (ECF No. 70, at 3), which the parties have provided (ECF No. 72, at 4-8; ECF No. 73, at 13-16).

In terms of citizen standing, Defendant argues that Plaintiffs as citizens of Colorado do not have standing because their claim is "a generally available grievance about government – claiming only harm to [their] and every citizen's interest in proper application of the Constitution and laws . . . ." (ECF No. 18, at 15-16 (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007)).) In response, Plaintiffs liken their claim of citizen standing to *Flast v. Cohen*, 392 U.S. 83 (1968), in which taxpayers bringing an Establishment Clause challenge were found to have standing. (ECF 30, at 10-11.) Defendant argues that *Flast*, a narrow exception to the general rule that taxpayers do not have standing, is inapplicable. (ECF No. 51, at 8-11.) The Court requested further briefing from the parties' regarding *Lance*'s applicability to this action (ECF No. 70, at 3), which the parties have provided (ECF No. 72, at 9-14; ECF No. 73, at 10-13).

14

The parties' original briefing on the Motion to Dismiss focused only on legislative standing and citizen standing.  Given the allegation in the Operative Complaint regarding the standing of educators (ECF No. 36, ¶ 45), the Court asked Plaintiffs to clarify whether they were alleging standing based on injury to educators, and asked the parties to brief whether standing would exist on that basis (ECF No. 70, at 3).  In the supplemental briefing, Plaintiffs clarified that they do seek standing on that basis, and both sides provided argument on that issue.  (ECF No. 72, at 14-17; ECF No. 73, at 16-19.)

The parties also disagree as to whether TABOR caused the injuries alleged, and whether a ruling in Plaintiffs' favor would redress those alleged injuries.  (ECF No. 18, at 17-18; ECF No. 30, at 12-14; ECF No. 51, at 11-13.)

### 3.    General Rules of Constitutional Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "[c]ases" and "[c]ontrover[ies]."  U.S. Const. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The gist of the question of standing" is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).  Standing "is perhaps the most important of the[] doctrines"

15

limiting the federal judicial power.  *Allen v. Wright*, 468 U.S. 737, 750 (1984).

"[T]he irreducible constitutional minimum of standing contains three elements":

(1) the plaintiff must have suffered a "concrete and particularized" injury that is "actual or

imminent" (*i.e.*, an "injury in fact"), (2) there must be "a causal connection between the

injury and the conduct complained of," and (3) it must be "likely . . . that the injury will be

redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61 (quotation marks omitted);

*see also Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to

the defendant's allegedly unlawful conduct and likely to be redressed by the requested

relief.")

"The party invoking federal jurisdiction bears the burden of establishing these

elements."  *Lujan*, 504 U.S. at 561.

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.  In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* (citations, quotation marks, and brackets omitted).

Also,

> [w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Id.* at 561-62.

### 4.      Legislative Standing – "Injury in Fact"

The Court first addresses the issue of whether the Legislator-Plaintiffs have standing to bring this action.

### a.      Governing Case Law

### (1)      U.S. Supreme Court Cases

The United States Supreme Court has infrequently addressed the issue of legislative standing.  One of the few cases in which it did so is *Coleman v. Miller*, 307 U.S. 433 (1939).  There, twenty Kansas State Senators, among others, brought suit after a vote in the Kansas State Senate deadlocked at 20-20 (which ordinarily would mean the measure would not pass), but the State's Lieutenant Governor cast a deciding vote passing the measure.  *Id.* at 435-36.  The Court found standing based on the complete nullification of the effectiveness of those Senators' votes, explaining, "[the plaintiffs'] votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification.  We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Id.* at 438.  The Court in *Coleman* ultimately ruled against the plaintiffs on the merits, affirming the Kansas Supreme Court's denial of mandamus.  *See id.* at 437-56.

The Supreme Court more recently took up the issue of legislative standing in *Raines v. Byrd*, 521 U.S. 811 (1997).  In *Raines*, six members of the United States Congress challenged the constitutionality of the Line Item Veto Act (the "Act"), which had been passed by Congress and signed into law by the President in 1996.  *Id.* at 814.  The

six plaintiffs had voted against passage of the Act.  *Id.*  The Court held that the plaintiffs lacked constitutional standing to bring the action because, among other reasons discussed in more detail below, the alleged injury constituted only an abstract dilution of institutional legislative power.  *Id.* at 818, 825-26, 830.[16]

The Supreme Court in *Raines* began its analysis by laying out fundamental rules of standing, *id.* at 818-20, and emphasized that "our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *id.* at 820.  Later in the decision, the Court again emphasized the importance of separation-of-powers concerns in the standing analysis, evaluating in depth instances during the nation's history when Members of Congress or the Executive declined to entangle the Judiciary in confrontations between Congress and the Executive branch.  *Id.* at 826-28.

The *Raines* Court then proceeded to analyze *Coleman* and another prior Supreme Court case in which a legislator was found to have standing, *Powell v. McCormack*, 395 U.S. 486 (1969).  In *Powell*, the Supreme Court held that the exclusion of a member of Congress from the House of Representatives (with a consequent loss of salary) presented a live "case or controversy."  395 U.S. at 512-14 & n.35.  *Raines*

---

[16] Notably, the Act specifically authorized Members of Congress to bring a legal action challenging the constitutionality of the Act.  *See id.* at 815-16.  As the Court in *Raines* pointed out, however, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."  *Id.* at 820 n.3.  Rather, "Congress' decision to grant a particular plaintiff the right to challenge an Act's constitutionality [only serves to] eliminate[] any prudential standing limitations."  *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules.").  *Raines*, therefore, dealt only with the issue of whether the plaintiffs there met the minimum constitutional requirements for standing.

distinguished *Powell* on two grounds.  First, the Court stated that, unlike in *Powell*, the plaintiffs in *Raines* "ha[d] not been singled out for specially unfavorable treatment . . . . [Instead t]heir claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally."  521 U.S. at 821.  Second, the Court stated that, unlike in *Powell*, the *Raines* plaintiffs' "claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete."  *Id.*  The Court in *Raines* emphasized that the plaintiffs were suing in their official capacities rather than based on some private injury.  *Id.*

Raines then turned to *Coleman*, identifying *Coleman* as "[t]he one case in which we have upheld standing for legislators (albeit *state* legislators) claiming an institutional injury."  *Id.* (emphasis in original).  After evaluating *Coleman*, the Court in *Raines* stated,

> [O]ur holding in *Coleman* stands (at most) for the proposition that
> legislators whose votes would have been sufficient to defeat (or enact) a
> specific legislative Act have standing to sue if that legislative action goes
> into effect (or does not go into effect), on the ground that their votes have
> been completely nullified.

521 U.S. at 823 (citation omitted).  The Court then proceeded to explain why *Coleman* provided "little meaningful precedent" for the situation presented in *Raines*:

> [The *Raines* plaintiffs] have not alleged that they voted for a specific bill,
> that there were sufficient votes to pass the bill, and that the bill was
> nonetheless defeated.  In the vote on the Act, their votes were given full
> effect.  They simply lost that vote.  Nor can they allege that the Act will
> nullify their votes in the future in the same way that the votes of the
> *Coleman* legislators had been nullified.  In the future, a majority of Senators
> and Congressmen can pass or reject appropriations bills; the Act has no
> effect on this process.  In addition, a majority of Senators and
> Congressmen can vote to repeal the Act, or to exempt a given
> appropriations bill (or a given provision in an appropriations bill) from the
> Act; again, the Act has no effect on this process.

*Id.* at 824.  The Court ultimately stated, "There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here.  To uphold standing here would require a drastic extension of *Coleman*.  We are unwilling to take that step." *Id.* at 826.

In conclusion, the Court in *Raines* stated:

> In sum, appellees have alleged no injury to themselves as individuals (contra, *Powell*), the institutional injury they allege is wholly abstract and widely dispersed (contra, *Coleman*), and their attempt to litigate this dispute at this time and in this form is contrary to historical experience.  We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.  We also note that our conclusion neither deprives Members of Congress of an adequate remedy (since they may repeal the Act or exempt appropriations bills from its reach), nor forecloses the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act).  Whether the case would be different if any of these circumstances were different we need not now decide.
> We therefore hold that these individual members of Congress do not have a sufficient "personal stake" in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing.

*Id.* at 829-30 (some citations omitted).

### (2)    Tenth Circuit Case

In *Schaffer v. Clinton*, 240 F.3d 878 (10th Cir. 2001), the Tenth Circuit discussed *Raines* and legislative standing.  In *Schaffer*, Bob Schaffer, a member of the U.S. House of Representatives, brought suit challenging a statute authorizing cost of living adjustments ("COLAs") for Members of Congress, claiming that the statute violated the Twenty-Seventh Amendment to the Constitution.[17]  Although the statute granted

---

[17] The Twenty-Seventh Amendment provides, "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened."  U.S. Const. amend. XXVII.

Congressman Shaffer a pay *increase*, he brought suit claiming that the unconstitutional salary increase was "personally offensive and professionally harmful to him, as well as damaging to his political position and his credibility among his constituency." *Id.* at 883 (quotation marks and brackets omitted).   Although that case presented an alleged injury quite different than the one alleged here, the Tenth Circuit's discussion of *Raines* is notable:

> Like the plaintiffs in *Raines*, Congressman Schaffer has not alleged a sufficiently personal injury to establish standing because he has not been singled out for specially unfavorable treatment as opposed to other Members of the House of Representatives.  Instead the COLAs, which apply to every Representative, necessarily damage all Members of Congress equally.  Congressman Schaffer's allegations of harm to his political position and his credibility among his constituency are even more abstract than the assertion of a dilution of institutional legislative power the Court found wanting in *Raines*.  Finally, as in *Raines*, there has been no nullification of Congressman Schaffer's ability to vote on the COLAs; if he received a COLA . . ., that is simply because he lost that vote.  The [COLA] has no effect on either Congressman Schaffer's ability to press for a change in the law setting Representatives' salaries or for Congress to amend the COLA provisions pursuant to the normal legislative process.

*Id.* at 885-86 (citations, quotation marks, brackets, and ellipses omitted).

        **b.**    **Analysis of Whether the Legislator-Plaintiffs Have Alleged a Cognizable Injury in Fact**

*Raines* identifies numerous issues to consider in determining whether legislators in a particular case have standing:   whether the alleged injury is concrete or abstract; whether the legislators allege an institutional injury in their official capacities that is common to all members of the legislative body; whether the legislators have been authorized to bring suit on behalf of the legislative body; whether separation-of-powers concerns are present; whether the legislators have an adequate internal remedy within the legislative body; and whether declining standing to the legislators would foreclose

21

any constitutional challenge to the disputed measure.  *See* 521 U.S. at 829.  *Raines* also specifically stated, "Whether the case would be different if any of these circumstances were different [than those present in *Raines*] we need not now decide."  *Id.* at 829-30. The Court will analyze these important standing considerations in turn.

### (1)   Concreteness of Injury

Standing jurisprudence makes clear that the concreteness (versus abstractness) of an injury is one of the more important, if not *the* critical issue, governing the standing question.  *See Lujan*, 504 U.S. at 560; *Schlesinger*, 418 U.S. at 222 ("To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'"); *Okpalobi v. Foster*, 190 F.3d 337, 352 (5th Cir. 1999) (stating that "the fundamental goal of the standing inquiry" is to "ensur[e] that litigants have a concrete stake in the outcome of the proceedings such that the issue will be framed properly").

In *Raines*, the Court did not engage in any extended discussion of why the injuries alleged by the plaintiffs there were too abstract to confer standing.  The Court's entire discussion regarding the nature of the injuries alleged was made during the process of distinguishing *Coleman*:

> [A]ppellees rely heavily on our statement in *Coleman* that the Kansas senators had "a plain, direct and adequate interest in maintaining the effectiveness of their votes."  Appellees claim that this statement applies to

22

them because their votes on future appropriations bills (assuming a majority of Congress does not decide to exempt those bills from the Act) will be less "effective" than before, and that the "meaning" and "integrity" of their vote has changed. . . . Even taking appellees at their word about the change in the "meaning" and "effectiveness" of their vote for appropriations bills which are subject to the Act, we think their argument pulls *Coleman* too far from its moorings. Appellees' use of the word "effectiveness" to link their argument to Coleman stretches the word far beyond the sense in which the Coleman opinion used it. There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here.

