IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-1350-RM-NYW

**ANDY KERR**, COLORADO STATE SENATOR;
**NORMA V. ANDERSON**;
**JANE M. BARNES**;
**K.C. BECKER,** COLORADO STATE REPRESENTATIVE;
**ELAINE GANTZ BERMAN**;
**BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY**;
**BOULDER VALLEY SCHOOL DISTRICT RE-2 BOARD OF EDUCATION**;
**ALEXANDER E. BRACKEN**;
**WILLIAM K. BREGAR**;
**BOB BRIGGS**;
**BRUCE W. BRODERIUS**;
**TRUDY B. BROWN**;
**STEPHEN A. BURKHOLDER**;
**RICHARD L. BYYNY, M.D.**;
**CHEYENNE WELLS RE-5 SCHOOL DISTRICT BOARD OF EDUCATION**;
**COLORADO SPRINGS DISTRICT 11 BOARD OF EDUCATION**;
**LOIS COURT**, COLORADO STATE SENATOR;
**DENVER COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION**;
**RICHARD E. FERDINANDSEN**;
**STEPHANIE GARCIA**;
**GUNNISON COUNTY METROPOLITAN RECREATION DISTRICT**;
**GUNNISON WATERSHED RE-1J SCHOOL DISTRICT BOARD OF EDUCATION**;
**CHRISTOPHER J. HANSEN,** COLORADO STATE REPRESENTATIVE;
**KRISTI HARGROVE**;
**LESLIE HEROD,** COLORADO STATE REPRESENTATIVE;
**DICKEY LEE HULLINGHORST**;
**NANCY JACKSON**;
**WILLIAM G. KAUFMAN**;
**CLAIRE LEVY**;
**SUSAN LONTINE,** COLORADO STATE REPRESENTATIVE;
**MARGARET (MOLLY) MARKERT**;
**MEGAN J. MASTEN**;
**MICHAEL MERRIFIELD,** COLORADO STATE SENATOR;
**MARCELLA (MARCY) L. MORRISON**;
**JOHN P. MORSE**;
**PAT NOONAN**;
**BEN PEARLMAN**;
**POUDRE SCHOOL DISTRICT BOARD OF EDUCATION;**

**PUEBLO CITY DISTRICT 60 BOARD OF EDUCATION**;
**PUEBLO COUNTY SCHOOL DISTRICT 70 BOARD OF EDUCATION;**
**WALLACE PULLIAM**;
**PAUL WEISSMANN,** BOULDER COUNTY TREASURER; and
**JOSEPH W. WHITE;**

Plaintiffs,

v.

**JOHN HICKENLOOPER**, GOVERNOR OF COLORADO, in his official capacity,

Defendant.

---

## FOURTH AMENDED COMPLAINT
## FOR INJUNCTIVE AND DECLARATORY RELIEF

---

## I.  OPENING STATEMENT

1.      This case presents for resolution the contradiction between direct democracy and representative democracy.  In 1992, Colorado voters adopted by initiative the Taxpayer's Bill of Rights (the "TABOR Amendment"), removing from the Colorado General Assembly and all subordinate levels of government the power to tax and arrogating that power exclusively to themselves.  In addition, the TABOR Amendment imposes strict constraints on the power of the Colorado General Assembly and all subordinate levels of government to appropriate revenues collected under existing law.  This dictate of reliance on direct democracy is not permitted under the United States Constitution or under the Colorado Statehood Enabling Act of 1875, 18 Stat. 474 (1875) (the "Enabling Act"), both of which require the State to have and maintain a Republican Form of Government in form embodied in a representative democracy.

2

2.      At our nation's birth, its citizens acted through their representatives at a constitutional convention and then through the states' ratification processes to commit the nation to a government of representative democracy, a Republic, and rejected direct, "popular," or plebiscitary democracy.  That constitutional commitment to a government of representative democracy has not changed since 1787.  Frustration with the work of legislatures, whether federal or state, may indicate a need for representative institutions to be more effective.  Such frustration cannot, however, justify or permit a rejection of republican governance.

3.      Since the passage of the TABOR Amendment in 1992, the fiscal condition of the State has experienced an inexorable and serious deterioration.  This deterioration of the State's funding base has occasionally, but only temporarily, been slowed by various attempts to patch, cover over, or bypass the straightjacket of the TABOR Amendment.  However, events have demonstrated that a government deprived of its fundamental powers to raise and appropriate funds cannot meet its primary constitutional obligations or provide services that are essential for the State and its political subdivisions.

4.      The framers of the federal Constitution prescribed a Republican Form of Government for the nation at large and, in Article IV, Section 4, of the United States Constitution, guaranteed and so required a Republican Form of Government for each state.  The federal statutes creating the Territory of Colorado and then enabling creation of the State of Colorado required that the State have a Republican Form of Government.  Under Article IV, Section 3, of the United States Constitution, the State cannot constitutionally govern itself without adhering to the requirements of a Republican Form of Government.

5.      In prescribing a Republican Form of Government for the states, the framers of the

federal Constitution intended that each state have a government with power exercised through

the institutions of a representative democracy.  James Madison explained in *Federalist 10* the

difference between a direct democracy and a representative democracy, and the reasons that a

representative democracy was essential to the Republic to be established by ratification of the

Constitution:

> From this view of the subject it may be concluded that a pure
> democracy, by which I mean a society consisting of a small number of
> citizens, who assemble and administer the government in person, can
> admit of no cure for the mischiefs of faction.  A common passion or
> interest will, in almost every case, be felt by a majority of the whole; a
> communication and concert result from the form of government itself;
> and there is nothing to check the inducements to sacrifice the weaker
> party or an obnoxious individual. . . . Theoretic politicians, who have
> patronized this species of government, have erroneously supposed that
> by reducing mankind to a perfect equality in their political rights, they
> would, at the same time, be perfectly equalized and assimilated in their
> possessions, their opinions, and their passions.