*Raines*, 521 U.S. at 824-26. *Raines* based its holding, in part, on the ultimate conclusion that "institutional injury [that plaintiffs] allege is wholly abstract and widely dispersed (contra, *Coleman*) . . . ." *Id.* at 829.[18]

In the Court's view, it is significant that *Raines* did not overrule *Coleman*, but instead reaffirmed that the "level of vote nullification" at issue in *Coleman* was sufficient to confer standing. *Coleman* involved a vote on *one measure* in which legislators' votes were "nullified." This action, on the other hand, challenges a state constitutional provision in effect for nearly twenty years, under which members of the Colorado General Assembly have not had the power to increase tax rates or approve new taxes

---

[18] The Court's emphasis on the "widely dispersed" nature of the injury appears to be tied to the fact that it is an institutional injury. Notably, though, in the Supreme Court's jurisprudence, this idea of a widely dispersed injury not being cognizable appears to have only been consistently applied in the context of citizen or taxpayer suits. *See, e.g., Warth*, 422 U.S. at 499 ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."). Importantly, the Supreme Court in *Akins* stated, "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" 524 U.S. at 24. Given that a sufficiently concrete injury can confer standing even if shared by all or a vast majority of Americans, this Court would be hard-pressed to deny standing if a sufficiently concrete injury existed, just because it was "widely shared" by 100 Colorado General Assembly members.

without voter approval.[19]   In the Operative Complaint, Plaintiffs allege:

- "An effective legislative branch must have the power to raise and appropriate funds.  When the power to tax is denied, the legislature cannot function effectively to fulfill its obligations in a representative democracy and a Republican Form of Government."  (*Id.* ¶ 7.)

- "[T]axation and appropriation" are "legislative core functions."  (*Id.* ¶ 43.)

- "[TABOR] removes entirely from the Colorado General Assembly any authority to change state law concerning taxation to replace or increase existing revenue, and prohibits the General Assembly from raising funds by any other means, including borrowing.  Moreover, the interaction of the provisions of TABOR may actually force existing taxes to be decreased without any action of the General Assembly." (*Id.* ¶ 80.)

- "A fully effective legislature is an essential component of a Republican Form of Government, as guaranteed to each state by [the Guarantee Clause].  By removing the taxing power of the General Assembly, the TABOR amendment renders the Colorado General Assembly unable to fulfill its legislative obligations under [the Guarantee Clause]."  (*Id.* ¶ 83.)

- "The TABOR amendment has made the General Assembly ineffective by removing an essential function, namely the power to tax.  In so doing, the TABOR amendment violates the Enabling Act."  (*Id.* ¶ 84.)

At this early stage of the proceedings, the Court *must* accept as true that the

Legislator-Plaintiffs have suffered a concrete injury.  *See Lujan*, 504 U.S. at 561 ("At the

pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice, for on a motion to dismiss we presume that general allegations

embrace those specific facts that are necessary to support the claim."); *see also Am.*

*Tradition Inst. v. State of Colorado*, --- F. Supp. 2d ---, 2012 WL 2899064, at *6-*7 (D.

Colo. July 17, 2012) (emphasizing importance of the stage of proceedings in denying

---

[19] Notably, in *Raines*, the plaintiffs brought suit *the day after* the Line Item Veto Act was passed, *see* 521 U.S. at 814, and so did not even wait until the President had exercised his new powers under the Act.

motion to dismiss complaint based on claim that the plaintiffs lacked standing).

As alleged, this injury is of a greater magnitude than the single instance of vote nullification in *Coleman*, and is far more concrete than the alleged injury in *Raines*. The injury alleged here is a concrete injury involving the removal of a "core" legislative power of the General Assembly. The allegations of the Operative Complaint are of such a magnitude that the term "dilution of institutional power" appears insufficient to describe the alleged injury TABOR has effected on Plaintiffs' core representative powers. More importantly, the allegations of the Operative Complaint detail anything but an *abstract* dilution of power. As a consequence, the concreteness of the injury alleged here weighs in favor of finding standing.[20]

With respect to the *nature* of the injury alleged by the Legislator-Plaintiffs and its

---

[20] The cases cited by Defendant are distinguishable. In *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333 (D.C. Cir. 1999), the court applied *Raines* and denied standing to state legislators challenging a federal statute that took away the power of the Alaska Legislature to control hunting and fishing on federal lands within Alaska. At this early stage of these proceedings, this Court can without hesitation distinguish the relatively narrow removal of the power over hunting and fishing on the portions of land in Alaska owned by the federal government, as being of less civic import than the alleged wholesale removal of the Colorado legislature's "core functions" of taxation and appropriation.

Defendant also unpersuasively likens this case to *Daughtrey v. Carter*, 584 F.2d 1050 (D.C. Cir. 1978). There, two legislators brought suit challenging the Executive Department's alleged failure to enforce a law that the legislature had passed. The Court denied standing on the ground that "[t]he failure or refusal of the executive branch to execute accomplished legislation does not affect the legal status of such legislation; nor does it invade, usurp, or infringe upon a Congressman's power to make law. [citation omitted] Once a bill becomes law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public." *Id.* at 1057. Here, however, the claim is that the power to legislate itself has been taken away.

Also, as previously mentioned, in *Schaffer*, a member of the House of Representatives alleged injuries based on a law being "personally offensive and professionally harmful to him, as well as damaging to his political position and his credibility among his constituency." 240 F.3d at 883. The Tenth Circuit denied standing, in part, on the conclusion that those asserted harms were "even more abstract" than those at issue in *Raines*. *Id.* at 885. Here, however, the alleged harm is significantly more concrete than that in *Raines*.

effect on standing, *Lujan* is telling.  There, the Supreme Court specifically emphasized:

> When the suit is one challenging the legality of government action or
> inaction, the nature and extent of facts that must be averred (at the
> summary judgment stage) or proved (at the trial stage) in order to establish
> standing depends considerably upon whether the plaintiff is himself an
> object of the action (or forgone action) at issue.  If he is, there is ordinarily
> little question that the action or inaction has caused him injury, and that a
> judgment preventing or requiring the action will redress it.

*Lujan*, 504 U.S. at 561-62.  Other courts have applied this holding from *Lujan* in finding

standing for legislators or legislative bodies.  *See Miller v. Moore*, 169 F.3d 1119, 1122-

23 (8th Cir. 1999) (finding standing where Nebraska voters passed ballot initiative

intended to punish legislators who did not support and actively pursue the passage of

congressional term limits); *U.S. House of Representatives v. U.S. Dep't of Commerce*,

11 F. Supp. 2d 76, 89 (D.D.C. 1998) (holding that House of Representatives had

standing to challenge the Census Bureau's plan to use statistical sampling in the Census

"because the House's composition will be affected by the manner in which the Bureau

conducts the Census," and citing this holding from *Lujan*).

Here, the allegations of the Operative Complaint indicate that TABOR was

specifically designed to take away from the General Assembly "the power to tax and [to]

arrogat[e] that power to [the voters] themselves."  (ECF No. 36, ¶ 1.)  The Legislator-

Plaintiffs, along with other members of the Colorado General Assembly, were the

targeted objects of TABOR's design.  *See Bickel v. City of Boulder*, 885 P.2d 215, 226

(Colo. 1994) ("[TABOR's] requirement of electoral approval is not a *grant* of new powers

or rights to the people, but is more properly viewed as a *limitation* on the power of the

people's elected representatives.") (emphasis in original).  That makes this case different

than *Raines*, where the challenged action was the passage of a statute where the

plaintiffs, although on the losing side of the vote, were not the targets of the action being challenged.

Thus, the concreteness and nature of the injury alleged here is distinguishable from the abstract injury alleged in *Raines*.  Moreover, the Court finds that the injury alleged here is of greater magnitude than the single instance of vote nullification in *Coleman*.  Both of these considerations weigh in favor of finding that the Legislator-Plaintiffs have standing in this action.[21]

### (2)   Institutional Injury, Suing in an Official Capacity, and Authorization to Represent the Legislative Body

*Raines* repeatedly emphasized the importance of the fact that the plaintiffs there alleged an institutional injury in their official capacities, and not any personal injury differentiable from the injury suffered by all Members of Congress.  *See, e.g.*, 521 U.S. at 821 (in distinguishing *Powell*, the Court stated, "[A]ppellees have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally.").  The *Raines* Court also attached "some importance" to the fact that the plaintiffs there had not been authorized to represent the legislative bodies in which they served.  *Id.* at 829.  These concepts are obviously inter-related because an institutional legislative injury might be more appropriately raised by the legislative

---

[21] It would be overly formalistic to deny standing on the ground that the Colorado General Assembly has never unsuccessfully attempted to circumvent TABOR by, for example, passing a tax bill and attempting to coax the Governor's office to sign the bill into law without first submitting the bill to the voters for approval, but ultimately being prevented from doing so by the Colorado Attorney General.

institution itself, or by legislators authorized to represent the legislative institution.

As in *Raines*, the Legislator-Plaintiffs here clearly base their claim of standing on an institutional injury:  TABOR's removal of the Colorado General Assembly's power to increase tax rates or impose new taxes without voter approval.  The Legislator-Plaintiffs also clearly bring their claims in their official capacities as state legislators.  (ECF No. 36, ¶¶ 9-10 ("The offices held by [the Legislator-Plaintiffs] are relevant to their standing in the case. . . . [They bring this action] in [their] capacity as [] State Representative[s].")  The Legislator-Plaintiffs also concede that they have not been authorized to bring this action on behalf of the General Assembly.  (*Id.* ¶ 9 ("[Plaintiffs do] not imply that the governmental bodies have themselves taken any official position regarding this litigation nor that these plaintiffs speak for those governmental bodies regarding this litigation.").

The law remains unclear regarding the situations in which an institutional legislative injury (where the plaintiffs legislators are not authorized to represent the legislative body) confers standing on legislators, and when it does not.  Notably, in *Coleman*, the plaintiffs alleged an injury suffered in their official capacities, of an institutional nature, and they had not been authorized to bring suit on behalf of the Kansas Senate.  The Supreme Court in *Raines* could have overruled *Coleman* and laid down a *per se* rule that legislators alleging an institutional injury, where the legislators have not been authorized to bring suit on behalf of the legislative body, never have standing to pursue such claims.  Instead, *Raines*'s treatment of *Coleman* was significantly more limited.  After analyzing ways in which *Coleman* was distinguishable (including the presence or lack of an adequate internal legislative remedy), the Court in *Raines* expressed concern about pulling *Coleman* "too far from its moorings," and

28

emphasized how significantly different the concreteness and magnitude of the injuries were. *Raines*, 521 U.S. at 825-26 ("There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here."). Also, although the *Raines* Court held that *Coleman* stands "at most" for the proposition that legislators have standing where their votes have been completely nullified (because their votes would have been successful but for the challenged action), that does not mean legislative standing can *only* be found to exist if the circumstances in *Coleman* are present. By analyzing *Coleman* in these ways, the Court in *Raines* provided less guidance to future lower courts, including this Court, regarding when an institutional legislative injury does or does not confer standing.

Given *Raines*'s discussion of *Powell*, however, and much of the case law interpreting *Raines*,[22] the institutional injury alleged by the Legislator-Plaintiffs here, and the fact that they have not been authorized to bring suit on behalf of the Colorado General Assembly, draws some skepticism from this Court regarding whether the injury alleged can provide a legitimate basis for standing. But because *Raines* did not provide clearer guidance, and because of the concreteness of the injury alleged here, the Court finds it appropriate to also evaluate the other factors identified in *Raines* to determine whether they weigh in favor or against finding legislative standing in the circumstances presented here. *See Raines*, 521 U.S. at 829-30 ("Whether the case would be different if

---

[22] As Defendant points out, however, numerous lower courts since *Raines*, in denying legislative standing, have placed great weight on the fact that what was being alleged was an institutional injury common to all members of the legislative body and/or one involving a mere loss of political power. *See, e.g.*, *Schaffer*, 240 F.3d at 885; *Alaska Legislative Council*, 181 F.3d at 1336-38; *Chenoweth v. Clinton*, 181 F.3d 112, 115-16 (D.C. Cir. 1999); *Kucinich v. Obama*, 821 F. Supp. 2d 110, 116-18 (D.D.C. 2011).

any of these circumstances were different we need not now decide.").