> A republic, by which I mean a government in which the scheme
> of representation takes place, opens a different prospect, and promises
> the cure for which we are seeking.  Let us examine the points in which it
> varies from pure democracy, and we shall comprehend both the nature of
> the cure and the efficacy which it must derive from the Union.

> The two great points of difference between a democracy and a
> republic are: first, the delegation of the government, in the latter, to a
> small number of citizens elected by the rest; secondly, the greater
> number of citizens, and greater sphere of country, over which the latter
> may be extended.

> The effect of the first difference is, on the one hand, to refine and
> enlarge the public views, by passing them through the medium of a
> chosen body of citizens, whose wisdom may best discern the true interest
> of their country, and whose patriotism and love of justice will be least
> likely to sacrifice it to temporary or partial considerations.  Under such a
> regulation, it may well happen that the public voice, pronounced by the

representatives of the people, will be more consonant to the public good than if pronounced by the people themselves, convened for the purpose.

6.      Madison elaborated on this basic premise of a Republican Form of Government, or representative democracy, in other *Federalist Papers* essays:

> What, then, are the distinctive characters of the republican form? . . . . we may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior. *Federalist 39*.

> In republican government, the legislative authority necessarily predominates. *Federalist 51*.

> The elective mode of obtaining rulers is the characteristic policy of republican government. *Federalist 57*.

7.      Alexander Hamilton, concerned as he was with the fiscal viability of the proposed new constitutional government, argued in *Federalist 30* that it is essential for any government to have the power to raise and spend money:

> The conclusion is, that there must be interwoven, in the frame of the government, a general power of taxation, in one shape or another. . . . Money is, with propriety, considered as the vital principle of the body politic; as that which sustains its life and motion, and enables it to perform its most essential functions. A complete power, therefore, to procure a regular and adequate supply of it, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution.

8.      The Colorado Constitution, as adopted at the Constitutional Convention in 1876 and continuing until the passage of the TABOR Amendment, fully complied with the federal constitutional requirement for a Republican Form of Government, in part by providing in Article X, Section 2, the requisite powers for the General Assembly to tax to provide for state expenses.

This provision recognized the essential interdependence between raising and appropriating revenues and the fulfillment of the basic functions of government.

9.      An effective legislative branch must have the power to raise and appropriate funds.  When the power to tax is denied and the power to appropriate is severely curtailed, the legislature cannot function to fulfill its obligations in a representative democracy and to exemplify a Republican Form of Government.

10.      The purpose of this case is to seek a ruling that the TABOR Amendment to the Constitution of the State of Colorado is unconstitutional and illegal because it deprives the State and its citizens of effective representative democracy, contrary to the requirements of the United States Constitution, of the Enabling Act, and of the Colorado Constitution, that it maintain a Republican Form of Government.

11.      The requirement to maintain a Republican Form of Government properly should extend to the subordinate levels of Colorado government, including its counties, school districts, and special districts.  Otherwise, the obligations of republican governance could easily be subverted by the delegation of powers to such subordinate entities.

## II.  **BACKGROUND**

12.      Article IV, Section 4, of the Constitution of the United States provides that: "The United States shall guarantee to every State in this Union a Republican Form of Government. . . ."   This "Guarantee Clause" requires that each state have and maintain a Republican Form of Government, including a legislative branch empowered to tax and appropriate.  The requirement for a state legislative branch is underscored by the fourteen

separate provisions of the original United States Constitution that depended on a fully functioning legislative branch in each state.

13.     On February 28, 1861, in accordance with Article IV, Section 3, of the United States Constitution, Congress enacted The Colorado Territorial Act, 12 Stat. 176 (1861) (the "Territorial Act"), providing for the organization of and a temporary government for the Territory of Colorado. That statute specified in Section 4 the establishment of a bicameral "legislative council" and in Section 6 that the power of the legislative council "extend to all rightful subjects of legislation consistent with the Constitution of the United States."

14.     On March 3, 1875, pursuant to Article IV, Section 3 of the United States Constitution, Congress enacted the Enabling Act. Under the terms of the Colorado Territorial Act and the Enabling Act, the Territory of Colorado was to be admitted to the Union as a state only after meeting certain requirements. Among them was the requirement that the territory convene a Constitutional Convention that would adopt on behalf of the people the Constitution of the United States and draft a state Constitution that "shall be republican in form." 18 Stat. 474, Section 4.

15.     In compliance with the provisions of the Enabling Act and the Territorial Act, the Constitutional Convention of the Territory of Colorado met, adopted the Constitution of the United States, and prepared a Constitution then fully compliant with the Enabling Act. That Constitution of the proposed State of Colorado did provide for a Republican Form of Government and, in Article V, Section 1, expressly provided that "[t]he legislative power shall be vested in the General Assembly, which shall consist of a Senate and House of Representatives, both to be elected by the People."

16.     Article V of the Constitution of the proposed new state provided in Sections 31 and 32 for the General Assembly of the State of Colorado to have and execute the powers to raise and appropriate revenue.

17.     Article X, Section 2, of the Colorado Constitution provides: "The general assembly shall provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of state government for each fiscal year." This provision was essential to and an integral part of the several provisions of the Colorado Constitution that constituted the State's Republican Form of Government.

18.     On August 1, 1876, President Ulysses S. Grant, pursuant to the Enabling Act, proclaimed the Territory of Colorado to be the State of Colorado, recognizing that the Constitution of the proposed State of Colorado had been duly drawn and ratified by the People of Colorado, and that compliance with the Enabling Act had been certified by the Territorial Governor, the Chief Justice, and the Territorial United States Attorney.  Compliance with the Enabling Act was and continues to be a matter of federal statutory law, an obligation enforceable by the courts of the United States against any contrary provision of state law under the Supremacy Clause of Article VI, Section 2, of the United States Constitution.

19.     The certifications of compliance with the Enabling Act and the Proclamation of Statehood by the President were expressly subject to and dependent upon the prior enactment of the Colorado Constitution and on its guarantee of a Republican Form of Government, including a legislature with powers sufficient to fulfill its responsibilities under a Republican Form of Government, including, without limitation, plenary powers to raise and appropriate revenues and to provide for taxes to defray the expenses of state government.