**(3)**      **Separation-of-Powers and Federalism Concerns**

In *Raines*, the Court's emphasis on separation-of-powers concerns was

significant.  Overlaying the entirety of the decision was the Court's initial statement that

> our standing inquiry has been especially rigorous when reaching the merits
> of the dispute would force us to decide whether an action taken by one of
> the other two branches of the Federal Government was unconstitutional.
> The law of Article III standing is built on a single basic idea – the idea of
> separation of powers.  In the light of this overriding and time-honored
> concern about keeping the Judiciary's power within its proper constitutional
> sphere, we must put aside the natural urge to proceed directly to the merits
> of this important dispute and to "settle" it for the sake of convenience and
> efficiency.

*Id.* at 819-20 (citations and quotation marks omitted).  Also, later in the decision, the

Court engaged in a detailed analysis of different times in the nation's history when

Members of Congress or the Executive declined to entangle the Judiciary in

confrontations between Congress and the Executive Branch.  *Id.* at 826-28.  This

historical discussion underscores the importance of separation of powers in the *Raines*

Court's analysis.  Further, it is notable that the *Raines* Court's initial statement regarding

*Coleman* emphasized that *Coleman* was brought by state legislators, not federal

legislators, further reiterating the importance of federal separation-of-powers concerns in

the Court's analysis.  *Id.* at 821 ("The one case in which we have upheld standing for

legislators (albeit *state* legislators) claiming an institutional injury is *Coleman* . . . .)

(emphasis in original).

Indeed, the vast majority of case law addressing legislative standing involve cases

in which the federal Judiciary is asked to resolve a dispute between the federal Executive

30

and Legislative Branches.[23]  Here, however, this Court is not being asked "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Id.* at 819-20.  Instead, like in *Coleman*, this Court is being asked to resolve a dispute involving a state legislature.[24]

It is significant, too, that this Court is also not being asked to resolve a dispute between separate branches of Colorado government.[25]  Articles IV, V, and VI of the Colorado Constitution create three "distinct departments" of the Colorado government, the Executive Department, the Legislative Department, and the Judicial Department, respectively.  *See* Colo. Const. arts. III, IV, V, VI.  This action involves a solely *intra*-branch dispute involving *only* the Colorado Legislative Department:  Article V of the Colorado Constitution – the Article creating the Legislative Department – not only creates the Colorado General Assembly, it also reserves to the Colorado electorate the initiative and referendum power as a legislative power.  *See* Colo. Const. art. V, § 1, cls. (1)-(3).  This dispute, therefore, is between two components of the same Legislative Department.

---

[23] Not surprisingly, for this reason most of these cases come out of the D.C. Circuit.

[24] *See also Harrington v. Bush*, 553 F.2d 190, 204 n.67 (D.C. Cir. 1977) ("The major distinguishing factor between *Coleman* and the present case lies in the fact that the plaintiffs in *Coleman* were state legislators.  A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.  If a federal court decides a case brought by a United States legislator, it risks interfering with the proper affairs of a coequal branch.").  *But see Alaska Legislative Council*, 181 F.3d at 1337-39 (applying *Raines* to deny standing to state legislators challenging a federal statute that took away the power of the Alaska Legislature to control hunting and fishing on federal lands within Alaska).

[25] *See Planned Parenthood of Mid-Missouri & E. Kan., Inc. v. Ehlmann*, 137 F.3d 573, 578 n.5 (8th Cir. 1998) ("Justice Souter [in his concurring opinion in *Raines*] cautioned against courts embroiling themselves in a political interbranch controversy between the United States Congress and the President.  [citation omitted]  Federal courts should exercise this same caution when, as in this case, there exists a political interbranch controversy between state legislators and a state executive branch concerning implementation of a bill.").

The fact that this action does not present any separation-of-powers concerns,
either between separate branches of the federal government or separate branches of the
Colorado government, does not end this Court's inquiry into whether an equivalent
concern warrants declining to hear this case:  federalism.[26]  *See* 13B Wright & Miller,
*Federal Practice & Procedure* § 3531.11.3 (3d ed. 2012) ("State legislator standing
raises issues similar to the issues of congressional plaintiff standing, although the
separation-of-powers concerns are much diminished and largely replaced by concerns of
federalism.").

> [Federalism involves] the notion of 'comity,' that is, a proper respect for
> state functions, a recognition of the fact that the entire country is made up
> of a Union of separate state governments, and a continuance of the belief
> that the National Government will fare best if the States and their
> institutions are left free to perform their separate functions in their separate
> ways. . . . The concept does not mean blind deference to 'States' Rights'
> any more than it means centralization of control over every important issue
> in our National Government and its courts.  The Framers rejected both
> these courses.  What the concept does represent is a system in which
> there is sensitivity to the legitimate interests of both State and National
> Governments . . . .

*Younger v. Harris*, 401 U.S. 37, 44 (1971).  Where, however, it is state action which
allegedly violates the U.S. Constitution, federalism concerns are reduced.  *See Valdivia
v. Scharzenegger*, 599 F.3d 984, 991 n.6 (9th Cir. 2010) ("[P]rinciples of federalism do
not permit a state to violate what this court has already deemed to be a constitutionally-
protected right."); *Mackin v. City of Boston*, 969 F.2d 1273, 1275-76 (1st Cir. 1992)
("[F]ederal courts, in mulling whether to relax or abandon their supervision over the

---

[26] *Raines* declined to address appellants' alternative arguments that *Coleman* should be
distinguished because "the separation-of-powers concerns present in such suit were not
present in *Coleman*, and since any federalism concerns were eliminated by the Kansas
Supreme Court's decision to take jurisdiction over the case."  *Raines*, 521 U.S. at 824 n.8.

operation of local governmental units, should take federalism concerns into account, ever

mindful that the legal justification for displacement of local authority is a violation of the

Constitution by the local authorities.") (quotation marks and ellipses omitted).

In this regard, the Court finds it significant that TABOR was passed nearly twenty

years ago.[27]  In *Lucas v. Forty-Fourth General Assembly of the State of Colorado*, 377

U.S. 713 (1964), the Supreme Court emphasized that a federal court might properly wait

a short period to allow a state's electorate to remedy an unconstitutional measure

passed by ballot initiative, but that otherwise the federal court must act to remedy the

constitutional violation:

> Courts sit to adjudicate controversies involving alleged denials of
> constitutional rights.  While a court sitting as a court of equity might be
> justified in temporarily refraining from the issuance of injunctive relief in an
> apportionment case in order to allow for resort to an available political
> remedy, such as initiative and referendum, individual constitutional rights
> cannot be deprived, or denied judicial effectuation, because of the
> existence of a nonjudicial remedy . . . .  [C]onstitutional rights can hardly be
> infringed simply because a majority of the people choose that it be. . . .
> [T]he fact that a practicably available political remedy, such as initiative and
> referendum, exists under state law provides justification only for a court of
> equity to stay its hand temporarily while recourse to such a remedial device
> is attempted . . . .

*Id.* at 736-37 (1964).[28]

At this stage of the proceedings, this Court must assume the validity of Plaintiffs'

---

[27] TABOR has only been modified since by Referendum C, which in no way affected the limitation on the General Assembly's power to increase tax rates or impose new taxes without voter approval.

[28] *See also Kean v. Clark*, 56 F. Supp. 2d 719, 727 (S.D. Miss. 1999) ("The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design. . . .  [Further,] it is irrelevant that a statutory restriction is based upon a constitutional provision enacted by petition.  The voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation.") (citations, quotation marks, brackets, and ellipses omitted).

allegations that TABOR is unconstitutional, and their allegations regarding the importance of the constitutional rights at issue. *See Lujan*, 504 U.S. at 561. Given these accepted allegations, the fact that TABOR has been in effect for nearly twenty years counsels against the Court "staying its hand," and in favor of allowing the case to proceed without further delay.

With there being no separation-of-powers concerns in this case (unlike in *Raines*), and with federalism concerns diminished by the length of time TABOR has caused the alleged harms at issue (with those allegations being accepted as true at this stage of the proceedings), the Court finds that these considerations weigh in favor of finding legislative standing here.

### (4)    Whether Legislators Have an Adequate Internal Remedy

TABOR was passed by the Colorado electorate by ballot initiative, without any involvement of the Colorado General Assembly. (ECF No. 36, ¶ 1.) Also, significantly, TABOR is an amendment to the Colorado Constitution that can only be revoked or amended by a majority of Colorado voters. *See* Colo. Const. art. XIX, §§ 1, 2. The only power members of the Colorado General Assembly have to undo TABOR is to *propose* to Colorado voters that they pass a constitutional amendment or authorize a constitutional convention. *See id.* In order for the legislature to submit a proposed constitutional amendment to the Colorado electorate, an affirmative vote by two-thirds of each House of the General Assembly is required. *See id.* This leaves the Legislator-Plaintiffs in this case with little available remedy in the political process to undo TABOR, and no means by which to effect any change to the current TABOR regime by way of any of the legislature's remaining powers or prerogatives.

34

That distinction makes this case remarkably different from *Raines*.  Indeed, in *Raines* the presence of an internal legislative remedy was one of the primary bases upon which the Court distinguished *Coleman*.  *See* 521 U.S. at 824.  The removal of the Colorado General Assembly's power to independently pass any tax legislation, without any recourse available to that Assembly, places this case in stark contradistinction to the facts in *Raines*, in which various internal remedies were available to the plaintiffs.

Courts since the *Raines* decision have continued to emphasize the importance of the existence of a legislative remedy in legislative standing analysis.  For example, in *Kucinich v. Obama*, 821 F. Supp. 2d 110 (D.D.C. 2011), the court denied standing to legislators who sought to challenge the President's authorization of military action in Libya without congressional approval.  Analyzing *Raines* and *Coleman*, the court concluded that for legislative standing to exist,

> plaintiff legislators must be without legislative recourse before they may turn to the courts to seek their desired remedy. . . . [The plaintiffs] have not demonstrated that they are without a legislative remedy. . . .  By contending that their votes were nullified, despite seemingly acknowledging that they retain legislative remedies, the plaintiffs' arguments overlook the important role political remedies have in the standing analysis.  In the end, the availability of effective political remedies goes to the very heart of the standing analysis . . . .

*Kucinich*, 821 F. Supp. 2d at 119-20.[29]  Also, in *Russell v. Dejongh*, 491 F.3d 130 (3d Cir.

---

[29] Defendant cites *Kucinich* in support of the argument that the Legislator-Plaintiffs do not have standing here.  (ECF No. 73, at 13, 15-16.)  Indeed, the *Kucinich* decision also placed great weight on the fact that what was alleged there was an institutional injury and that the legislator plaintiffs had not been authorized to bring suit on behalf of their respective legislative bodies.  821 F. Supp. 2d at 116-18.  However, the fact that in *Kucinich* an internal legislative remedy existed – and the fact that *Kucinich* placed so much importance on this fact – makes *Kucinich* distinguishable on that basis.  Also, like in *Raines*, separation-of-powers concerns existed in *Kucinich*, but do not exist here, further distancing *Kucinich* from the issues presented by the instant dispute.

2007), a Senator of the Virgin Islands challenged the Governor's appointment of Supreme Court justices on the ground that the Governor was untimely in submitting the nominations to the legislature for approval.  The court distinguished cases in which there were no internal legislative remedies, stating, "the Legislature was free to confirm, reject, or defer voting on the Governor's nominees.  The consequence of the Governor's late submission of the nominations was thus not to circumvent the Legislature, but to place the decision whether to confirm the nominees directly in their hands."  *Id.* at 136.  The Third Circuit in *DeJongh* also stated, "[C]ourts have drawn a distinction . . . between a public official's mere disobedience of a law for which a legislator voted – which is not an injury in fact – and an official's distortion of the process by which a bill becomes law by nullifying a legislator's vote or depriving a legislator of an opportunity to vote – which is an injury in fact."  *Id.* at 135-36 (quotation marks omitted).