8

20.     For the succeeding 116 years, the State of Colorado and its Constitution complied with the requirements of the Territory Act, the Enabling Act, and Article IV, Section 4, of the United States Constitution, in that the State maintained a General Assembly able to meet its constitutional obligations under a Republican Form of Government, including the powers to raise and appropriate revenues.

21.     In 1910, the people approved an amendment to the Colorado Constitution, with the short title, "Providing for the initiative and referendum." This amendment revised Article V, Section 1(1) of the Colorado Constitution.  That section originally stated that "[t]he legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people." The amendment added the following language: "but the people reserve to themselves the power *to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the general assembly and also reserve power at their own option to approve or reject at the polls any act or item, section, or part of any act of the general assembly.*" Laws 1910 Ex. Sess., at 11 (emphasis added).  Subsequent subsections added and amended in 1980 and 1994 elaborate on the initiative and referendum processes.

22.     Notwithstanding its sweeping terms, this initiative and referendum provision could not lawfully compromise the undertakings of the State of Colorado, required under the Enabling Act and by the Guarantee Clause, to have and maintain a Republican Form of Government, including a legislative branch with the requisite powers to fund the State's needs through taxation and appropriation.  Section 2 of Article II of the Colorado Constitution expressly recognizes this limitation, stating that the plenary power reserved to the people "to

alter or abolish their constitution and form of government" is itself constrained in that "any such change be not repugnant to the constitution of the United States."  This provision is a necessary limitation on the powers of initiative and referendum in order for the State to remain in compliance with its Enabling Act.

23.     On November 3, 1992, the People of the State of Colorado voted to amend the Colorado Constitution by adding Section 20, "the Taxpayer's Bill of Rights," known as "TABOR," as an amendment to Article X ("Revenue") of the Constitution.  The TABOR Amendment became effective by Proclamation of the Governor of Colorado on January 14, 1993.

24.     The TABOR Amendment removed from the General Assembly and subordinate political subdivisions the power to tax and raise revenue, and severely curtailed their respective powers to appropriate existing revenues.  Under the TABOR Amendment, the powers removed from the General Assembly and from subordinate political subdivisions were vested exclusively in the People of Colorado, to be exercised only through a tightly constrained popular voting process.

25.     Paragraph 4 of the TABOR Amendment, "Required Elections," and its subparagraphs vested in the People of Colorado, to be exercised only by popular vote, all of the powers to enact new taxes, to increase tax rates, to change in any manner existing tax structures or the incidents of taxation, and in all other respects to raise and collect funds for the operation of the State.  By its incorporation of various terms and definitions, paragraph 4 extended to all other political subdivisions of the State this arrogation of power to popular vote, removing the separate taxing ability of counties, municipalities, special districts, and school districts.

26.     Paragraph 7 of the TABOR Amendment, "Spending Limits" and its subparagraphs, established a cap on the total amount that the State or any of its subdivisions may spend in any given fiscal year, a cap adjusted annually for the combination of "inflation" plus the "percentage change in state population." This cap is inviolable and not subject to any findings, determinations, or exigencies that might be found by the State or by counties, municipalities, special districts, or school districts. To the extent that revenues from tax sources exceed the cap, any excess must be refunded to the people of the State or of the affected jurisdiction.

27.     The TABOR Amendment spending limitation remains intact, adjusted only for inflation and population increases. The spending limit has eroded and will continue to erode the ability of the State and its subdivisions to pay the necessary expenses of government. This occurs primarily because the annual adjustment for inflation is governed by the "Consumer Price Index," which is based on typical private consumer spending and so fails to account for the significantly greater costs of the goods and services purchased by governmental entities. That difference then compounds over time. The spending limit adjustment also fails to account for other factors that affect the overall cost of providing government services (but not the cost of goods and services in the Consumer Price Index), such as demographic changes and federal mandates on state spending.

28.     Paragraph 8 of the TABOR Amendment, "Revenue limits," and its subparagraphs prohibit the imposition of new or increased property taxes, prohibit any new local district income tax, and prohibit any new income tax change that is progressive.

29.     The totality of these provisions of the TABOR Amendment removes entirely from the Colorado General Assembly and the governing bodies of the State's political subdivisions

any authority to adjust tax laws to replace or increase revenue, severely limits their power to appropriate existing revenues, and prohibits them from raising funds by any other means, including borrowing.

### III.  FUNDING FOR PUBLIC SCHOOLS

30.     Various provisions of the Enabling Act specify the use of, and revenue from, the federal lands ceded to the State upon admission as a state to be dedicated to "the support of common schools" (Section 7), "support of a State university" (Section 10), and "the two sections of land in each township herein granted for the support of common schools . . . the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools" (Section 14).  The revenues from federal common lands ceded to the State under the Enabling Act, together with the mandate in Article X, Section 2, of Colorado's original constitution, itself required by the Enabling Act, combined with the revenues allocated by the State and by local school districts, constituted an integrated scheme for funding public education in the State in which federal obligations and state and local educational responsibilities are inextricably intertwined.

31.     In Article IX of the original Colorado Constitution, the State of Colorado undertook to provide its children with a universal system of free public education.  Specifically, Section 2 of Article IX provided that "[t]he General Assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the State, wherein all residents of the State between the ages of six and twenty-one years may be educated gratuitously."   Section 15 of Article IX provided for the organization of school districts "in each of which shall be established a board of education, to

consist of three or more directors to be elected by the qualified electors of the district.  Said directors shall have control of instruction in the public schools of their respective districts."

32.     In the several sections of the Colorado Revised Statutes, known collectively as the "School Finance Act," currently C.R.S. §§ 22-54-101, *et seq*., as amended and reenacted by the General Assembly from time to time, the State of Colorado has prescribed the responsibility for fulfilling the obligations of Section 2 of Article IX as one shared by the State, acting through its fiscal processes, and by the 178 local district school boards, acting through their authority to raise and expend funds in support of their local public schools.  The state and local sharing under the School Finance Act is intended, *inter alia*, to offset vast disparities in local school districts' ability to raise money from local property tax.