The importance of the presence of a potential internal legislative remedy makes sense, because this consideration is directly tied to federal separation-of-powers concerns.  *See, e.g.*, *Leach v. Resolution Trust Corp.*, 860 F. Supp. 868, 875 (D.D.C. 1994) (stating that courts should be "reluctant to meddle in the internal affairs of the legislative branch" due to separation-of-powers concerns).  If a legislator has an adequate internal remedy, he should not be challenging a decision of the legislature in an Article III court.  Instead, he should work within his own legislature to enact a remedy.  Those concepts are entirely inapplicable here.  The fact that Colorado voters enacted TABOR in 1992, with members of the Colorado General Assembly having no effective recourse to legislatively prevent its passage or undo its effects, weighs heavily in favor of finding legislative standing in this case.

36

### (5)   Whether a Finding of No Standing Would Foreclose TABOR from Constitutional Challenge

Without discussing the issue during most of the decision, the Supreme Court at the end of the *Raines* decision also "note[d]" that its decision to deny legislative standing would not "foreclose[] the [Line Item Veto] Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act)."  521 U.S. at 829.  The weight of Supreme Court jurisprudence on this point, however, makes clear that this issue is irrelevant:  standing cannot be found merely because there is no other plaintiff who would have standing.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) ("'[T]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.'  This view would convert standing into a requirement that must be observed only when satisfied.  Moreover, we are unwilling to assume that injured parties are nonexistent simply because they have not joined respondents in their suit.") (quoting *Schlesinger*, 418 U.S. at 227); *United States v. Richardson*, 418 U.S. 166, 179 (1974) ("It can be argued that if respondent is not permitted to litigate this issue, no one can do so.  In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process."); *see also State of Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998).  Given this precedent, the Court declines to place any weight on the possibility that if the Legislator-Plaintiffs were denied standing, there might be no other plaintiff who would have standing to bring an action in federal court challenging TABOR.

### c. Conclusion on Injury in Fact

This action involves an alleged institutional legislative injury asserted by legislators suing in their official capacities, but who have not been authorized to bring this action on behalf of their respective legislative bodies. These factors are of considerable significance in determining whether the Legislator-Plaintiffs have standing to pursue this action.

It is there, however, that the similarity between this case and *Raines* ends. Unlike in *Raines*, this action involves a concrete, though dispersed, injury. Also, unlike *Raines*, there are no separation-of-powers concerns present in this case, concerns that lie at the heart of standing analysis. Moreover, given the circumstances of this dispute, federalism concerns do not weigh against hearing this case. And finally, unlike in *Raines*, the Legislator-Plaintiffs here are without meaningful legislative recourse. All of these factors, especially when considered together, weigh in favor of finding that the Legislator-Plaintiffs have standing to pursue this action.

The Court therefore concludes that the Legislator-Plaintiffs have, at this early stage of the proceedings, advanced sufficient allegations of a cognizable injury in fact sufficient to confer Article III standing.

### 5. Legislative Standing – Causation and Redressability

Having determined that the Legislator-Plaintiffs have sufficiently alleged injury in fact, the Court has little trouble concluding that the remaining causation and redressability elements for legislative standing are also met at the pleading stage. *Lujan*, 504 U.S. at 561. Plaintiffs have sufficiently alleged that the passage of TABOR and resulting amendment of the Colorado Constitution directly and proximately caused the

harm of which Plaintiffs complain:  the removal of the Colorado General Assembly's power to raise tax rates or impose new taxes without separate voter approval.  (ECF No. 36, ¶¶ 1, 6-8.)  *See also* Colo. Const. art. X, § 20, cls. (2)(b), (4)(a).  Thus, as Plaintiffs also allege, it would appear to easily follow that the invalidation of TABOR would remove the requirement that a tax rate increase or new tax passed by the General Assembly obtain separate voter approval prior to becoming law.  *See Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1084-85 (D. Colo. 2001) (accepting general allegations of causation and redressability at the pleading stage); *Am. Tradition Inst.*, --- F. Supp. 2d ---, 2012 WL 2899064, at *7 (same).

The Court therefore concludes that, at this stage of the litigation, the Legislator-Plaintiffs have constitutional standing.

### 6.    Prudential Standing of Legislator-Plaintiffs

Neither in the Motion to Dismiss nor in the Reply brief does Defendant specifically argue that the Court should dismiss this action based on prudential standing principles. Defendant's Supplemental Brief, however, contains a brief section arguing that dismissal is warranted based on the prudential standing principle that federal courts should refrain from resolving "abstract questions of wide public significance."  (ECF No. 73, at 23-24.)

"Beyond the constitutional requirements [for standing], the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll.*, 454 U.S. at 474; *see also Allen*, 468 U.S. at 751 (describing prudential standing principles as "judicially self-imposed limits on the exercise of federal jurisdiction").  First, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally

does not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499.  Second, "even when

the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . .

the plaintiff generally must assert his own legal rights and interests, and cannot rest his

claim to relief on the legal rights or interests of third parties." *Id.*  And third, "the interest

sought to be protected [must be] arguably within the zone of interests to be protected or

regulated by the statute or constitutional guarantee in question." *See Ass'n of Data*

*Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  *See also Allen*, 468

U.S. at 751 (summarizing all three prudential standing principles).

      The prudential standing principle that federal courts should refrain from resolving

"abstract questions of wide public significance" – the basis on which Defendant tardily

seeks dismissal – might arguably be applicable to Plaintiffs' claim that they have standing

as citizens of Colorado.  However, the Court declines to reach the issue of whether

Plaintiffs as citizens have standing in that capacity.  (*See infra.*)  In terms of the

Legislator-Plaintiffs (five of whom have brought this action and where there are a total of

100 members of the Colorado General Assembly), the Court declines to dismiss this

action based on the prudential standing principle barring adjudication of "abstract

questions of wide public significance."  Accepting the Operative Complaint's allegations

as true, TABOR was an action targeted at the 100-member General Assembly.  The

injury alleged by the Legislator-Plaintiffs is not a "generalized grievance shared in

substantially equal measure by *all or a large class of citizens.*"  *Warth*, 422 U.S. at 499

(emphasis added); *see also Akins*, 524 U.S. at 23 ("Whether styled as a constitutional or

prudential limit on standing, the Court has sometimes determined that where *large*

*numbers of Americans* suffer alike, the political process, rather than the judicial process,

may provide the more appropriate remedy for a widely shared grievance.") (emphasis

added).  The prudential standing principle barring adjudication of "generalized

grievances" or "abstract questions of wide public significance" does not apply to the

Legislator-Plaintiffs' claims.

Likewise, no other prudential standing principle bars this action, and Defendant

has not asserted as much.  First, the principle prohibiting a litigant from raising another

person's legal rights does not apply.  The Operative Complaint's allegations, accepted as

true, indicate that TABOR was directly targeted at taking away the power of members of

the General Assembly to independently enact tax legislation.  *See Lujan*, 504 U.S. at

561-62 ("[I]f the plaintiff is himself an object of the action (or forgone action) at issue . . .,

there is ordinarily little question that the action or inaction has caused him injury, and that

a judgment preventing or requiring the action will redress it.").  And second, the zone of

interests test does not bar this action, at least at this early stage of the proceedings.  In

terms of that test, the Court has found little to no case law authority indicating who falls

within the zone of interests intended to be protected by the Guarantee Clause and

Enabling Act.  *See Largess v. Supreme Judicial Court for the State of Mass*., 373 F.3d

219, 228 n.9 (1st Cir. 2004) (citing authorities discussing question of whether the

Guarantee Clause confers judicially cognizable rights on individuals as well as states).

As to the Supremacy Clause, the Tenth Circuit recently declined to decide who falls

within the zone of interests test, but pointed to case law from other Circuits in which

courts held that consideration of prudential standing is unnecessary in Supremacy

Clause challenges.  *See Wilderness Soc'y v. Kane Cnty., Utah*, 632 F.3d 1162, 1170

(10th Cir. 2011) (citing cases).  Given the lack of precedent, the Court will err on the side

41

of finding that the zone-of-interests test is met here. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (stating that the zone of interests prudential standing test "is not meant to be especially demanding" and that "we have always conspicuously included the word 'arguably' in the test to indicate that the benefit of the doubt goes to the plaintiff") (quotation marks omitted).

On these grounds, the Court concludes that prudential standing principles do not bar the Legislator-Plaintiffs at this stage of the proceedings.

### 7.    Standing of Other Plaintiffs

Because the Court holds that the Legislator-Plaintiffs have standing to pursue this action, the Court need not, and declines to, address whether any other Plaintiffs have standing. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) ("[Because] we have at least one individual plaintiff who has demonstrated standing . . ., we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State's."); *cf. Horne v. Flores*, 129 S. Ct. 2579, 2592 (2009) ("Because the superintendent clearly has standing to challenge the lower courts' decisions, we need not consider whether the Legislators also have standing to do so.").[30]

### B.    The Political Question Doctrine

Defendants also argue that the political question doctrine bars all of Plaintiffs'

---

[30] *See also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 729 (1990); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

claims brought in the Operative Complaint.

### 1.    General Rules Regarding the Political Question Doctrine

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990) (stating that the political question doctrine "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government"); *Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers."). The basis for the doctrine is that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling*, 478 U.S. at 230 (quotation marks omitted). It is a "judicially created" doctrine (not an express constitutional or statutory provision), *In re Nazi Era Cases Against German Defendants Litig.*, 196 F. App'x 93, 97 (3d Cir. 2006), having its roots in case law dating back to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

The six widely recognized tests for determining whether a particular case presents a non-justiciable political question come from *Baker v. Carr*, 369 U.S. 186 (1962). There, the Court stated,

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found **[1]** a textually demonstrable constitutional commitment of the issue to a coordinate political department;

> or **[2]** a lack of judicially discoverable and manageable standards for
> resolving it; or **[3]** the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or **[4]** the
> impossibility of a court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of government; or
> **[5]** an unusual need for unquestioning adherence to a political decision
> already made; or **[6]** the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

*Id.* at 217 (bolded numbering added by this Court).  The *Baker* Court continued,

> Unless one of these formulations is inextricable from the case at bar, there
> should be no dismissal for non-justiciability on the ground of a political
> question's presence.  The doctrine of which we treat is one of 'political
> questions,' not one of 'political cases.' The courts cannot reject as 'no law
> suit' a bona fide controversy as to whether some action denominated
> 'political' exceeds constitutional authority.

*Id.  Baker* further emphasized, "The cases we have reviewed show the necessity for

discriminating inquiry into the precise facts and posture of the particular case, and the

impossibility of resolution by any semantic cataloguing."  *Id.*; *see also id.* at 210-11

("Much confusion results from the capacity of the 'political question' label to obscure the

need for case-by-case inquiry.  Deciding whether [the political question doctrine applies]

is itself a delicate exercise in constitutional interpretation . . . ."); *id.* at 210 ("the attributes

of the [political question] doctrine . . . in various settings, diverge, combine, appear, and

disappear in seeming disorderliness").

### 2.    The Guarantee Clause Claim and the Political Question Doctrine

#### a.    Summary of Parties' Arguments Regarding the Political Question Doctrine's Applicability to Plaintiffs' Guarantee Clause Claim

The parties' arguments, particularly those of Defendant, regarding the applicability

*vel non* of the political question doctrine to this action focus on Plaintiffs' First Claim for

44

Relief in the Operative Complaint, the Guarantee Clause Claim.  Plaintiffs' Guarantee

Clause claim alleges that, "[b]y removing the taxing power of the General Assembly, the

TABOR amendment renders the Colorado General Assembly unable to fulfill its

legislative obligations under a Republican Form of Government and violates the

guarantee of Article IV, Section 4 . . . ."  (ECF No. 36, ¶ 82.)