33.     The ability of the State's local school districts to fulfill their share of the responsibility for funding the public schools depends on the General Assembly meeting its part of the shared responsibility to fund the State's public schools.

34.     The requirements and limitations imposed by the TABOR Amendment have prevented the State and its local school districts from fulfilling their obligations, derived from the original state constitution, and its derivation from the Enabling Act, adequately to fund the public schools of the State.

35.     Property tax mill levies are the principal source of revenue available to local school district boards to fund their public schools.  Prior to the TABOR Amendment, local district school boards had authority, within statutory limits, to set such property tax mill levies. After the TABOR Amendment, if a district's year-over-year revenues increased more than allowed by the revenue or spending cap of the TABOR Amendment, the district was required to

reduce the mill levy or refund the "excess" revenues or both.  Also, as a result of the TABOR Amendment's impact on the sufficiency of state revenues available to fund public education, local districts have suffered reductions in the state share of school funding.  In sum, the TABOR Amendment has caused local school districts to lose funding and incur costs, delays, and other injuries to their ability to provide for the education of their children.  These injuries are due to the TABOR Amendment's requirement for elections to approve retention of revenues that exceed the spending limits imposed by the TABOR Amendment and to the TABOR Amendment's effect in reducing the State's capacity to fund the public schools.  That reduction in state support has led many local districts to hold mill levy "override" elections to permit increases in districts' property tax mill levies.

36.    The State, through its Attorney General, has admitted that, because of the TABOR Amendment, the State can no longer fulfill a critical constitutional obligation, the requirement that it educate its children because the TABOR Amendment constrains any funding required by the Education Clause of the state constitution. *See Def.'s Mot. for Determination of Questions of Law Pursuant to C.R.C.P. 56(h)* (the "Motion"), filed by the Attorney General of Colorado, February 25, 2011, in *Lobato, et al. v. State of Colorado, et al.,* District Court, City & County of Denver, Colorado, 05 CV 4794, at 6-7.  A copy of the Motion is submitted herewith as Exhibit A.

37.    Some of the negative effects of the TABOR Amendment on the funding of the State's public schools are analyzed in a study prepared by the independent, nonpartisan Colorado Futures Center ("CFC Study"), available at http://www.coloradofuturescsu.org/tabor-has-increased-school-property-taxes-for-most-coloradans/.  The CFC Study demonstrates that a

large majority of Coloradans pay more in school property taxes than they would have if voters had never enacted the TABOR Amendment. Contrary to the requirement stated in section 2 of Article XI that the State maintain "a thorough and uniform system of free public schools," district disparities have worsened after the TABOR Amendment. In the process, the policies set out in the School Finance Act, adopted pursuant to republican governance, *i.e.*, by decision of the General Assembly, have been thwarted. The key findings from the CFC Study (emphasis in the original):

> 1. As a result of TABOR, **taxpayers in 74 of the state's 178 school districts currently pay more in school property taxes than they would if two provisions of TABOR were never enacted.** These 74 districts contain 81% of the state's population, 80% of the pupils, and represent 2/3 of the property tax base of the entire state.

> 2. **District level funding disparities increased as the use of local override levies became increasingly prevalent in districts with falling effective property tax rates for base school programs.** These falling rates were in part a result of the local property tax and mill levy limits in TABOR. Local override levies are additional property taxes subject to a vote and provide a mechanism to supplement base school budgets. The unequal use of them, facilitated by the unequal effect of the limits in TABOR, results in an increase in district level funding disparities.

> 3. As measured by effective tax rates, local property taxes to support base school programs have become **more unequal** since the passage of TABOR. That is, the effective rates on the most highly burdened districts have increased while the rates on the least burdened districts have decreased.

> 4. Also as measured by effective tax rates, the local property tax to support base school programs has become **more regressive.**

*Id.*

38.     The Education Clause of the state constitution, section 2 of Article IX, provides for the free education of its children through the age 21, and, in concert with the Enabling Act, provides for the creation and maintenance of post-secondary institutions.

39.     In addition to the effects on the funding of K-12 public schools described in the foregoing paragraphs, the impact of the TABOR Amendment on state budgets has resulted in severely reduced state support for public post-secondary education.  Despite Colorado's relative wealth, its support for higher education by all standard measures ranks near the bottom nationally.  Consequently, the State's public post-secondary institutions have come to rely primarily on increased tuition revenue, to the injury of Colorado's post-secondary students and their families.

## IV.  OPERATION OF COUNTY GOVERNMENT

40.     Counties were recognized in section 1 of Article XIV of the original constitution of Colorado, and county commissioners likewise in section 6 of Article XIV.  Commissioners are constitutional officers and are vested with a broad range of responsibilities and concomitant authority and powers.  C.R.S. § 30-11-103 authorizes the commissioners to exercise the powers of the county.

41.     C.R.S. § 30-11-107 provides that the board of county commissioners of each county has power at any meeting: to settle all accounts of the receipts and expenses of the county; to examine and settle and allow all accounts chargeable against the county; and, *inter alia,* to apportion and order the levying of taxes as provided by law.  Section 30-11-107 further provides that the board of county commissioners of each county has exclusive power to adopt the annual budget for the operation of the county government, including all offices, departments,

boards, commissions, other spending agencies of the county government, and other agencies that are funded in whole or in part by county appropriations.

42.     The limitations imposed by the TABOR Amendment on the exercise of the counties' fiscal powers directly contravene the powers and responsibilities of commissioners and have undermined the counties' republican form of government.