In moving to dismiss Plaintiffs' Guarantee Clause claim, Defendant argues that

this case is directly on point with *Pacific States Telephone & Telegraph Co. v. State of*

*Oregon*, 223 U.S. 118 (1912), a U.S. Supreme Court case holding that a Guarantee

Clause challenge to Oregon's ballot initiative system was barred by the political question

doctrine.  Defendant also argues that all of the six tests identified in *Baker v. Carr* for

whether a case presents a non-justiciable political question are met here.

In response, Plaintiffs (and the *amici* Professors) argue that *Pacific States* is

distinguishable, because that case involved a challenge to Oregon's entire ballot initiative

process, while this case presents a far narrower challenge to only one particular

measure passed by Colorado voters pursuant to their power of initiative.  Plaintiffs (and

*amici* Professors) also argue that none of the six *Baker* tests are met here.

> **b.    The History of the Application of the Political Question Doctrine
> to Guarantee Clause Claims, and Whether Such Claims Are *Per
> Se* Non-Justiciable**

The United States Supreme Court's most recent pronouncement regarding the

applicability of the political question doctrine to Guarantee Clause claims came in 1992 in

*New York v. United States*, 505 U.S. 144 (1992).  There, the Court reviewed the history

of court decisions and other sources addressing the issue of whether Guarantee Clause

claims are barred by the political question doctrine.  *Id.* at 184-85.  The Court first pointed

out a substantial line of cases, beginning with *Luther v. Borden*, 48 U.S. 1 (1849), that

"metamorphosed into the sweeping asssertion" that Guarantee Clause claims are *per se*

non-justiciable.  *New* York, 505 U.S. at 184.[31]  The Court then pointed out other cases

(decided between 1875 and 1905) in which courts "addressed the merits of claims

founded on the Guarantee Clause without any suggestion that the claims were not

justiciable."  *Id.* at 184-85.  Further, the Court indicated that more recent authority

"suggest[s] that perhaps not all claims under the Guarantee Clause present

nonjusticiable political questions."  *Id.* at 185 (citing, *inter alia*, *Reynolds v. Sims*, 377

U.S. 533 (1964)).  Ultimately, the Court did not resolve the question, stating, "We need

not resolve this difficult question today.  Even if we assume that petitioners' claim is

justiciable, [it ultimately lacks merit]."  *Id.*

  This Court proceeds to conduct its own, albeit non-exhaustive, historical analysis

of the case law on the topic.  In *Luther v. Borden*, 48 U.S. 1 (1849) ("*Luther*"), the

Supreme Court was asked to decide whether the charter government of Rhode Island, or

a competing faction, was the legitimate government of Rhode Island.  The Court

ultimately held that the case could not be heard in the courts because "it rests with

Congress to decide what government is the established one in a State.  For as the

United States guarantee to each State a republican government, Congress must

necessarily decide what government is established in the State before it can determine

whether it is republican or not."  *Id.* at 42.  The *Luther* Court also pointed out that the

President had already recognized the charter government by agreeing to assist it with

---

[31] Also citing *Pacific States*, 223 U.S. 118; *Colegrove v. Green*, 328 U.S. 549 (1946); *Baker*, 369 U.S. 186; and *City of Rome v. United States*, 446 U.S. 156 (1980).

military force if the need should arise, and that courts in Rhode Island had also recognized the charter government's authority. *Id.* at 40, 43-44. The *Luther* Court further emphasized, among other things, that there were no judicially manageable standards to resolve the dispute, and that the Court was being asked to make a political decision. *Id.* at 41.

*New York* emphasized that the "limited" holding in *Luther* – that it rests with Congress to decide what government is the established one in a state – subsequently began "metamorphos[izing] into the sweeping assertion" that Guarantee Clause claims are *per se* non-justiciable. *New York*, 505 U.S. at 184; *see also* Akhil Reed Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 753 (1994) ("[T]he hoary case said to establish the general nonjusticiability of the [Guarantee] Clause, *Luther v. Borden*, in fact establishes no such thing . . . .").

The next significant U.S. Supreme Court decision in this area is *Pacific States Telephone & Telegraph Co. v. State of Oregon*, 223 U.S. 118 (1912) ("*Pacific States*"). This is the case focused on most heavily by the parties, with Defendant arguing that the case is on point, and Plaintiffs arguing that it is distinguishable. In that case, Pacific States Telephone & Telegraph Co. challenged a corporate tax passed by voter initiative. Through the framing of the issues, the U.S. Supreme Court was asked to decide whether Oregon's entire voter initiative system violated the Guarantee Clause. The Court in *Pacific States* analyzed the *Luther* opinion and concluded that "[i]t was long ago settled that the enforcement of th[e] guaranty [of a republican form of government] belonged to the political department." *Id.* at 149. Applying *Luther*, the Court continued,

47

> [The] essentially political nature [of the attack on the statute here] is at once made manifest by understanding that the assault which the contention here advanced makes is not on the tax as a tax, but on the state as a state.  It is addressed to the framework and political character of the government by which the statute levying the tax was passed.  It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power . . . but to demand of the state that it establish its right to exist as a state, republican in form.

*Id.* at 150-51.  Based on this rationale, the Court held that the challenge to Oregon's ballot initiative system presented a non-justiciable political question.  *Id.* at 151.

In *Colegrove v. Green*, 328 U.S. 549 (1946) ("*Colgrove*"), the Supreme Court was asked to intervene in a dispute regarding the apportionment of legislative districts within Illinois.  The Court held that the issue was political and non-justiciable.  "To sustain this action would cut very deep into the very being of Congress.  Courts ought not to enter this political thicket.  The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress."  *Id.* at 556.  Citing to *Pacific States*, the Court in *Colegrove* again enunciated the broad rule called into question in *New York*:  "Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts."  *Id.*

The next case discussing the justiciability of Guarantee Clause claims is the foundational case for the political question doctrine, *Baker v. Carr*, 369 U.S. 186 (1962) ("*Baker*").[32]  There, the Court laid out the six (now widely recognized) tests for whether a case presents a non-justiciable political question.  *Id.* at 217.  The Court also repeatedly emphasized that the facts of each case must be scrutinized in determining justiciability.

---

[32] Notably, *Baker* held to be justiciable the same type of claim – legislative apportionment – that was at issue in *Colegrove*.

*See id.* ("The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.").  After reviewing other subject areas, the Court addressed Guarantee Clause cases, discussing *Luther* and its progeny, and stating that "the Court has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question . . . ."  *Id.* at 224; *see generally id.* at 218-26.  There is language in *Baker* indicating the Court's belief, based on precedent, that Guarantee Clause claims are *per se* non-justiciable.  *See id.* at 226-27 ("[T]he appellants might conceivably have added a claim under the Guarantee Clause.  Of course, as we have seen, any reliance on that clause would be futile.").  However, there is other language to the contrary.  *See id.* at 222 n. 48 ("Even though the [*Luther*] Court wrote of unrestrained legislative and executive authority under this Guaranty, thus making its enforcement a political question, the Court plainly implied that the political question barrier was no[t] absolute . . . .").  Further, it is important to note that *Baker* involved an equal protection claim, not a Guarantee Clause claim, so the Court's discussion of Guarantee Clause cases, albeit detailed, is clearly *dicta*.  Nevertheless, *Baker* is much more widely recognized for setting forth the six governing tests for determining whether a particular claim presents a non-justiciable political question.

Between the *Baker* decision in 1962 and the 1992 *New York* decision, the Supreme Court did not address in detail the justiciability of Guarantee Clause cases.  Two years after the *Baker* decision, the Court in *Reynolds v. Sims*, 377 U.S. 533 (1964), cited *Baker* and stated, "*some* questions raised under the Guaranty Clause are nonjusticiable, where [they are] 'political' in nature and where there is a clear absence of

49

judicially manageable standards." *Id.* at 582 (emphasis added).  This is the case cited by the *New York* Court for the proposition that "[m]ore recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions."  505 U.S. at 185.

That brings this Court back to the Supreme Court's most recent pronouncement of the issue in *New York*, in which the Supreme Court called into question the cases adopting a *per se* rule that Guarantee Clause claims are not justiciable.  In addition to looking at controlling precedent from the U.S. Supreme Court, this Court also looks for binding precedent from the Tenth Circuit.  Significantly, two recent Tenth Circuit decisions have discussed the fact that *New York* called into question the idea that Guarantee Clause claims are *per se* non-justiciable.  In *Kelley v. United States*, 69 F.3d 1503 (10th Cir. 1995), the Tenth Circuit described the *New York* decision, pointing out that "there has been some belief that violations of the Guarantee Clause cannot be challenged in the courts," but also pointing out that "it has [been] suggested, in more recent opinions, that this belief may be incorrect."  *Id.* at 1510.  Like *New York*, the Court in *Kelley* did not resolve the issue:  "Assuming, without deciding, that plaintiffs' claim is justiciable, there appears to be no merit to it."  *Id.* at 1511.  Then, in *Hanson v. Wyatt*, 552 F.3d 1148 (10th Cir. 2008), the Tenth Circuit briefly identified *Colegrove*'s holding that Guarantee Clause claims cannot be raised in court, and then stated, "[t]he *New York* court, however, was not so sure about that.  It decided not to resolve the matter on justiciability grounds.  Rather, it *assumed justiciability* and rejected the claim on the

merits." *Id.* at 1163 (emphasis in original).[33]

   c. **Discussion of Whether a *Per Se* Rule Would Be Properly Applied, and Whether *Pacific States* Controls, in this Action**

  *New York*, *Kelley*, and *Hanson* provide little to no guidance to this Court regarding whether the political question doctrine bars the particular Guarantee Clause claim being raised in this action, a claim based on unique allegations involving TABOR and its effects.  However, given this recent U.S. Supreme Court and Tenth Circuit case law seriously calling into question the propriety of applying a *per se rule of non-justiciability* in Guarantee Clause cases, the Court determines that it cannot summarily conclude that Plaintiffs' Guarantee Clause claim is *per se* non-justiciable.  *See Trimble v. Gordon*, 430 U.S. 762, 776 n.17 (1977) ("To the extent that our analysis in this case differs from [a previous case] the more recent analysis controls."); *Peoples v. CCA Detention Ctrs.*, 422 F.3d 1090, 1102 (10th Cir. 2005) ("We . . . think it prudent to follow the Court's most

---

[33] It is notable that many courts, like *New York*, *Kelley*, and *Hanson*, have resolved cases on the merits rather than having to resolve the difficult question of whether any Guarantee Clause claims are justiciable, and if some are, which types of claims.  *See, e.g.*, *City of New York v. United States*, 179 F.3d 29, 37 (2d Cir. 1999) (citing *New York*, and stating, "Even assuming the justiciability of this [Guarantee Clause] claim, [it lacks merit].");  *United States v. Vazquez*, 145 F.3d 74, 83 (2d Cir. 1998) (same); *Adams v. Clinton*, 90 F. Supp. 2d 27, 34 (D.D.C. 2000) (same); *see also State of Michigan v. United States*, 40 F.3d 817, 837 (6th Cir. 1994) (Guy, J., dissenting) ("I hesitate to reach the substantive question of the Guarantee Clause's effect on federal taxation. . . .  The district court did not reach plaintiffs' main arguments, for it concluded that this was a nonjusticiable issue. . . . Just as the Supreme Court has declined to answer this difficult question, *see New York* . . ., I would decline here.  I would leave it to the Supreme Court in the first instance to enter this constitutional thicket.").

  Indeed, if possible, courts should "adhere to [the] wise policy of avoiding the unnecessary adjudication of difficult questions of constitutional law."  *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 778 (2005).  This consideration, alone, would not warrant allowing this case to proceed past the pleading stage into the burdensome discovery process.  However, independent of this consideration, the Court concludes below that it is not appropriate to dismiss this action as non-justiciable at this early stage of the proceedings.  Given that the case will proceed to the summary judgment stage, the Court notes that it may be able to resolve the case on the merits at that stage, rather than having to address this difficult constitutional question.

recent pronouncement on the issue.").