43.     Due to the unconstitutional requirements of the TABOR Amendment, on numerous occasions since 1992, counties has been forced to incur costs and expenses necessary to present matters affecting the exercise of their fiscal powers of taxation and appropriation to the voters for their decision.  These are matters that would otherwise have been within the powers and responsibilities of the commissioners, including changes in county sales taxes and property taxes and relief from the TABOR Amendment's spending limits.  When revenues exceed the amount permitted under the TABOR Amendment's spending limits, counties may be required by the TABOR Amendment to lower mill levies or refund the excess or both.  The boards of county commissions retain the authority to make decisions to *lower* mill levies or order refunds.  However, when conditions change and revenues later fall below the permitted spending limit, boards of county commissions are required by the TABOR Amendment to seek voter approval to *restore* mill levies.

## V.  OPERATION OF SPECIAL DISTRICTS

44.     Article 1 of Title 32 of the Colorado Revised Statutes, known as the "Special Districts Act," C.R.S. §§ 32-1-101, *et seq*., has prescribed the responsibility of and authority for a variety of special districts and the governing boards of directors of such special districts to fulfill various obligations undertaken as subdivisions of the State, for the benefit of the people

organized under law in such districts, including the authority to levy taxes on the property within such district's jurisdiction and to expend the tax revenues generated for the purposes of such districts.

45.     Prior to the TABOR Amendment, special district boards had authority, within statutory limits, to set the property tax mill levies to fund their functions.  The TABOR Amendment has impaired the authority of special districts to fulfill their responsibilities and has caused special districts to incur costs, delays, and other injuries to their ability to provide for the needs of their districts occasioned by the TABOR Amendment's requirements for elections to approve any increases in the property tax mill levies and to retain revenues generated by existing mill levies that exceed the spending limits imposed by the TABOR Amendment.  When revenues exceed the amount permitted under the TABOR Amendment's spending limits, the TABOR Amendment may require special districts to *lower* mill levies or to refund the excess or both, and boards of special districts retain the authority to make decisions to lower mill levies or order refunds.  However, when conditions change and revenues later fall below the permitted spending limit, the TABOR Amendment requires the boards of special districts to seek voter approval to *restore* mill levies.

46.     The limitations imposed by the TABOR Amendment directly contravene the powers and responsibilities of the boards of directors of special districts and have undermined the special districts' Republican Form of Government.

## VI.  PARTIES

47.     Several Plaintiffs described in the caption and in the following paragraphs as governmental bodies, *i.e.*, county commissions, boards of education, and special districts, have

acted officially to join this litigation as plaintiffs because each has sustained injuries as a result of the TABOR Amendment in that their fundamental fiscal powers and responsibilities have been impaired and their Republican Form of Government undermined.   Their injuries will be remedied by the relief sought in voiding the TABOR Amendment as a violation of the Guarantee Clause and the Enabling Act.

48.     Certain Plaintiffs in this case are past or sitting elected Representatives or Senators in the General Assembly of the State of Colorado.   As such, they have a direct and specific interest in securing to themselves, and to their constituents and to the State, the legislative core functions of taxation and appropriation.   They have acted to join this litigation as plaintiffs because each has sustained injuries as a result of the TABOR Amendment in that their fundamental fiscal powers and responsibilities have been impaired and their Republican Form of Government undermined.   Their injuries will be remedied by the relief sought in voiding the TABOR Amendment as a violation of the Guarantee Clause and the Enabling Act.

49.     Certain Plaintiffs in this case are past or sitting elected officials of counties, cities, and school districts in the State of Colorado, jurisdictions whose authority and responsibility to tax are eliminated, and whose ability to appropriate existing revenues are curtailed, by the TABOR Amendment.   Their counties, districts, and municipalities are dependent, under the state constitution, on the power of the legislature and their own powers to tax and appropriate.   They have acted to join this litigation as plaintiffs because each has sustained injuries as a result of the TABOR Amendment in that their fundamental fiscal powers and responsibilities have been impaired and their Republican Form of Government undermined.   Their injuries will be

remedied by the relief sought in voiding the TABOR Amendment as a violation of the Guarantee Clause and the Enabling Act.

50.     Certain Plaintiffs in this case are or have been educators employed by the State of Colorado or by various school districts in this State.  In addition to their interests as citizens of the State, they also have a specific interest in ensuring that the legislature of the State can discharge its authority and responsibilities to tax for the purpose of adequately funding core education responsibilities of the State, as provided in Article IX, Section 2 of the Colorado Constitution.  They have acted to join this litigation as plaintiffs because each has sustained injuries as a result of the TABOR Amendment in that their ability properly to educate the students for whom they are responsible has been impaired.  Their injuries will be remedied by the relief sought in voiding the TABOR Amendment as a violation of the Guarantee Clause and the Enabling Act.

51.     Each Plaintiff has been directly and concretely injured by the TABOR Amendment and its effects in impairing the fiscal authority and responsibilities of State and local government, and the resulting impacts on the ability of State and local government to provide for the needs of the State and of the people of Colorado.  Their injuries will be remedied by the relief sought in voiding the TABOR Amendment as a violation of the Guarantee Clause and the Enabling Act.

52.     Plaintiff Andy KERR is a member of the Colorado State Assembly representing Senate District 22, a social studies teacher in the Jefferson County school, and a citizen of the State of Colorado.

53.     Plaintiff Norma V. ANDERSON is a former member of and Majority Leader of the Colorado House of Representatives, a former member the Colorado Senate, a former director of the Regional Transportation District, and a citizen of the State of Colorado.

54.     Plaintiff Jane M. BARNES is a former member of the Jefferson County Board of Education, past president of the Colorado Association of School Boards, and a citizen of the State of Colorado.

55.     Plaintiff K. C. BECKER is a member of the Colorado House of Representatives, representing House District 13, and a citizen of the State of Colorado.

56.     Plaintiff Elaine Gantz BERMAN is a former member of the Colorado State Board of Education, a former member of the Denver Public Schools Board of Education, and a citizen of the State of Colorado.

57.     Plaintiff BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY is the duly constituted governing body of the County of Boulder, acting officially under powers delegated by state law.  On August 25, 2016, the Board unanimously voted to become a plaintiff in this case through its adoption of Resolution 2016-97.