The Court concludes that *Pacific States* is not controlling here.  The way the issues were framed in *Pacific States* led the Court there to consider whether the entire voter initiative system in Oregon violated the Guarantee Clause.  Similarly, Defendant in this case tries to characterize Plaintiffs' Guarantee Clause claim as challenging the entire initiative process in Colorado.  (*See, e.g.*, ECF No. 18, at 2 ("[W]hile [Plaintiffs'] policy preferences lead them to focus their ire on one particular instance of direct democratic participation in Colorado, the Taxpayers' Bill of Rights, their arguments ultimately would require the Court to hold unconstitutional all forms of direct citizen lawmaking.").  So framed, Defendant has little trouble arguing that *Pacific States* controls.  Indeed, the Court would agree that it would be appropriate to apply *Pacific States* in an action brought under the Guarantee Clause challenging Article V, Section 1, Clause 2 of the Colorado Constitution, the clause reserving in Colorado voters the power of the initiative process.

This action, however, seeks not the invalidation of Colorado's ballot initiative system.  Plaintiffs, in fact, seek only to invalidate *one particular measure* passed via the Colorado voter initiative process:  TABOR.  (*See* ECF No. 36, at 20-21 (prayer for relief seeking invalidation of the "TABOR AMENDMENT").)  Invalidating Article X, Section 20 of the Colorado Constitution will in no way affect Colorado voters' power of initiative codified in Article V, Section 1 of that Constitution.  The Court cannot conclude that a challenge to the effects of TABOR itself should be equated with a challenge to the entire voter initiative process, at least at this stage of the proceedings, merely because both involve questions regarding how power is to be divided between the General Assembly

and the Colorado electorate.  While *Pacific States* has language that one can argue should be similarly applied to the power struggle involved here, the Court declines to read *Pacific States* that broadly.

Given that the Court declines to adopt a *per se* rule of non-justiciability in Guarantee Clause cases, and given that *Pacific States* is not controlling, the Court finds it appropriate to apply the widely-recognized *Baker* tests to determine whether Plaintiffs' Guarantee Clause claim is barred by the political question doctrine.  *See Baker*, 369 U.S. at 217 ("The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.").[34]

### d.    The *Baker* Tests

#### (1)    "A textually demonstrable constitutional commitment of the issue to a coordinate political department"[35]

Addressing the first *Baker* test of whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department," Defendant argues that there is a textually demonstrable commitment of Guarantee Clause disputes

---

[34] Indeed, both Plaintiffs and Defendant, and the *amici* Professors, conduct a thorough review of the *Baker* tests.  (*See* ECF No. 18, 7-11; ECF No. 30, at 29-33; ECF No. 51, at 18-24; ECF No. 61, at 12-16.)  At the very least this suggests Defendant's agreement that, if there is no *per se* rule of non-justiciability in political question cases, and if *Pacific States* does not govern, then the *Baker* tests should be applied.

[35] Some recent Supreme Court decisions have only identified the first two *Baker* tests in describing the test for whether the political question doctrine applies in a particular case, suggesting the importance of the first two tests.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) ("[A] controversy involves a political question where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.") (quotation marks and ellipses omitted); *Clinton v. Jones*, 520 U.S. 681, 700 n.34 (1997) (same); *Nixon v. United States*, 506 U.S. 224, 228 (1993) (same).

to a coordinate political department, namely, Congress.  (ECF No. 51, at 18-19.)

Defendant purports to support that argument by citing to *Luther* and *Pacific States*,

arguing that "[t]he Supreme Court has long been clear that the question of what

constitutes a republican form of government is committed to Congress."  (*Id.* at 19.)  But

"textually demonstrable" means demonstrable from the text of the constitution itself, not

from case law interpreting the constitutional text.  *See Nixon v. United States*, 506 U.S.

224, 228 (1993) ("[C]ourts must, in the first instance, interpret the text in question and

determine whether and to what extent the issue is textually committed [to a coordinate

branch of government].") (emphasis added); *Powell*, 395 U.S. at 519-20 ("In order to

determine whether there has been a textual commitment to a coordinate department of

the Government, we must interpret the Constitution.").  The language in case law

precedent, even from the U.S. Supreme Court, does not make the commitment of an

issue to a coordinate branch of government "textually demonstrable."

     Although Defendant also baldly argues that "[t]he text of the Guarantee Clause . . .

definitively commit[s] this question to Congress," that assertion is not correct.  Again, the

Guarantee Clause provides, "The United States shall guarantee to every State in this

Union a Republican Form of Government . . . ."  The implication in the Guarantee Clause

that the "United States" will enforce this guarantee of a republican form of government in

no way specifies whether enforcement will lie in the Legislative, Executive, or Judicial

Department of the U.S. government.  *See Wang v. Masaitis*, 416 F.3d 992, 996 (9th Cir.

2005) (stating that there was no textually demonstrable commitment to a coordinate

political branch because "the text [in question] is silent" regarding any such commitment);

*cf. Nixon*, 506 U.S. at 229-36 (holding that constitutional clause providing that "[t]he

Senate shall have the sole Power to try all Impeachments" constituted a textually

demonstrable commitment of that issue to the Senate).  Also, importantly, the Guarantee

Clause is included within Article IV of the Constitution, the Article entitled "The States."

Thus, it does not fall under Article I (specifying Congress's powers), Article II (specifying

the Executive's powers), or Article III (specifying the Judiciary's powers).

Plainly, there is no textually demonstrable commitment of this issue to Congress

or to the Executive Department.  Thus, this *Baker* test is not met and does not indicate

the political question doctrine's applicability to this case.

> **(2)**      **"A lack of judicially discoverable and manageable**
> **standards for resolving [the issue]"**

The second *Baker* test, asking whether there are judicially discoverable and

manageable standards for resolving a plaintiff's claim, gives this Court some pause.

As previously discussed, the U.S. Supreme Court has focused on the justiciability

of Guarantee Clause challenges, providing little guidance to lower courts regarding

actual standards for resolving Guarantee Clause claims on the merits.  Also, in *Largess*

*v. Supreme Judicial Court for the State of Mass.*, 373 F.3d 219 (1st Cir. 2004), the First

Circuit pointed out that "scholars have interpreted . . . the Guarantee Clause in

numerous, often conflicting, ways."   *Id.* at 226 (citing various law review articles).  The

*Largess* Court also noted that "John Adams himself, twenty years after ratification of the

Constitution, confessed that he 'never understood' what the Guarantee Clause meant

and that he 'believ[ed] no man ever did or ever will.'"   *Id.* at 226-27 (citing letter written by

Adams in 1807).  However, the *Largess* Court ultimately found sufficient standards for

interpreting the Guarantee Clause, concluding that the plaintiffs' Guarantee Clause

challenge in that case lacked merit.  *See id.* at 227-29.  Notably, the Independence

Institute's *amicus* brief argues the merits of Plaintiffs' Guarantee Clause claim, indicating

its belief that there are sufficiently clear standards for dismissing Plaintiffs' Guarantee

Clause claim on the merits.  (ECF No. 21-1.)  *See also Zivotofsky ex rel. Zivotofsky v.*

*Clinton*, 132 S. Ct. 1421, 1428 (2012) (stating that the judicially manageable standards

for determining the constitutionality of the statute in question were evidenced by the

detailed legal arguments made by both sides on the issue).

However, the foregoing discussion of this *Baker* test reflects the fact that the

discussion is premature at this stage of the litigation.  Resolving the issue of whether

there are judicially discoverable and manageable standards for determining the merits of

Plaintiffs' Guarantee Clause claim would *necessarily* require this Court to begin to wade

into the merits of this dispute.  Indeed, in *Largess*, the court stated, "[R]esolving the issue

of justiciability in the Guarantee Clause context may also turn on the resolution of the

merits of the underlying claim."  373 F.3d at 225.  For obvious reasons, the Court

declines to address the merits of Plaintiffs' Guarantee Clause claim based merely on the

pleadings filed in this action.  *See Shakman v. Democratic Org. of Cook Cnty.*, 435 F.2d

267, 271 (7th Cir. 1970) ("We do not view [the aforementioned] difficulties . . . as

demonstrating 'a lack of judicially discoverable and manageable standards for resolving'

the case or as requiring, at the pleading stage, a decision that plaintiffs' claim is not

justiciable."); *Holtzman v. Richardson*, 361 F. Supp. 544, 551 (E.D.N.Y. 1973) (declining

to evaluate whether there were judicially discoverable and manageable standards for

resolving a dispute because "the issue arises on a motion to dismiss the complaint on its

face").[36]

At this early stage of the proceedings, the Court cannot resolve the issue of whether there will be judicially discoverable and manageable standards for evaluating Plaintiffs' Guarantee Clause claim.  At the very least, the Court is comfortable at this early stage in concluding that this *Baker* test is not "inextricable from" this case.  *See Baker*, 369 U.S. at 217 ("Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.").

<blockquote>

**(3)     "The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"**
</blockquote>

The third *Baker* test asks whether it is possible for a court to resolve a plaintiff's claim "without [making] an initial policy determination of a kind clearly for nonjudicial discretion."

As to this test, Defendant's argument focuses entirely on Plaintiffs' motives in bringing this action – that Plaintiffs only brought this particular action because of their own values and judgments that TABOR is bad public policy.  (ECF No. 18, at 8-9; ECF No. 51, at 20-21.)  However, notwithstanding Plaintiffs' personal motivations for bringing this particular action, this *Baker* test concerns whether *the Court itself* will be required to make a policy determination in resolving the claims.  The question of whether TABOR

---

[36] *See generally United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222, 1229 (10th Cir. 2003) ("Defendants . . . outline what must be proven to ultimately succeed on the merits, and not what is required at the pleading stage."); *Enriques v. Noffsinger Mfg. Co., Inc.*, 412 F. Supp. 2d 1180, 1183 (D. Colo. 2006) ("[Defendant's] argument, while perhaps appropriate at the merits stage with the benefit of discovery, is insufficient to dismiss the claim at the pleading stage, where a plaintiff's well-pleaded allegations must be accepted as true.").

violates Colorado's obligation to maintain a republican form of government is a question requiring interpretation of the Guarantee Clause.  A court's interpretation of the Constitution does not constitute a policy determination, but instead a legal determination that courts are well-positioned to resolve.  *See Marbury*, 5 U.S. (1 Cranch) at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."); *Powell*, 395 U.S. at 548 (in finding the political question doctrine inapplicable, the Court stated that resolving the claim at issue "would require no more than an interpretation of the Constitution.  Such a determination falls within the traditional role accorded courts to interpret the law . . . .").

That makes this case entirely distinguishable from the types of cases involving non-justiciable policy determinations soundly committed to the political branches of government.  *See, e.g.*, *Schroder v. Bush*, 263 F.3d 1169, 1774 (10th Cir. 2001) ("Appellants' request that courts maintain market conditions, oversee trade agreements, and control currency . . . would require courts to make [non-justiciable] policy determinations . . . ."); *Ad Hoc Comm. on Judicial Admin. v. Commonwealth of Massachusetts*, 488 F.2d 1241, 1245 (1st Cir. 1973) (finding non-justiciable a policy determination regarding the financing of the judicial branches, an issue that has "been left to the people, through their legislature"); *Orlando v. Laird*, 443 F.2d 1039, 1044 (2d Cir. 1971) (in action challenging war in Vietnam, court stated, "[D]ecisions regarding the form and substance of congressional enactments authorizing hostilities are determined by highly complex considerations of diplomacy, foreign policy and military strategy inappropriate to judicial inquiry.").

The Court thus finds that the third *Baker* test does not apply to the case at bar.

> **(4)    "The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"**

The fourth *Baker* test requires the Court to consider whether it is possible to undertake resolution of this action "without expressing lack of the respect due coordinate branches of government."