58.     Plaintiff BOULDER VALLEY SCHOOL DISTRICT RE-2 BOARD OF EDUCATION is the duly constituted governing body of Boulder Valley School District Re-2, acting officially under powers delegated by state law.  On September 27, 2016, the Board voted to become a plaintiff in this case through its adoption of Resolution 16-30.

59.     Plaintiff Dr. Alexander E. BRACKEN is a former member of the Colorado Commission on Higher Education, was the Nineteenth President of the University of Colorado, and is a citizen of the State of Colorado.

60.     Plaintiff William K. BREGAR is a former member of the Pueblo District 70 Board of Education, a past President of the Colorado Association of School Boards, and a citizen of the State of Colorado.

61.     Plaintiff Bob BRIGGS is a former Councilman of the City of Westminster, a former member of the Colorado House of Representatives, a former member of the Adams County Commission, a former director of the Regional Transportation District, and a citizen of the State of Colorado.

62.     Plaintiff Bruce W. BRODERIUS is a former member of Weld County District 60 Board of Education, Professor of Education Emeritus and former Dean of Education at the University of Northern Colorado, and a citizen of the State of Colorado.

63.     Plaintiff TRUDY B. BROWN is a citizen of the State of Colorado.

64.     Plaintiff Stephen A. BURKHOLDER is former Mayor and Councilman of the City of Lakewood and a citizen of the State of Colorado.

65.     Plaintiff Richard L. BYYNY, M. D., is former Director of the Center for Health Policy at the University of Colorado Hospital, former Chancellor of the Boulder Campus of the University of Colorado, and a citizen of the State of Colorado.

66.     Plaintiff CHEYENNE WELLS RE-5 SCHOOL DISTRICT BOARD OF EDUCATION is the duly constituted governing body of the Cheyenne Wells RE-5 schools, acting officially under powers delegated by state law.   On September 26, 2016, the Board unanimously voted to become a plaintiff in this case.

67.     Plaintiff COLORADO SPRINGS DISTRICT 11 BOARD OF EDUCATION is the duly constituted governing body of the Colorado Springs District 11 schools, acting officially

under powers delegated by state law.  On November 30, 2016, the Board voted to adopt its Resolution 2017-21 to become a plaintiff in this case.

68.     Plaintiff Lois COURT assumes office January 11, 2017, as a member of the Colorado Senate representing Senate District 31, was previously a member of the Colorado House of Representatives representing House District 6, and is a citizen of the State of Colorado.

69.     Plaintiff DENVER COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION is the duly constituted governing body of the Denver Public Schools, acting officially under powers delegated by state law.  On September 15, 2016, the Board unanimously voted to become a plaintiff in this case through its adoption of Resolution 3725.

70.     Plaintiff Richard E. FERDINANDSEN is a former Jefferson County Commissioner and a citizen of the State of Colorado.

71.     Plaintiff Stephanie GARCIA is former President of the Pueblo City Board of Education and a citizen of the State of Colorado.

72.     Plaintiff GUNNISON COUNTY METROPOLITAN RECREATION DISTRICT BOARD OF DIRECTORS is the duly constituted governing body of the Gunnison County Metropolitan Recreation District, acting officially under powers delegated by state law under the Special Districts Act.  On September 19, 2016, the Board unanimously voted to become a plaintiff in the case.

73.     Plaintiff GUNNISON WATERSHED RE-1J BOARD OF EDUCATION is the duly constituted governing body of the Gunnison Watershed School District, acting officially under powers delegated by state law.  On September 12, 2016, the Board unanimously voted to become a plaintiff in this case through its adoption of Resolution 09121608.

74.     Plaintiff Kristi HARGROVE is a member of the Board of Directors of Great Education Colorado, is a member of the Colorado PTA, volunteers frequently to raise money for the local schools, and is a citizen of the State of Colorado.

75.     Plaintiff Christopher J. HANSEN assumes office January 11, 2017, as a member of the Colorado House of Representatives representing House District 6 and is a citizen of the State of Colorado.

76.     Plaintiff Leslie HEROD assumes office January 11, 2017, as a member of the Colorado House of Representatives representing House District 8 and is a citizen of the State of Colorado.

77.     Plaintiff Dickey Lee HULLINGHORST has served as Speaker of the Colorado House of Representatives and as a member of the Colorado House of Representatives representing House District 10, and is a citizen of the State of Colorado.

78.     Plaintiff Nancy JACKSON is a former Arapahoe County Commissioner and a citizen of the State of Colorado.

79.     Plaintiff William G. KAUFMAN is a former member of the Colorado Transportation Commission, a former member of the Colorado House of Representatives, and a citizen of the State of Colorado.

80.     Plaintiff Claire LEVY is a former member of the Colorado House of Representatives and a citizen of the State of Colorado.

81.     Plaintiff Susan LONTINE is a member of the Colorado House of Representatives, representing House District 1, and a citizen of the State of Colorado.

82.     Plaintiff Margaret (Molly) MARKERT is a former Councilwoman of the City of Aurora, a former member of the Colorado House of Representatives, and a citizen of the State of Colorado.

83.     Plaintiff Megan J. MASTEN is the parent of two school children and a citizen of the State of Colorado.

84.     Plaintiff Michael MERRIFIELD is a member of the Colorado Senate, representing Senate District 11, a former member of the Colorado House of Representatives, and a citizen of the State of Colorado.

85.     Plaintiff Marcella (Marcy) L. MORRISON is a former member of the Colorado House of Representatives, a former member of the El Paso County Commission, a former member of the Manitou Springs Board of Education, and a citizen of the State of Colorado.

86.     Plaintiff John P. MORSE is former Majority Leader of the Colorado Senate and a citizen of the State of Colorado.

87.     Plaintiff Pat NOONAN is a former Arapahoe County Commissioner and a citizen of the State of Colorado.

88.     Plaintiff Ben PEARLMAN is the County Attorney of Boulder County, a former Boulder County Commissioner, and a citizen of the State of Colorado.