As to this test, Defendant first argues that the Court's consideration of Plaintiffs' Guarantee Clause claim would express a lack of respect due to the U.S. Congress. (ECF No. 18, at 9; ECF No. 51, at 22-23.)  In support of that argument, Defendant cites cases in which courts have held that questions arising under the Guarantee Clause are to be decided by Congress, not the federal Judiciary.  (*Id.*)  However, the Court has already determined that, at this early stage of the proceedings, it is not appropriate to apply those cases' *per se* rules of non-justiciability.  Thus, there is still a question whether Plaintiffs' Guarantee Clause claim can be decided by the Court, or whether the decision should be deferred to Congress.  Further, the Court again finds it of some import that TABOR has been in effect for nearly twenty years, and the Court is not aware of Congress ever having taken a position on TABOR's constitutionality.  While silence could indicate approval, the Court cannot so presume.  *See Hanson v. Wyatt*, 552 F.3d 1148, 1164 (10th Cir. 2008) ("It may be worth noting that neither *New York*'s treatment of the Guarantee Clause issue in that case nor our resolution of [this case] is likely to raise any concern in the political branches about the courts' violating their turf.").

Defendant also argues that this Court should defer to decisions of the Colorado Supreme Court which have addressed TABOR:  *Zaner v. City of Brighton*, 917 P.2d 280 (Colo. 1996) ("*Zaner*"), and *Bickel v. City of Boulder*, 885 P.2d 215 (Colo. 1994)

59

("*Bickel*").  (ECF No. 51, at 22; *see also* ECF No. 18, at 11.)  If the Colorado Supreme

Court had addressed a Guarantee Clause challenge to TABOR, this Court would now

likely defer to that Court's interpretation of the U.S. Constitution.  *See Trans Shuttle, Inc.*

*v. Pub. Utils. Comm'n*, 24 F. App'x 856, 859 (10th Cir. 2001) ("One of the fundamental

policies underlying the *Younger* doctrine is the recognition that state courts are fully

competent to decide federal constitutional questions.").  However, in neither *Zaner* nor

*Bickel* did the Colorado Supreme Court consider whether TABOR violated the U.S.

Constitution's Guarantee Clause, whether TABOR violated the requirement that

Colorado maintain a republican form of government, or even more generally whether

TABOR is constitutional under either the U.S. Constitution or Colorado Constitution.

Instead, *Bickel* merely stated (a passage repeated by *Zaner*) that TABOR "is a perfect

example of the people exercising their initiative power to enact laws in the specific

context of state and local government finance, spending and taxation."  *Bickel*, 885 P.2d

at 226; *Zaner*, 917 P.2d at 284.  These cases' statements that TABOR is a "perfect

example" of the Colorado electorate's exercise of its initiative power does not speak to

the issue of whether that particular exercise of the initiative power in 1992 resulted in a

violation of the Guarantee Clause, the issue presented in this case.

    And finally, Defendant suggests that this Court must defer to the will of the

Colorado electorate itself in enacting TABOR.  As a foundational matter, the political

question doctrine's applicability in a particular case is lessened or eradicated when the

action challenges an act of a state.  *See Baker*, 369 U.S. at 210 ("[I]n the Guaranty

Clause cases and in the other 'political question' cases, it is the relationship between the

judiciary and the coordinate branches of the Federal Government, and not the federal

judiciary's relationship to the States, which gives rise to the 'political question.'"); *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 701-02 (9th Cir. 1992) ("[T]he political question doctrine arises primarily from concerns about the separation of powers within the federal government. . . .  Accordingly, the doctrine has at best limited applicability to actions challenging state statutes as violative of the federal Constitution.").  Also, as the Court's previous discussion of *Lucas* indicates, the Court cannot defer to the will of a state's electorate when it passes an allegedly unconstitutional ballot initiative, particularly when that law has been in effect for nearly twenty years.  *See also Romer v. Evans*, 517 U.S. 620 (1996) (invalidating amendment to Colorado Constitution passed by ballot initiative prohibiting all legislative, executive, or judicial action designed to protect homosexuals).

Although the fourth *Baker* test presents more difficult and sensitive issues, the Court finds that the test is not met here.

### (5)    "An unusual need for unquestioning adherence to a political decision already made"

Regarding the issue of whether this case presents "an unusual need for unquestioning adherence to a political decision already made," Defendant argues that "[t]wenty-six states now use some form of direct democracy, and countless laws and constitutional provisions have been instituted through these mechanisms. . . . Plaintiffs' argument, if accepted, would call into question all of these provisions, and all of the countless laws enacted under them."  (ECF No. 18, at 10; *see also* ECF No. 51, at 23-24.)

The Court has already addressed and rejected Defendant's argument that this action is properly interpreted as a frontal attack on Colorado's entire ballot initiative

process.  Thus, Defendant's more incredible argument that this action should be construed as an attack on the ballot initiative systems in place in twenty-six states in this country is similarly and even more appropriately rejected.  Thus, Defendant's concern regarding the continuing validity of laws enacted via ballot initiative (other than TABOR, of course) is also unfounded.  And significantly, in terms of Plaintiffs' actual challenge to TABOR itself, it warrants mentioning that laws are not enacted pursuant to TABOR. Instead, TABOR merely acts to limit the power of the General Assembly to legislate in certain areas ("core" areas according to Plaintiffs).  *See Bickel*, 885 P. 2d at 226 ("[TABOR's] requirement of electoral approval is not a *grant* of new powers or rights to the people, but is more properly viewed as a *limitation* on the power of the people's elected representatives.").  Thus, the invalidation of TABOR would not undo any other enacted law.  Further, as already explained, the Colorado Supreme Court's decisions in *Zaner* and *Bickel* did not address the question of whether TABOR violates Colorado's obligation to maintain a republican form of government, and therefore a judgment resolving that issue would not violate those "decision[s] already made."

The Court therefore concludes that the fifth *Baker* test is not met here.

**(6)    "The potentiality of embarrassment from multifarious pronouncements by various departments on one question"**

As for the sixth and final *Baker* test, Defendant again repeats the mantra that this action challenges the entire ballot initiative process, a process repeatedly upheld by state and federal decision-makers.  (*See* ECF No. 18, at 10 ("[A] court pronouncement in favor of Plaintiff would be in conflict with the views of various state and federal departments on . . . whether direct democracy is incompatible with a republican form of government. . . .

62

Congress . . . has never questioned the practice of state direct democracy . . . . State courts and legislators have likewise upheld and relied upon citizen-initiated or approved laws.").)  Defendant also again cites *Zaner* and *Bickel* for the proposition that TABOR has already been upheld.  (*Id.* at 11; ECF No. 51, at 24.)  For the aforementioned reasons, those arguments are rejected.  The sixth *Baker* test is also not met in this case.

### e.    Conclusion

In summary, there is no basis to conclude, at this stage of the proceedings, that any of the six *Baker* tests are "inextricable from the case at bar."  369 U.S. at 217.  Thus, the Court concludes it is not appropriate to dismiss Plaintiffs' Guarantee Clause claim at this stage as non-justiciable under the political question doctrine.

### 3.    The Enabling Act Claim and the Political Question Doctrine

Defendant's Motion to Dismiss includes little argument as to why the Enabling Act in particular should be dismissed, saying only in a footnote that "[t]he rationale applied by the Supreme Court to Guarantee Clause claims therefore applies with equal force to Plaintiffs' claims brought under the Colorado Enabling Act," and citing the fact that *Pacific States* included an Enabling Act claim.  (ECF No. 18, at 6 n.4.)[37]  Defendant repeats the same argument in the Reply brief.  (ECF No. 51, at 25-26.)  However, as explained above, *Pacific States* is not controlling and does not bar this Court's consideration of

---

[37] *Pacific States* did include an Enabling Act claim.  *See* 223 U.S. at 139 (listing as an assignment of error, "The provision in the Oregon Constitution for direct legislation violates the provisions of the act of Congress admitting Oregon to the Union").  The Court in *Pacific States* held that the Guarantee Clause claim and the Enabling Act claim, among others, were to be resolved on the same basis:  "the propositions each and all proceed alone upon the theory that the adoption of the initiative and referendum destroyed all government republican in form in Oregon."  *Id.* at 141.

Plaintiffs' Guarantee Clause claim.  Because the Court holds Plaintiffs' Guarantee Clause claim to be justiciable at this early stage of the proceedings, Plaintiffs' Enabling Act claim is likewise not subject to dismissal.

Further, even if Plaintiffs' Guarantee Clause claim were barred by the political question doctrine, the Court would nevertheless conclude that Plaintiffs' Enabling Act claim is not subject to dismissal.  *Pacific States* includes a brief discussion as to why it was appropriate to treat all of the claims in that case similarly.  Indeed, both Plaintiffs' Guarantee Clause claim and their Enabling Act claim are based on the requirement that Colorado maintain a republican form of government.  *See* U.S. Const. art. IV, § 4; 18 Stat. 474 (1875).

However, the fact that Plaintiffs' Enabling Act claim is a statutory claim leads the Court to conclude that it would have jurisdiction to hear that claim *even if* the Guarantee Clause claim were held to be non-justiciable under the political question doctrine.  In *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986), wildlife conservation groups brought an action challenging an executive agreement between Japanese and U.S. officials that allegedly violated a U.S. statute requiring sanctions for violations of whale harvesting quotas.  On appeal, petitioners argued that the action was barred by the political question doctrine because federal courts lack the power to call into question Executive Department decisions, such as the executive agreement at issue.  *Id.* at 229. The Court disagreed:

> [I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.  It is also evident that [whether the statute was violated] presents a purely legal question of statutory interpretation.  The Court must first . . . apply[] no more than the traditional rules of statutory construction, and then apply[] this analysis to

> the particular set of facts presented below.  We are cognizant of the
> interplay between [the statute] and the conduct of this Nation's foreign
> relations, and we recognize the premier role which both Congress and the
> Executive play in this field.  But under the Constitution, one of the
> Judiciary's characteristic roles is to interpret statutes, and we cannot shirk
> this responsibility merely because our decision may have significant
> political overtones.  We conclude, therefore, that the present cases present
> a justiciable controversy . . . .

*Id.* at 230.

Earlier this year, the Supreme Court again reiterated the rule that federal courts

have jurisdiction to interpret federal statutes, even in politically charged cases.  In

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012), the plaintiff, who was

born in Jerusalem, challenged a decision by State Department officials to deny his

request that his passport indicate his place of birth as Israel, in apparent direct violation

of a federal statute.  The Secretary of State argued that the case presented a non-

justiciable political question.  The Court disagreed:

> The existence of a statutory right . . . is certainly relevant to the Judiciary's
> power to decide Zivotofsky's claim.  The federal courts are not being asked
> to supplant a foreign policy decision of the political branches with the
> courts' own unmoored determination of what United States policy toward
> Jerusalem should be.  Instead, Zivotofsky requests that the courts enforce
> a specific statutory right.  To resolve his claim, the Judiciary must decide if
> Zivotofsky's interpretation of the statute is correct, and whether the statute
> is constitutional.  This is a familiar judicial exercise.

*Id.* at 1427.

For the Court's purposes here, a fellow U.S. District Judge has stated the rule

clearly.  In *Bredesen v. Rumsfeld*, 500 F. Supp. 2d 752 (M.D. Tenn. 2007), the Court

stated that "it is well-settled that the political question doctrine applies only to

constitutional questions, not to questions of statutory violations."  *Id.* at 762 (citing *Japan*

*Whaling*).  In *Bredesen*, the Court ultimately found that the plaintiff's constitutional claims

(but not the statutory claims) were barred by the political question doctrine.  *Id.* at 762-63.[38]

Thus, it is not surprising that numerous courts have evaluated the merits of Enabling Act claims.  *See Branson Sch. Dist. v. Romer*, 161 F.3d 619 (10th Cir. 1998) (evaluating whether an amendment to the Colorado Constitution passed by voter initiative violated the Colorado Enabling Act); (ECF No. 30, at 41-44 (listing 117 other cases in which courts have taken up the issue of whether a provision in an Enabling Act has been violated).).

Given the sufficiently clear and recent case law authority (some of it binding U.S. Supreme Court authority from the past three decades) that this Court has jurisdiction to hear the Enabling Act claim, it would be error to dismiss this case based only on the fact that *Pacific States* also involved an Enabling Act claim.  The Court therefore concludes that it has jurisdiction to hear Plaintiffs' Enabling Act claim under 28 U.S.C. § 1331, and as a consequence Plaintiffs' Enabling Act claim is not subject to dismissal.

To summarize, the Court concludes that, at this stage of the litigation, Plaintiffs' Guarantee Clause and Enabling Act claims are justiciable and not barred by the political question doctrine.