89.     Plaintiff POUDRE SCHOOL DISTRICT BOARD OF EDUCATION is the duly constituted governing body of the Poudre School District schools, acting officially under powers delegated by state law.   On November 22, 2016, the Board voted unanimously to adopt a resolution to become a plaintiff in this case.

90.     Plaintiff PUEBLO CITY SCHOOLS BOARD OF EDUCATION is the duly constituted governing body of the Pueblo City School District 60, acting officially under powers delegated by state law. On September 27, 2016, the Board unanimously voted to adopt a resolution to become a plaintiff in this case through its adoption of a resolution.

91.     Plaintiff PUEBLO COUNTY DISTRICT 70 BOARD OF EDUCATION is the duly constituted governing body of the Pueblo County District 70 schools, acting officially under powers delegated by state law. On November 25, 2016, the Board unanimously voted to adopt a resolution to become a plaintiff in this case.

92.     Plaintiff Wallace PULLIAM is a former director of the Regional Transportation District and a citizen of the State of Colorado.

93.     Plaintiff Paul WEISSMANN is Treasurer of Boulder County, a former member of both the Colorado Senate and the Colorado House of Representatives, and a citizen of the State of Colorado.

94.     Plaintiff Joseph W. WHITE is a teacher at ThunderRidge High School and a citizen of the State of Colorado.

95.     Certain Plaintiffs in this case are individual citizens of the State of Colorado, having a specific, protectable interest in ensuring that their representatives can discharge the inherently legislative function of taxation and appropriation, and an interest in ensuring that the State of Colorado has a Republican Form of Government, as required by the United States Constitution and the Enabling Act. They have been injured in the deprivation of their elected representatives' services, authority, and responsibilities to exercise the fundamental fiscal powers assigned to them.

96.     All Plaintiffs in this case have rights protectable under the United States Constitution and the Enabling Act, including the right to a Republican Form of Government and therewith to legislative branches of state and local government with the powers to tax and to appropriate revenues.

97.     The nature and extent of the injuries sustained by Plaintiffs due to the violations of the Guarantee Clause by the TABOR Amendment will be further clarified upon development of facts to be adduced at trial and a judicial determination of the protections Plaintiffs enjoy under the Guarantee Clause.  Thus, each of the Plaintiffs' injuries necessary to establish Article III standing are inextricably and inseparably intertwined with the facts to be proven of the constitutional and federal claims they assert.  Each plaintiff's injury results from the TABOR Amendment's removal of the General Assembly's fundamental power to tax and to control revenue as elected representatives of the citizens of Colorado.  These injuries are in addition to the clear facial injuries suffered by certain Plaintiffs.

98.     Defendant John HICKENLOOPER is Governor and chief executive officer of the State of Colorado with authority to administer and execute the provisions of the Constitution and laws of the State of Colorado, and is named in his official capacity.

## VII.  **JURISDICTION AND VENUE**

99.     Jurisdiction of this case is grounded in 28 U.S.C. § 1331, Federal Question, as this case requires the Court to interpret the provisions of Article IV, Section 4, of the United States Constitution, the "Guarantee Clause," which requires a Republican Form of Government.

100.    Jurisdiction of this case is grounded in 28 U. S. C. § 1331, Federal Question, as this case requires the Court to interpret the provisions of Article VI, Section 2, of the United States Constitution, the "Supremacy Clause."

101.    Jurisdiction under 28 U.S.C. § 1331 also lies because this case requires the Court to interpret federal statutes, to wit, the Territorial Act and the Enabling Act, under which Congress granted the People of Colorado the authority to form a state subject to requirements that are at issue in this case.

102.    Jurisdiction of this case is also grounded in 28 U.S.C. § 1367, as this Court has Supplemental Jurisdiction over such matters as may involve the interpretation of the Constitution of the State of Colorado.

103.    Jurisdiction for relief in this case is also grounded in 28 U.S.C. § 1651, the All Writs Act, and 28 U.S.C. § 2201, the Declaratory Judgment Act.

104.    The Courts of the United States have jurisdiction to determine a state's compliance with Article IV, Section 4, of the Constitution of the United States, *i.e.*, whether its government is a Republican Form of Government, and to nullify and declare void laws or state constitutional provisions that deprive the State of republican governance.

105.    The Courts of the United States have jurisdiction to determine whether the TABOR Amendment violates the requirement that Colorado have a Republican Form of Government prescribed by Article IV, Section 4, of the Constitution of the United States, the "Guarantee Clause," and the Enabling Act, and that such conflict compels invalidation of the TABOR Amendment under the Supremacy Clause.

106.    The Courts of the United States have jurisdiction to determine whether a state is in compliance with federal statutes and, specifically the Enabling Act, under the terms of which Congress authorized the creation of the State of Colorado and its admission to the Union.

107.    Venue of this case is proper in this Court under the provisions of 31 U.S.C. § 1391(b), as all of the Plaintiffs and the Defendant are residents of the State of Colorado.

## COUNT I - VIOLATION OF ARTICLE IV, SECTION 4
## OF THE UNITED STATES CONSTITUTION

108.    A fully effective legislature is an essential component of a Republican Form of Government, as guaranteed to each state by Article IV, Section 4, of the Constitution of the United States.  By removing the taxing power of the General Assembly, and severely limiting its appropriations power, the TABOR Amendment renders the Colorado General Assembly unable to fulfill its legislative obligations under a Republican Form of Government and violates the guarantee of Article IV, Section 4, of the United States Constitution.  The TABOR Amendment similarly undermines the Republican Form of Government for all subordinate levels of government in the State.

## COUNT II - VIOLATION OF THE ENABLING ACT

109.    The Enabling Act of 1875, a statute of the United States, set forth the conditions for Colorado statehood, including the requirement that the state have a Republican Form of Government.  The Enabling Act's requirement for a Republican Form of Government entailed having and maintaining a fully effective legislature.  By removing the taxing power of the General Assembly, and severely limiting its appropriations power, the TABOR Amendment renders the Colorado General Assembly unable to fulfill its legislative obligations under a

Republican Form of Government.  In so doing, the TABOR Amendment violates the Enabling

Act, a statutory violation cognizable separately from the Plaintiffs' constitutional claims.