_____

[38] *See also Schiaffo v. Helstoski*, 492 F.2d 413, 419 (3d Cir. 1974) ("[S]ince Congress has seen fit to enact a statute granting the franking privilege, we have considerable doubt whether the political question doctrine is applicable at all.  We have found no case regarding the application of a statute concerned solely with domestic affairs and passed by Congress in which the political question doctrine has precluded Supreme Court review."); *El-Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836, 851 (D.C. Cir. 2010) (Ginsburg, J., concurring) ("Under *Baker v. Carr* a statutory case generally does not present a non-justiciable political question because the interpretation of legislation is a recurring and accepted task for the federal courts.") (quotation marks omitted).  *But see Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of the U.S. Trade Representative*, 540 F.3d 940, 945 (9th Cir. 2008) ("[I]t is a political question arising out of a statute that provides us with no meaningful standards to apply.").

C.      **Equal Protection Claim**

Defendant separately moves to dismiss Plaintiffs' Equal Protection claim for failure

to state a claim upon which relief can be granted.  (ECF No. 18, at 19-21.)[39]  Defendant

argues that the claim must fail because Plaintiffs have not alleged that they are members

of a constitutionally protected class or that they are being treated differently than other

similarly situated people in Colorado.  (*Id.* at 19.)  Defendant also points out that

Colorado cannot extend its jurisdiction outside its borders so as to treat Colorado citizens

differently than citizens in other states.  (*Id.* at 20.)

In response, Plaintiffs argue that their Equal Protection claim should not be

dismissed because their claim is analogous to the Equal Protection claims found viable in

the legislative apportionment cases of *Baker v. Carr*, 369 U.S. 186 (1962), *Reynolds v.

Sims*, 377 U.S. 533 (1964), and *Lucas v. Forty-Fourth General Assembly of the State of

Colorado*, 377 U.S. 713 (1964).  (ECF No. 30, at 33-36.)  Plaintiffs argue that, as in the

legislative apportionment cases, this action involves a majority's efforts to impose an

unconstitutional law on a minority.  (*Id.*)[40]

---

[39] Defendant also briefly argues that Plaintiffs "cannot use [the Equal Protection claim] to turn their otherwise non-justiciable question into a justiciable one."  (ECF No. 18, at 19.) Because the Court has held that Plaintiffs have standing and that the political question doctrine does not bar this action, Plaintiffs' Equal Protection claim is not subject to dismissal on the ground of non-justiciability.

[40] Specifically, Plaintiffs make clear that their Equal Protection claim is based on the premise that a voting majority has taken away the minority's right to a republican form of government.  (*See* ECF No. 36, ¶ 85 ("The aforesaid violations of the requirement for a Republican Form of Government deny to Plaintiffs and others similarly situated the Equal Protection of the Laws . . . ."); ECF No. 30, at 33 ("[The Equal Protection Clause prohibits] a majority's efforts to impose an unconstitutional law on a state's entire population."); *id.* at 35 ("[Plaintiffs' Equal Protection claim] concerns a minority's attempt to vindicate rights lost through the will of the majority."); *id.* at 35-36 ("The Equal Protection Clause [bars] a majority's attempt . . . to place in its own hands the critical functioning of the state legislature.").)

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Plyler v. Doe*, 457 U.S. 202, 216 (1982) ("The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.") (quotation marks omitted); *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998).  "In order to assert a viable Equal Protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them."  *Barney*, 143 F.3d at 1312; *see also Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011) (same); *Campbell v. Buckley*, 203 F.3d 738, 747 (10th Cir. 2000) (same).

Plaintiffs' Equal Protection claim is properly dismissed because Plaintiffs have not plead or otherwise shown that TABOR has treated any of the Plaintiffs differently from others who are similarly situated to them.  All Colorado voters had an equally weighted vote on TABOR in 1992.  All Colorado voters would have an equal vote on any attempt to pass a ballot initiative invalidating TABOR.  TABOR increases all Colorado voters' power equally by, *inter alia*, giving them the power to approve or reject any proposed new tax or tax rate increase.  TABOR decreases Colorado General Assembly members' power equally by, *inter alia*, taking away their power to approve new taxes or tax rate increases without voter approval.[41]  Plaintiffs have not plead or shown how TABOR treats

---

[41] Although Plaintiffs have not made the argument, it would not be appropriate to treat a Colorado voter as similarly situated to a member of the General Assembly for purposes of equal

68

similarly situated people in Colorado differently.[42]

The legislative apportionment cases cited by Plaintiffs are inapposite.  Of those cases, *Reynolds* provides the clearest explanation for why the legislative apportionment at issue there violated the Equal Protection Clause.  In *Reynolds*, the plaintiffs raised an Equal Protection claim challenging the apportionment of legislative districts in Alabama that gave voters in certain districts greater weighted votes than voters in other districts. 377 U.S. at 537-46.  The Court struck down the apportionment as violative of the Equal Protection Clause, stating,

> [T]he concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.  With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. . . .  Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment. . . .  Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

*Id.* at 565-68.  In the legislative apportionment cases, the allegation was that similarly

---

protection analysis.  *See Campbell*, 203 F.3d at 748 ("Citizens who propose legislation through the initiative process and members of the general assembly who pass bills are not similarly situated classes. . . . The legislative process and the initiative process are so fundamentally different that we cannot read the Equal Protection Clause of the federal Constitution to require the state to afford the same title setting treatment to these two processes.").

[42] In the Court's view, it would also not be appropriate in evaluating Plaintiffs' Equal Protection claim to consider how TABOR treats Colorado citizens differently than the citizens of other states.  U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person *within its jurisdiction* the equal protection of the laws.") (emphasis added); *see also Fetzer v. McDonough*, No. 4:07cv464–WS, 2009 WL 3163147, at *7 (N.D. Fla. Sept. 29, 2009) ("Plaintiff's argument that inmates in other states are provided Kosher food does not show that *these Defendants*, who are responsible for inmates incarcerated *in Florida*, have treated other inmates in Florida differently than Plaintiff.  These Defendants are not responsible for the conditions of confinement for other prisoners incarcerated in other states . . . .") (emphasis in original).

situated people – voters from different districts – were being treated differently.  That is not the case here.  Here, TABOR affects all voters equally.  TABOR does not give any voter more or less voting power than any other voter.  And even if TABOR does violate Plaintiffs' constitutional rights as citizens to have a government republican in form, TABOR has the same effect on *every* Colorado citizen's constitutional right to a republican form of government.[43]

The Court therefore concludes that Plaintiffs' Equal Protection claim is properly dismissed.  Because Plaintiffs have not requested leave to amend this Claim, nor made any suggestion how this fundamental defect in their Equal Protection claim might be cured, the dismissal will be with prejudice.  *See Curley v. Perry*, 246 F.3d 1278, 1282 (10th Cir. 2001).

**D.    Impermissible Amendment Claim**

Defendant's primary argument in moving to dismiss Plaintiffs' Impermissible Amendment claim is that the claim presents a non-justiciable political question.  (ECF No. 18, at 21-22; ECF No. 51, at 27-28.)  For the reasons discussed above, the political question doctrine does not bar this action or any claims brought herein, including the Impermissible Amendment claim.

Defendant also argues that the Impermissible Amendment claim fails to state a claim upon which relief can be granted.  (ECF No. 18, at 22.)  In support of that

---

[43] Plaintiffs attempt to generalize the holdings of the voter apportionment cases to stand for the propositions that the Equal Protection Clause does not allow a voting majority to "remake a state legislature," to "compromise the fundamental operations" of the legislature, and to "manipulate their legislatures to promote the interests of particular groups."  (ECF No. 30, at 33-34.)  Such a reading of the voter apportionment cases is overly broad and unsupported.

70

contention, Defendant argues that the Colorado Supreme Court considers the initiative and referendum process to be a fundamental right of voters, and also argues that the Colorado Supreme Court has never questioned TABOR's general structure. (*Id.*) Regarding the first argument, as this Court has already stated, this action challenging TABOR is not properly interpreted as an attack on the entire initiative and referendum process in Colorado. Nonetheless, it is also indisputable that just because Colorado voters have the right to the initiative process does not mean they can pass any ballot initiative they choose, no matter how violative of state or federal constitutional rights. *See Romer*, 517 U.S. 620. As to the second argument, Defendant attempts to read far too much into the fact that the Colorado Supreme Court to date has never questioned TABOR's general structure. Particularly in light of the fact that a direct challenge to TABOR's constitutional legitimacy has never previously been mounted, Defendant's contention that the Colorado Supreme Court has at least implicitly found TABOR to pass constitutional muster is without merit.

The Court therefore also finds that Plaintiffs' Impermissible Amendment claim is not subject to dismissal for failure to state a claim. The Court properly exercises supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a). (*See* ECF No. 36, ¶ 53.)

## E.   Supremacy Clause Claim

Defendant does not separately move to dismiss Plaintiffs' Supremacy Clause claim. In fact, the only time the Supremacy Clause claim is even mentioned in Defendant's Motion to Dismiss (ECF No. 18) or in his Reply brief (ECF No. 51) is in a footnote pointing out that *Pacific States* also involved a claim brought under the

Supremacy Clause.  (ECF No. 18, at 13 n.7.)  Plaintiffs' Supremacy Clause claim is

based on the allegation that "TABOR must yield to the requirements of the 'Guarantee

Clause' and of the Enabling Act that Colorado maintain a Republican Form of

Government."  (ECF No. 36, ¶ 84.)  The Supremacy Clause claim is derivative of the

Guarantee Clause claim and Enabling Act claim; if TABOR violates the Guarantee

Clause and/or the Enabling Act, then it would appear that it also violates the Supremacy

Clause.  Because the Court has held that Plaintiffs' Guarantee Clause claim and

Enabling Act claim are not subject to dismissal at this stage of the proceedings,

Defendant's Motion to Dismiss Plaintiffs' Supremacy Clause claim will also be denied.

## F.      Unopposed Motion to Amend Complaint

On March 28, 2012, Plaintiffs filed an Unopposed Motion for Leave to File Second

Amended Substitute Complaint for Injunctive and Declaratory Relief ("Unopposed

Motion").  (ECF No. 74)  In the Unopposed Motion, Plaintiffs explain that they only seek

to amend the Operative Complaint in order to update the current elective status of six

particular plaintiffs.  (*Id.*)  This Court's review of the Operative Complaint and the

proposed Second Amended Substitute Complaint for Injunctive and Declaratory Relief

confirms that those were the only changes made to the Operative Complaint.  (*Compare*

ECF No. 36, *with* ECF No. 74-1.)  The Court therefore finds good cause to grant the

Unopposed Motion.

## IV.  CONCLUSION

In accordance with the foregoing, the Court hereby ORDERS as follows:

(1)      Defendant's Motion to Dismiss Plaintiffs' Substitute Complaint (ECF No. 18),

properly construed as moving to dismiss Plaintiffs' First Amended Substitute

Complaint for Injunctive and Declaratory Relief, is GRANTED IN PART and DENIED IN PART;

(2)     Defendant's Motion to Dismiss is GRANTED as to Plaintiffs' Equal Protection claim.  Plaintiffs' Equal Protection claim is hereby DISMISSED WITH PREJUDICE;

(3)     Defendant's Motion to Dismiss is DENIED as to Plaintiffs' other four claims for relief.  Those four claims will be allowed to proceed past the pleading stage in this action;

(4)     Plaintiffs' Unopposed Motion for Leave to File Second Amended Substitute Complaint for Injunctive and Declaratory Relief (ECF No. 74) is GRANTED;

(5)     The Clerk of Court shall FILE as a separate docket entry the Second Amended Substitute Complaint for Injunctive and Declaratory Relief, currently filed as an attachment at ECF No. 74.  The Second Amended Substitute Complaint for Injunctive and Declaratory Relief will hereinafter be the operative complaint in this action; and

(6)     The Court's Order staying disclosures and discovery in this action (ECF No. 29) is VACATED and said stay is hereby LIFTED.

Dated this 30th day of July, 2012.

BY THE COURT:

William J. Martinez
United States District Judge