### COUNT III - VIOLATION OF ARTICLE VI, SECTION 2, OF THE UNITED STATES CONSTITUTION

110.    The TABOR Amendment is in irresolvable conflict with the Guarantee Clause of

the United States Constitution and with the undertakings of the State of Colorado as required by

the Enabling Act.  Under the Supremacy Clause of Article VI, Section 2, of the United States

Constitution, must yield to the requirements of the Guarantee Clause and of the Enabling Act

that Colorado maintain a Republican Form of Government.

### COUNT IV – IMPERMISSIBLE AMENDMENT OF COLORADO CONSTITUTION

111.    As a condition for Colorado to become a state and be accepted into the Union

under the Enabling Act, the citizens of the State of Colorado undertook to create and to maintain

irrevocably a Republican Form of Government.  Colorado may not deviate from the

requirements of the Enabling Act without obtaining its amendment.

112.    The expectant citizens of the future State of Colorado, for themselves and for all

citizens of Colorado to come, obligated themselves irrevocably to form and to maintain a state

government republican in form.  That obligation necessarily inheres in the Colorado Constitution

and entails having a legislative branch able to fulfill its responsibilities under a Republican Form

of Government.  Section 2 of Article II of the Colorado Constitution expressly recognizes that

the people of the State relinquish the power to alter the republican nature of their government.

113.    By accepting the obligations under both its Enabling Act and in its Constitution to

establish and maintain a Republican Form of Government, the State of Colorado and its citizens

irrevocably undertook for themselves and their successors to have and to maintain a Constitution embodying a Republican Form of Government.  An essential component of a Republican Form of Government is a legislature with sufficient plenary authority to be effectively republican both in form and in actual authority, necessarily including the power to impose taxes and raise revenues necessary to pay the expenses of state government.

114.    Any amendment to the Colorado Constitution must therefore be read as subordinate to the original and perpetual obligation of the State to maintain a Republican Form of Government.   The citizens of the State of Colorado were and are constitutionally disempowered to amend the state constitution to derogate or to remove power and authority from the legislative branch such that the fundamental nature of the State's Republican Form of Government is compromised or undermined.

115.    The TABOR Amendment, in depriving the General Assembly of the power to tax and severely limiting its power to appropriate, compromises and undermines the fundamental nature of the State's Republican Form of Government.  In passing the TABOR Amendment, the citizens of the State of Colorado violated the superior obligation inherent in the Colorado Constitution to maintain, and the right of all the people to enjoy, a Republican Form of Government.  Therefore, under *state* constitutional law, the TABOR Amendment exceeded the powers retained by the citizens of the State and is unconstitutional and void under the Constitution of the State of Colorado.

116.    The TABOR Amendment, in depriving the General Assembly of the power to tax, nullifies the inherent and necessary powers of General Assembly under Article X, Section 2, and Article V, Sections 31 and 32, of the Colorado Constitution, and so violates both those superior

provisions of the Colorado Constitution and the guarantee of a Republican Form of Government under Article IV, Section 4, of the United States Constitution.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      For a DECLARATION that the TABOR Amendment is facially unconstitutional and unconstitutional as applied;

2.      For a DECLARATION that the TABOR Amendment is null and void;

3.      For a DECLARATION that the Plaintiffs' rights to and responsibilities under a Republican Form of Government in accordance with Article IV, Section 4, of the United States Constitution have been violated;

4.      For a DECLARATION that the TABOR Amendment violates the Colorado Statehood Enabling Act;

5.      For an ORDER prohibiting any state or local officer from taking any action whatsoever to effectuate the requirements and purposes of the TABOR Amendment; and

6.      For an ORDER enjoining any transfer funds, including so-called TABOR refunds, that would be required under the TABOR Amendment; and

7.      For such other and further relief as the Court may find just and proper.

Respectfully submitted this 1st day of December 3, 2016.

/s/ *David E. Skaggs*
LINO S. LIPINSKY de ORLOV
DAVID E. SKAGGS
Dentons US LLP
1400 Wewatta Street, Suite 700
Denver, Colorado 80202
Email:   lino.lipinsky@dentons.com
              david.skaggs@dentons.com
Telephone:  (303) 634-4000

MICHAEL F. FEELEY
SARAH M. CLARK
CARRIE E. JOHNSON
Brownstein Hyatt Farber Schreck LLP
410 17th Street, Suite 2200
Denver, Colorado 80202-4437
Email:   mfeeley@bhfs.com
              sclark@bhsf.com
              cjohnson@bhsf.com
Telephone:  (303) 223-1100

HERBERT LAWRENCE FENSTER
Covington & Burling LLP
850 10th Street NW
Washington, DC 20001
Email:   hfenster@cov.com
Telephone:  (202) 662-5381

MICHAEL L. BENDER
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Email:   mbender@perkinscoie.com
Telephone:  (303) 291-2366

JOHN A. HERRICK
2715 Blake Street, #9
Denver, Colorado 80205
Email:   john.herrick@outlook.com
Telephone:  (720) 987-3122

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of December, 2016, a true and correct copy of the foregoing FOURTH AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF was electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following:

Frederick Richard Yarger (fred.yarger@state.co.us)
Glenn E. Roper (glenn.roper@coag.gov)
Megan Paris Rundlet (megan.rundlet@state.co.us)
William V. Allen (Will.allen@coag.gov)
Matthew David Grove (matt.grove@state.co.us)
Stephanie Lindquist Scoville (Stephanie.scoville@coag.gov)
Kathleen L. Spalding (kit.spalding@coag.gov)
Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203

David Benjamin Kopel (david@i2i.org)
Independence Institute
13952 Denver West Parkway, Suite 400
Golden, CO 80401

Melissa Hart (Melissa.hart@colorado.edu)
University of Colorado School of Law
Wolf Law Building Campus Box 401
Boulder, CO 80309-0401

*/s/ Kay North*
Kay North

101981195\V-2

34