**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Case No. 11-cv-01350-RM-NYW

ANDY KERR, *et al.*,

      Plaintiffs,

v.

JOHN HICKENLOOPER, Governor of Colorado in his official capacity,

      Defendant.

---

## OPINION AND ORDER

---

On June 3, 2016, the Tenth Circuit Court of Appeals vacated this Court's Order finding certain legislator-plaintiffs to have standing, concluded that the legislator-plaintiffs did not have standing, and remanded for this Court to determine whether any non-legislator plaintiffs have standing. (ECF No. 123.)

On December 6, 2016, plaintiffs filed a Fourth Amended Complaint ("FAC") against John Hickenlooper in his official capacity as the Governor of Colorado ("defendant"), seeking declaratory and injunctive relief with respect to the Taxpayer's Bill of Rights ("TABOR"), an amendment to the Colorado Constitution passed by voter initiative in 1992. (ECF No. 151.) Plaintiffs allege that TABOR violates: Article IV, Section 4 of the U.S. Constitution; the Enabling Act of 1875 ("the Enabling Act"), 18 Stat. 474; Article IV, Section 2 of the U.S. Constitution; and Article X, Section 2, and Article V, Sections 31 and 32 of the Colorado Constitution. (*Id.*)

On December 16, 2016, defendant filed a motion to dismiss the FAC ("the motion to dismiss"), pursuant to Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)"). (ECF No. 156.) Plaintiffs have responded in opposition to the motion to dismiss (ECF No. 160), and defendant has filed a reply (ECF No. 163). Subsequently, plaintiffs filed a motion requesting oral argument on the motion to dismiss (ECF No. 167), to which defendant has responded (ECF No. 169).

## I.      Legal Standards

Motions to dismiss for lack of subject matter jurisdiction take two principal forms: (1) a facial attack, or (2) a factual attack on the allegations in the complaint. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). Here, defendant facially attacks the sufficiency of the allegations in the FAC. (*See* ECF No. 156 at 6-7.) As a result, the Court accepts the allegations in the FAC as true for purposes of its jurisdictional analysis. *Holt*, 46 F.3d at 1002. The party asserting jurisdiction has the burden of establishing it. *Port City Properties v. Union Pacific R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

## II.      Pertinent Factual Background

As an initial matter, the Court notes that this case has been thoroughly litigated up to this point and received various opinions from this Court and the Tenth Circuit Court of Appeals. Those opinions have set forth the alleged facts concerning the effect of TABOR on the revenue-raising power of state and local governments in Colorado. The Court, thus, does not find it necessary to repeat what has come before, given that the alleged effect of TABOR has not changed. (*See* ECF No. 147-1 at ¶¶ 12-46.) What has changed in this case since its visit to the Tenth Circuit is the pertinence of the non-legislator plaintiffs. As such, the Court will summarize the allegations pertaining to the identity of the plaintiffs, and the injuries they have allegedly suffered.

## A.     Political Subdivisions

Several of the plaintiffs are political subdivisions of the State of Colorado, such as county commissions, boards of education, and special districts.  (ECF No. 151 at ¶ 47.)  Specifically, these plaintiffs are: the Board of County Commissioners of Boulder County; the Boulder Valley School District RE-2 Board of Education; Cheyenne Wells RE-5 School District Board of Education; Colorado Springs District 11 Board of Education; the Denver County Public Schools Board of Education; Gunnison County Metropolitan Recreation District Board of Directors; Gunnison Watershed RE-1J Board of Education; Poudre School District Board of Education; the Pueblo City Schools Board of Education; the Pueblo County District 70 Board of Education.  (*Id*. at ¶¶ 57-58, 66-67, 69, 72-73, 89-91.)

Plaintiffs allege that TABOR has injured these political subdivisions by impairing their fiscal powers and responsibilities, and undermining a Republican form of government.  (*Id*. at ¶ 47.)  More specifically, with respect to the plaintiff that is a board of county commissioners, it is alleged that TABOR has caused it to incur costs and expenses to present matters to voters affecting the exercise of the board's fiscal powers.  (*Id*. at ¶ 43.)  With respect to the special-district plaintiff, it is alleged that TABOR has impaired the special district's authority to fulfill its responsibilities and caused the incurrence of costs.  (*Id*. at ¶ 45.)  With respect to the school-district plaintiffs, it is alleged that TABOR has prevented adequate funding of public schools in the State.  (*Id*. at ¶¶ 34-35.)

In addition, attached to plaintiffs' response to the motion to dismiss, are various resolutions or affidavits from the political-subdivision plaintiffs.  (ECF No. 160-2 to ECF No. 160-14.)  Given that this is a facial challenge to the allegations of the FAC, it is far from certain that documents attached to pleadings outside the FAC can be considered.  *See Holt*, 46 F.3d at 1002-03 (explaining

that, for purposes of a *factual* attack, a court has wide discretion to consider documents outside the complaint, but not explicitly stating that such discretion applies to a *facial* challenge). Nonetheless, so the record is complete, the Court will summarize the documents.

Succinctly, and pertinently, the resolutions or affidavits state that TABOR has caused the respective political subdivisions to incur costs and expenses in presenting matters to voters for decision; matters, which, without TABOR, the political subdivisions would not have needed to present to voters. (*See, e.g.*, ECF No. 160-3 at 2-3.) All of the political subdivisions have submitted a resolution of their respective board (ECF Nos. 160-2 to 160-7; ECF No. 160-9; ECF No. 160-11; ECF Nos. 160-13 to 160-14), and some of the school districts have also submitted affidavits (ECF Nos. 160-8, 160-10, 160-12). Almost all of the resolutions or affidavits reference specific matters that have been presented to voters, such as mill levy overrides. (ECF No. 160-3 at 3; ECF No. 160-4 at 2; ECF No. 160-5 at 3; ECF No. 160-6 at 2; ECF No. 160-8 at 2-3; ECF No. 160-10 at 2; ECF No. 160-12 at 2; ECF No. 160-13 at 2-3; ECF No. 160-14 at 2).[1] Most of the resolutions or affidavits are signed on behalf of school districts (ECF No. 160-2 to ECF No. 160-12), but, one resolution is signed on behalf of a board of county commissioners (ECF No. 160-13), and one resolution is signed on behalf of a special district (ECF No. 160-14).

B.      **Elected Officials, Educators, and Citizens**

Despite the Tenth Circuit's June 3, 2016 holding, plaintiffs leave in the FAC allegations pertaining to the injuries suffered by several plaintiffs due to their positions as legislators. (*See* ECF No. 151 at ¶¶ 48-49.) Those allegations are obviously irrelevant to the Court's current standing

---

[1] Only one resolution does not list specific matters that have been presented to voters. (ECF No. 160-2 at 2-3.)

analysis in light of the remand order. The Court notes the allegations, however, for completion purposes.

The plaintiffs listed as elected officials, educators, and/or citizens are: Andy Kerr, as an elected official, educator, and citizen; Norma V. Anderson, as a former elected official and citizen; Jane M. Barnes, as a former elected official and citizen; K.C. Becker, as an elected official and citizen; Elaine Gantz Berman, as a former elected official and citizen; Dr. Alexander E. Bracken, as a citizen; William K. Bregar, as a former elected official and citizen; Bob Briggs, as a former elected official and citizen; Bruce W. Broderius, as a former elected official and citizen; Trudy B. Brown, as a citizen; Stephen A. Burkholder, as a former elected official and citizen; Richard L. Byyny, as a citizen; Lois Court, as an elected official and citizen; Richard E. Ferdinandsen, as a former elected official and citizen; Stephanie Garcia, as a former elected official and citizen; Kristi Hargrove, as a citizen; Christopher J. Hansen, as an elected official and citizen; Leslie Herod, as a an elected official and citizen; Dickey Lee Hullinghorst, as a former elected official and citizen; Nancy Jackson, as a former elected official and citizen; William G. Kaufman, as a former elected official and citizen; Claire Levy, as a former elected official and citizen; Susan Lontine, as an elected official and citizen; Margaret Markert, as a former elected official and citizen; Megan J. Masten, as a citizen; Michael Merrifield, as an elected official and citizen; Marcella L. Morrison, as former elected official and citizen; John P. Morse, as a former elected official and citizen; Pat Noonan, as a former elected official and citizen; Ben Pearlman, as a former elected official and citizen; Wallace Pullman, as a citizen; Paul Weissmann, as an elected official and citizen; and Joseph W. White, as an educator and citizen. (*Id*. at ¶¶ 52-56, 59-65, 68, 70-71, 74-88, 92-94.)

Plaintiffs allege that citizens have protectable interests in a Republican form of government and in their elected representatives discharging "inherently legislative" functions such as taxation and appropriation. (*Id*. at ¶ 95.) Plaintiffs allege that TABOR has injured citizens by injuring their elected representatives' responsibilities and authority. (*Id*.) With respect to the educator-plaintiffs, it is alleged that TABOR has injured them by impairing their ability to properly educate students. (*Id*. at ¶ 50.)

Plaintiffs also allege that their injuries "will be further clarified upon development of facts to be adduced at trial and a judicial determination of the protections Plaintiffs enjoy under the Guarantee Clause." (*Id*. at ¶ 97.)

## III. Discussion

As an initial matter, the Court considers the motion requesting oral argument (ECF No. 167). Having reviewed the motion to dismiss, plaintiffs' response and defendant's reply thereto, the motion requesting oral argument, and defendant's response thereto, the Court DENIES the motion requesting oral argument. The Court believes that the record and arguments are sufficiently developed and ready for resolution. So it is clear, to the extent arguments are made in the motion requesting oral argument, the Court has considered them in reaching its findings herein.

Turning to the motion to dismiss, as indicated *supra*, the Court believes that there are two essential groupings of plaintiffs in this case: the political-subdivision plaintiffs; and the plaintiffs who are elected officials, educators, and/or citizens. The Court will deal with the latter grouping first, and then the political-subdivision plaintiffs.[2]

---

[2] The Court notes that in its motion to dismiss, defendant places the plaintiffs into three groups: political subdivisions; citizens; and educators. (ECF No. 156 at 7.) The Court further notes that plaintiffs do not object to defendant's grouping or classification of the various plaintiffs. (*See generally* ECF No. 160.)

**A.    Elected Officials, Educators, and Citizens**

As defendant points out in its reply, plaintiffs spend little to no time in their response addressing how the individual plaintiffs—the elected officials, educators, and citizens—have standing.  As mentioned *supra*, the inclusion of allegations in the FAC with respect to how elected officials have been injured by TABOR may have simply been an oversight or a failure to press the "backspace" button enough times when plaintiffs re-drafted their Complaint because there is certainly no basis to find that the plaintiffs who were or are legislators have standing in light of the Tenth Circuit's remand order.

As for elected officials who are not members of the State General Assembly, plaintiffs make no attempt explain how they, but not their General Assembly brethren, have standing.  The same is true of the educator plaintiffs and the citizen plaintiffs.  The only mention of these plaintiffs, in an unspecific manner, is when the FAC alleges that "all Plaintiffs" have suffered concrete TABOR-related injuries. (*See* ECF No. 160 at 5.)  Plaintiffs then proceed to ignore the forest for the political-subdivision tree by, *inter alia*, explaining that the political subdivisions have provided resolutions setting forth their injuries and discussing cases that involve political subdivisions.  (*See id* at 6-9, 13-15.)  That is all well and good for the political-subdivision plaintiffs (and will be addressed *infra*), but it does not help the individual plaintiffs to any great degree.

As the Tenth Circuit has explained, "[t]he Supreme Court's standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing which embodies judicially self-imposed limits on the exercise of federal jurisdiction."  *The Wilderness Soc'y v. Kane Cnty., Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011) (ellipsis, quotation, and internal quotation omitted).

With respect to the individual plaintiffs, plaintiffs make no effort to discuss, analyze, or even ruminate on how the elected officials, educators, and citizens have standing under either strand. Simply asserting that all plaintiffs have suffered concrete TABOR-related injuries, falls far short of satisfying either strand. And the Court should not step in to perform the analysis for plaintiffs. The analysis for both strands is nuanced and cannot take place in an argument vacuum, not least because it is far from certain whether the individual plaintiffs could satisfy either strand.

Article III standing requires, "at an irreducible minimum," that a party show an actual or threatened injury as a result of defendant's allegedly illegal conduct, the injury can be traced to the challenged action, and is likely to be redressed by a favorable decision. *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752 (1982). The Court should not have to wade into that analysis when plaintiffs have voluntarily decided to stay dry on the riverbank.[3]

Much is the same, if not worse, with respect to prudential standing. Although plaintiffs argue that prudential standing has been recently shorn of some of its components, plaintiffs do not dispute that those components remain part of the standing analysis, just under the Article III guise. (*See* ECF

---

[3] If the Court were to don waders, it might have been persuaded that the *citizen*-plaintiffs had alleged Article III's "irreducible minimum," but only if the Court had found that their alleged injury (which is essentially an interest in having a Republican form of government) was inextricably intertwined with the merits of their underlying claim. Arguably, that injury is inextricably intertwined, given that the Court cannot assess whether the citizen-plaintiffs' injury has actually occurred without determining whether TABOR has deprived the people of Colorado a Republican form of government. No such argument applies to the educator-plaintiffs, given that their alleged injury is being unable to properly educate their students. (*See* ECF No. 151 at ¶ 50.) That injury is not intertwined with the merits of any of the underlying claims. Moreover, as explained, plaintiffs have made no attempt to argue that, that injury satisfies Article III's "irreducible minimum." However, assuming for present purposes that plaintiffs' argument, regarding injuries being inextricably intertwined with facts, can be seen as covering the injury alleged by the citizen-plaintiffs (which is far from clear, given that plaintiffs make no such direct argument) (*see* ECF No. 160 at 9-11), the citizen-plaintiffs must still show that they have prudential standing, which the Court discusses *infra*.

No. 160 at 16.)  Those components are: (1) "the general prohibition on a litigant's raising another person's legal rights"; (2) "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches"; and (3) "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___, 134 S.Ct. 1377, 1386 (2014) (quotation and internal quotation omitted).

For some reason, plaintiffs appear to believe that the latter two tests are off the table, as they make no attempt to address them.  (*See* ECF No. 160 at 16-17.)  The mere fact that *Lexmark* may have removed the latter two tests from the prudential standing inquiry, does not mean that they are irrelevant, given that the Supreme Court specifically analyzed whether the plaintiff in that case was within the zone of the interests of the statute relied upon, and also noted that suits raising generalized grievances do not present constitutional cases or controversies.  *See Lexmark*, 134 S.Ct. at 1387-88 & n.3.  In addition, contrary to plaintiffs' contention, the Tenth Circuit has not held that "prudential standing review is often unnecessary in Supremacy Clause challenges."  (*See* ECF No. 160 at 16.) Instead, the very case plaintiffs cite for this proposition demonstrates that prudential standing review is still very necessary, given that the Tenth Circuit concluded that the plaintiff lacked prudential standing in that case, and remanded for the case to be dismissed.  *See Wilderness Soc'y*, 632 F.3d at 1170-72, 1174.[4]

---

[4] The Court notes that the Tenth Circuit's statement that the Supreme Court has yet to "weigh in" on whether the Supremacy Clause provides a cause of action, *Wilderness Soc'y*, 632 F.3d at 1169, is likely out-dated, given that, in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. ___, 135 S.Ct. 1378, 1383 (2015), the Supreme Court subsequently held that the Supremacy Clause is not a source of federal rights, "and certainly does not create a cause of action."

Furthermore, the Court rejects any suggestion that plaintiffs' prudential standing has been established by prior decisions in this case. As plaintiffs are more than fully aware, the Court's prior decision addressed the prudential standing of the legislator-plaintiffs only—the Court's bold heading to that effect should have made the same fairly clear. (*See* ECF No. 78 at 39.) If that did not, then the Court's subsequent declination to address whether any other plaintiffs had standing, should have done so. (*See id*. at 42.) Nor did the Tenth Circuit's original decision address anything other than the legislator-plaintiffs' prudential standing. (*See* ECF No. 115 at 27-29.)

In this light, plaintiffs' failure to address whether their injuries amount to generalized grievances or are within the zone of interests contemplated by the Enabling Act is perhaps indicative of their own belief as to the outcome of those inquiries. Again, though, the Court should not have to engage in a detailed inquiry of these issues, when plaintiffs have not done so in response to defendant's clear assertion that plaintiffs lack standing on those grounds. (*See* ECF No. 156 at 17-20.) As already stated, the Court is not plaintiffs' advocate, and, as the party with the burden to establish standing, plaintiffs must live and die by their decision not to address defendant's arguments in this regard.[5] *See Port City Properties*, 518 F.3d at 1189.

---

[5] The Court addresses the considerations of asserting another's rights and the Enabling Act's zone of interest in more detail *infra* with respect to the political-subdivision plaintiffs. If the Court were to engage in the hypothetical exercise of assessing the citizen-plaintiffs' standing in this regard, the analysis would appear to come to an end with the issue of asserting generalized grievances. As the Supreme Court has explained, "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and law, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 601, 127 S.Ct. 2553 (2007). Here, the citizen-plaintiffs are asserting a harm to which every citizen in Colorado has allegedly been subjected, and seeking relief that would no more benefit them than it would all of those other citizens. (*See* ECF No. 151 at 32 & ¶ 95.) As such, despite not having the benefit of any argument from plaintiffs, it appears that the citizen-plaintiffs do not state an Article III case or controversy. *See Hein*, 551 U.S. at 601.

This still leaves the first test: whether plaintiffs seek to raise another person's legal rights. Plaintiffs' response to this inquiry is again demonstrative. For once, plaintiffs do address it; albeit with two meager sentences. Which effectively amount to the conclusory statement that plaintiffs seek to assert their own rights, rather than the rights of others. If all arguments could be won simply by restating the test and inserting a "do not," then the Court's job might be much easier. But, alas, that is not how things work. At best, plaintiffs' statement, that "TABOR removes state fiscal power from Colorado's representative institutions and relegates those powers to plebiscitary decision-making," can be construed as addressing whether the *political-subdivision* plaintiffs are asserting the rights of others. However, it does not come close to stating, let alone explaining, why the plaintiffs who are elected officials, educators, or citizens are asserting their own rights, rather than the rights of others, such as the political subdivisions.

In summary, plaintiffs have not attempted to meaningfully argue, and certainly not analyze, why the plaintiffs who are elected officials, educators, and/or citizens have either Article III standing or prudential standing. To repeat, it is plaintiffs burden to do so. Thus, their failure is determinative, and the Court finds that the plaintiffs identified in Section II.B. *supra* who are elected officials, educators, and/or citizens do not have Article III or prudential standing to pursue this case.

### B.      Political Subdivisions

To the heart of the parties' dispute: whether the political-subdivision plaintiffs have standing to pursue this action. As with the individual plaintiffs addressed *supra*, this inquiry involves tests of the political-subdivision plaintiffs' Article III and prudential standing. An additional wrinkle to the analysis, however, is whether the political-subdivision plaintiffs, as political subdivisions of the State of Colorado, have standing to bring this action. This has been called the concept of "political

11

subdivision standing." *See Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628-630 (10th Cir. 1998).

**First**, the Court addresses Article III standing. The Court finds that the political-subdivision plaintiffs have Article III standing. Although the political-subdivision plaintiffs allege a host of injuries, the one the Court finds determinative is the alleged injury the political-subdivision plaintiffs have suffered as a result of having to incur costs to present matters to voters that would have, without TABOR, been within the power of the political subdivisions to decide.[6] The incurrence of costs is a concrete monetary injury. *See Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013) (concluding that the additional cost of purchasing specialty license plates was a "concrete, actual monetary injury" for purposes of Article III standing). In addition, the FAC alleges that the elections resulting in the incurred costs are the result of TABOR requiring certain fiscal matters to be submitted to voters. (*See* ECF No. 151 at ¶¶ 35, 43, 45.) Finally, the Court finds that, unlike other of plaintiffs' alleged injuries, such as the inability to adequately educate children, declaring TABOR unconstitutional would redress the incurrence of election costs because, as alleged, the political-subdivision plaintiffs would not incur those costs in a TABOR-free world. As such, all three parts of Article III's "irreducible minimum" have been achieved.

**Second**, the Court addresses political-subdivision standing. As the parties present the issue, there are two relevant Tenth Circuit cases. The Court agrees. Those cases are *Branson* and *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011). The Court begins with *Branson*. In *Branson*, *inter*

---

[6] Although the resolutions and affidavits attached to the response to the motion to dismiss make more explicit that the political-subdivision plaintiffs have incurred costs in connection with presenting matters to voters, the FAC also makes that allegation with respect to each type of political-subdivision plaintiff. (*See* ECF No. 151 at ¶¶ 35, 43, 45.) Thus, whether or not the Court may consider the resolutions and affidavits attached to the response, the Court finds that the FAC alleges a sufficiently concrete injury with respect to the political-subdivision plaintiffs.

*alia*, the Tenth Circuit was faced with whether school-district plaintiffs had standing to pursue an action seeking to have a voter-approved amendment to the Colorado Constitution declared violative of the U.S. Constitution's Supremacy Clause. *Branson*, 161 F.3d at 625, 628. The Tenth Circuit answered in the affirmative. The Circuit began by explaining that, despite sweeping language in certain Supreme Court decisions, a political subdivision is not barred "from asserting the structural protections of the Supremacy Clause of Article IV in a suit against its creating state." *Id*. at 628-629. The Tenth Circuit also stated that prior Supreme Court cases "stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Id*. at 628.

The Tenth Circuit then concluded that the school-district plaintiffs in that case were not disentitled from standing by virtue of being a political subdivision, in part, because they were "substantially independent" from the State of Colorado. *Id*. at 629. "Most important[]," though, the Tenth Circuit concluded that the school districts were "essentially the beneficiaries of the federal trust at issue here." *Id*. (quotation omitted). Addressing this latter aspect in more detail, the Tenth Circuit explained that the Colorado Enabling Act granted more than 4.6 million acres of school lands to Colorado for the support of "common schools," and school districts were the direct political descendants of "common schools." As a result, the Tenth Circuit concluded that the school districts' status as political subdivisions did not disentitle them from "bringing an action under the Supremacy Clause to enforce the terms of the Colorado Enabling Act …." *Id*.

The Tenth Circuit further explained that its conclusion was supported by case law from other circuits, citing a Fifth Circuit Court of Appeals case holding that a political subdivision could bring

13

a claim against its creating state when the claim was based upon a controlling federal law and the subdivision was a beneficiary of that law. *Id*. The Tenth Circuit also explained that its understanding of political-subdivision standing was "at work" in another of its decisions, *Housing Auth. of the Kaw Tribe of Indians v. City of Ponca City*, 952 F.2d 1183 (10th Cir. 1991), where the Circuit held, *inter alia*, that a local housing authority had standing to sue under the federal Fair Housing Act. *Id*. The Tenth Circuit explained that "[i]mplicit" in its *Kaw Tribe* decision was the "view that the Fair Housing Act, as a federal statute, trumps contradictory state law through the operation of the Supremacy Clause." *Id*. at 630.

Many years later, the Tenth Circuit decided *City of Hugo*. In that case, the Circuit addressed, *inter alia*, whether the City of Hugo, a political subdivision, had standing to sue its creating state under the dormant Commerce Clause. *City of Hugo*, 656 F.3d at 1254. The Circuit's analysis, naturally, discussed the decision in *Branson*. *Id*. at 1256-58. The Tenth Circuit explained that in *Branson*, as well as *Kaw Tribe*, "the source of substantive rights was a federal statute directed at protecting political subdivisions," which, the Circuit further explained, "informs" "the rights political subdivisions may vindicate in federal court against their parent states." *Id* at 1257. The Tenth Circuit also stated that courts have only allowed political-subdivision suits "when Congress has enacted statutory law specifically providing rights to municipalities." *Id*. The Tenth Circuit then concluded that, because the claims were based upon a substantive provision of the U.S. Constitution and the Supreme Court had made clear that the Constitution did not contemplate the rights of political subdivisions as against their parent states, the City of Hugo lacked standing under *Branson*. *Id*. at 1257-58.

The parties go to great lengths to explain the decisions in *Branson* and *City of Hugo*, and, where it suits them, distinguish the facts of those cases from those here. The Court finds both decisions pertinent. To begin, *factually*, the situation here is more similar to *Branson* than it is to *City of Hugo* in that the political-subdivision plaintiffs here are seeking to enforce a federal statute—the Colorado Enabling Act (perhaps coincidentally, the same one being enforced in *Branson*)—by way of the Supremacy Clause. To understand whether that factually similarity is determinative, it is necessary to more closely assess the Tenth Circuit's reasons for concluding that the school-district plaintiffs in *Branson* had standing, and the Circuit's further explanation of those principles in *City of Hugo*.

Put simply, the Court does not find the fact that the political-subdivision plaintiffs are seeking to enforce a federal statute via the Supremacy Clause alone to be determinative. If it were, then the Tenth Circuit's discussion in *Branson* of the school districts' independence and the school districts being the beneficiaries of a federal trust, would have been unnecessary. The Circuit could have simply stopped after identifying that the school districts sought to enforce a federal statute. What more is required therefore? *Branson*, as clarified in *City of Hugo*, provides the answer.

In *Branson*, it was (1) substantial independence from the creating State, which, for present purposes, the Court will assume the political-subdivision plaintiffs have, even though plaintiffs fail to make that argument, and (2), "[m]ost importantly," the plaintiffs being "essentially" the beneficiaries of a federal trust created by the Enabling Act. *Branson*, 161 F.3d at 629. With respect to the second factor, *City of Hugo* explains that the federal statute being enforced must be "directed at protecting political subdivisions." *City of Hugo*, 656 F.3d at 1257. As the Tenth Circuit further explained, this understanding of *Branson* comports with its facts, as those facts, as well as the facts

of other decisions upon which it relied, involved "whether a political subdivision could enforce against its parent state, via the Supremacy Clause, rights accorded it by a federal statute or statutory scheme." *Id*. at 1260.

At least for a fleeting moment, plaintiffs do not appear to disagree. Notably, in their response, plaintiffs assert that they are seeking to enforce rights granted to the political-subdivision plaintiffs in the Enabling Act. (ECF No. 160 at 14.) Whether that is the case will be discussed *infra*, but it is telling that plaintiffs acknowledge that which *City of Hugo* makes clear: a political subdivision must be seeking to enforce rights afforded it in a federal statute. Although plaintiffs may correctly assert that "determinative" in *City of Hugo* was the fact that the plaintiffs in that case sought to enforce a dormant Commerce Clause claim, *see City of Hugo*, 656 F.3d at 1257-58, that does not make the Tenth Circuit's explanation of *Branson* any less instructive for the purposes of this case; something which plaintiffs appear, at times, to acknowledge. (*See* ECF No. 160 at 14-15.)

With all this in mind, the Court turns to plaintiffs' assertion that the political-subdivision plaintiffs are seeking to enforce rights granted to them in the Enabling Act. (ECF No. 160 at 14.) Plaintiffs cite numerous paragraphs from the FAC; presumably to support this assertion. (*See id*. (citing ECF No. 160 at ¶¶ 10, 22, 30, 34, 47-51, 95, 96, 101, 105-106, 109-113)). Therefore, the Court will begin its analysis with those paragraphs. The first cite, to Paragraph One of the FAC, provides no support, as it simply states, with respect to the Enabling Act, that the same requires a Republican form of government. (*See* ECF No. 151 at ¶ 1.) There is no mention of rights being granted in the Enabling Act to the political-subdivision plaintiffs. (*See id*.) The same is true of Paragraphs Ten, Twenty-Two, Forty-Seven through Fifty-One, Ninety-Five,[7] Ninety-Six, One

---

[7] The Court also notes that Paragraphs Fifty and Ninety-Five pertain to educator and citizen-plaintiffs, and thus, have nothing to do with the political-subdivision plaintiffs. (*See* ECF No. 151 at ¶¶ 50, 95.)

Hundred and One, One Hundred and Five, One Hundred and Six, and One Hundred and Nine through One Hundred and Thirteen.  (*See id* at ¶¶ 10, 22, 47-51, 95-96, 101, 105-106, 109-113.)

The only potentially relevant paragraphs are Paragraphs 30 and 34, which pertain to the funding of public schools.  (*See id* at ¶¶ 30, 34.)  Before analyzing those paragraphs, the Court makes some preliminary observations.  First, given that the paragraphs pertain to *public schools*, they do not pertain to boards of county commissioners or special districts.  Because the other paragraphs to which plaintiffs cite do not allege that the Enabling Act grants those entities rights, the Court finds that the FAC fails to allege that the plaintiffs who are the board of county commissioners (the Board of County Commissioners of Boulder County) or the special district (the Gunnison County Metropolitan Recreation District) are seeking to enforce a right granted to them in the Enabling Act, and thus, those plaintiffs do not have political-subdivision standing to pursue this action.  *See Branson*, 161 F.3d at 629.

Second, although plaintiffs cite to numerous paragraphs in the FAC, they make no effort to explain to the Court how those paragraphs sufficiently allege that the political-subdivision plaintiffs are seeking to enforce rights granted to them in the Enabling Act.  (*See* ECF No. 160 at 14.)  As with much of the standing inquiry, therefore, the Court is left without meaningful argument from plaintiffs.  This is particularly troubling given that it is plaintiffs' burden to establish their standing.  In the specific context of the current inquiry it is equally troubling because whether a federal statute confers rights on a party is not necessarily straightforward, especially here where plaintiffs reference numerous provisions of the Enabling Act.  (*See* ECF No. 151 at ¶ 30.)  In their response, though, plaintiffs do not even identify the rights that the Enabling Act allegedly confers upon them.  (ECF No. 160 at 14 (stating simply, "The political subdivision Plaintiffs here also seek to enforce the

rights granted to them in the Enabling Act.")). That one conclusory statement is the extent of plaintiffs' analysis. As a result, and perhaps understandably, in reply, defendant only directs its arguments toward the political-subdivision plaintiffs' alleged right to a Republican form of government. (*See* ECF No. 163 at 6-7.) Why plaintiffs should be able to proceed on the basis of one conclusory sentence is beyond the Court. Nonetheless, for the sake of completing the record, the Court addresses Paragraphs 30 and 34 of the FAC.

In Paragraph 30 plaintiffs reference specific provisions of the Enabling Act. Specifically, plaintiffs reference Sections 7, 10, and 14 of the Enabling Act. (ECF No. 151 at ¶ 30.) Section 10, however, relates to state universities. 18 Stat. 475 § 10. Because none of the plaintiffs are state universities, the Court finds Section 10 to be irrelevant to its analysis. This leaves Sections 7 and 14. As the Tenth Circuit explained in *Branson*, Sections 7 and 14 provide that certain plots of land in each township must be used to support "common schools," and, if the land is sold, the proceeds must constitute a permanent school fund, with the interest to be expended in support of "common schools." *Branson*, 161 F.3d at 625.

As an initial matter, Sections 7 and 14 have no relationship to plaintiffs' argument that the Enabling Act allegedly requires a Republican form of government. This alleged requirement of a Republican form of government is the sole basis upon which plaintiffs argue that the terms of the Enabling Act have been violated. (*See* ECF No. 160 at 8.) As discussed *supra*, the numerous paragraphs in the FAC to which plaintiffs' cite in their response (*id*. at 14), alleging that the Enabling Act requires a Republican form of government, do not allege that such a requirement is a right afforded to the political-subdivision plaintiffs. Neither do Sections 7 and 14 of the Enabling Act, given that they do not mention any requirement of a Republican form of government.

18

In this light, the Court is again skating on fresh ice because nowhere do plaintiffs assert in their response that Sections 7 and 14 afford the political-subdivision plaintiffs rights under the facts of this case. (*See generally* ECF No. 160.) Putting that aside, the Court finds that those provisions do not afford these political-subdivision plaintiffs rights in this case. The important thing to note is that, unlike the plaintiffs in *Branson* who were seeking to enjoin the implementation of an amendment to the Colorado Constitution that directly affected the administration of the public land trust established by Sections 7 and 14, the political-subdivision plaintiffs' claims here do not allege that TABOR has had *any* effect on the public land trust. Paragraph 34 of the FAC merely alleges that TABOR has prevented school districts from fulfilling their obligations to adequately fund public schools. (*See* ECF No. 151 at ¶ 34.) However, as the FAC then goes onto allege, TABOR's effect on the adequacy of school funding has been on the setting of property tax mill levies. (*See id*. at ¶ 35.) Moreover, given that TABOR is allegedly a means to curtail state and local governments' power to tax and raise revenue (*id*. at ¶ 24), the Court cannot discern how TABOR would have any effect on the public land trust. As such, unlike *Branson*, and the Supreme Court case to which it cites, there is no public trust "at issue here." *Branson*, 161 F.3d at 629 (citing *Lassen v. Arizona ex. rel. Arizona Highway Dep't*, 385 U.S. 458, 459 n.1, 87 S.Ct. 584 (1967)). Thus, although in certain cases Sections 7 and 14 of the Enabling Act may provide school districts with political-subdivision standing to sue their creating State, those provisions do not in this case.

What of plaintiffs' main argument then—that TABOR violates the express terms of the Enabling Act requiring a Republican form of government? (*See* ECF No. 160 at 8.) Of course, plaintiffs provide no actual analysis of the provision(s) of the Enabling Act that expressly require such a form of government or why those provision(s) afford the political-subdivision plaintiffs a

right to the same.  (*See id*.)  Instead, all plaintiffs cite is three paragraphs in the FAC; none of which either point to a specific provision of the Enabling Act or allege that the political-subdivision plaintiffs are afforded rights under the Act.  (*See id*. (citing ECF No. 151 at ¶¶ 100, 105, 110)).

Like pushing a boulder up a hill, the Court presumes that plaintiffs rely upon Section 4 of the Enabling Act (*see* ECF No. 151 at ¶ 14), which provides, *inter alia*, that the constitution for the territory of Colorado "shall be republican in form."  18 Stat. 474 § 4.  As already mentioned, plaintiffs make no attempt to explain how this provision provides the political-subdivision plaintiffs with a right to a Constitution "republican in form."  In any event, the Court finds that, based on the present record, it does not.  Unlike Sections 7 and 14 which specifically provide that the public land trusts were created to support "common schools," Section 4 does not expressly provide for whom the "republican in form" requirement is designed.  However, review of Section 4, and also Section 5, indicate that the requirement is for the people of Colorado.  Notably, in Section 4, it states that the State Constitution must be Republican in form.  In Section 5, it states that, in the event a State Constitution is formed "for the people" of Colorado, the State Constitution shall be submitted to the people for ratification.  18 Stat. 475 § 5.  In other words, the language of the Enabling Act reflects that the State Constitution was formed *for the people of Colorado*.  Not the State's political subdivisions.

Absent any language to the contrary, which the Court does not find there to be, the inference the Court draws from this language is that the Colorado Constitution, including the requirement that it be Republican in form, is for the people of the State.[8]  The allegations of the FAC appear to

---

[8] To be clear, this does not effect the Court's analysis *supra* with respect to the citizen-plaintiffs. First, the present analysis is one related to political-subdivision standing, it is not a component of assessing the standing of plaintiffs who are not political subdivisions.  Second, even if the Enabling Act's requirement of a Constitution "republican in form" is meant to protect the people of Colorado, as discussed *supra*, the

support the Court's interpretation. Notably, in alleging that TABOR impermissibly amended the Colorado Constitution, plaintiffs allege that "the citizens of the State of Colorado" undertook to create and maintain a Republican form of government, and "the people of the State" relinquished the power to alter the Republican nature of their government. (ECF No. 151 at ¶¶ 111-112.) If anything, these allegations suggest that the right to a Constitution "republican in form" is that of the people of Colorado, as they are the ones who allegedly created, maintained, and relinquished the power to alter the same.

As a result, the Court finds that the school-district plaintiffs do not have political subdivision standing to pursue this action because they are not seeking to enforce any rights granted to them under the Enabling Act. *See City of Hugo*, 656 F.3d at 1260.

**Third**, the Court addresses plaintiffs' argument related to the standing inquiry being inextricably intertwined with the merits. As noted *supra*, arguably, this argument stretches to encompass the standing of the citizen-plaintiffs, assuming (because plaintiffs do not explain) that the pertinent inquiry here is whether TABOR undermines the requirement of a Constitution "republican in form." (*See* ECF No. 160 at 9-11.)[9] The Court does not believe that it stretches to the political-subdivision plaintiffs. As an initial matter, the Court has already found that the political-subdivision plaintiffs have alleged a sufficient injury for Article III standing purposes. Thus, it is not clear to what extent the inextricably intertwined analysis is necessary for the political-subdivision plaintiffs.

_____

citizen-plaintiffs still do not have standing due to their failure to present any arguments related to the prohibition on bringing generalized grievances.

[9] In light an assertion in the motion requesting oral argument, the Court notes that it did not believe plaintiffs' "inextricably intertwined" argument to be plaintiffs' "primary" argument on standing. (*See* ECF No. 167 at 3-4.)

Next, in light of the Court's analysis *supra* with respect to rights afforded by the Enabling Act, the political subdivision plaintiffs cannot be seeking to enforce a right to a Constitution "republican in form" because they have no such right. Thus, the presumed merits issue for the inextricably intertwined analysis—whether a Republican form of government has been undermined by TABOR—does not apply to the political-subdivision plaintiffs because that is not their injury to assert. Finally, even if the "republican in form" merits issue were applicable to the political-subdivision plaintiffs, the Court does not believe that their standing issue is inextricably intertwined with it. The standing issue for the political-subdivision plaintiffs is whether they are enforcing rights granted to them by the Enabling Act. This is a completely different inquiry to whether a Republican form of government has been undermined by TABOR. *See Day v. Bond*, 500 F.3d 1127, 1138 (10th Cir. 2007) (concluding that standing was not inextricably intertwined with the merits because the merits question was whether a state statute was preempted by federal law, while the standing question was whether the federal law created a private cause of action for the plaintiffs).

**Fourth**, the Court addresses prudential standing. To the extent that the pertinent plaintiffs have political-subdivision standing, the Court finds that they do not have prudential standing (however the components of that concept are characterized). As discussed *supra*, plaintiffs make no attempt to explain how they are not raising generalized grievances or that they are in the zone of interest of the Enabling Act. (*See generally* ECF No. 160 at 16-17.) Similarly, as already discussed, the Court rejects plaintiffs' apparent reasons for not reaching those issues. Thus, plaintiffs have forfeited those issues. To the extent they have not forfeited them, in light of the Court's finding *supra* that the Enabling Act's "republican in form" requirement is for the people of the State, the Court does not find the political-subdivision plaintiffs to be in the zone of interest of the Enabling Act, at least not the zone alleged in this case.

22

As for generalized grievances, it would of course help for plaintiffs to at least suggest the grievance being alleged by the political subdivisions. The closest plaintiffs get to this is asserting that TABOR has removed fiscal power from Colorado's representative institutions. (*See* ECF No. 160 at 16.) The Court presumes this is an extension of the "republican in form" argument. On that basis, the Court finds it to be a generalized grievance for the same reason noted *supra*—namely, because it is a harm to which every citizen and political subdivision in Colorado has allegedly been subjected, and seeks relief that would no more benefit the political subdivisions than it would all citizens and political subdivisions.

Similar reasoning applies to the remaining prudential consideration: the assertion of another's rights. Here, to the extent the political subdivision plaintiffs are seeking to assert that TABOR has undermined a Constitution "republican in form," that is not their right to assert. Section 4 of the Enabling Act, if anything, does not extend to, let alone mention, political subdivisions or even their political predecessors as in *Branson*. As construed *supra*, the requirement that a State Constitution be in a republican form is for the people of the State. Therefore, the Court finds that the political-subdivision plaintiffs are asserting the rights of another in alleging that TABOR violates the Enabling Act.

## IV.    Conclusion

For the reasons discussed herein, the Court finds that none of the named plaintiffs (be they political subdivisions, former or current elected officials, educators, citizens, or anything else) have standing to pursue this action. As a result, the Court GRANTS the motion to dismiss (ECF No. 156), and DISMISSES this action for lack of subject matter jurisdiction.

Plaintiffs' motion requesting oral argument (ECF No. 167) is DENIED.

The Clerk is instructed to enter Final Judgment in favor of defendant, and then CLOSE this case.

**SO ORDERED.**

DATED this 4th day of May, 2017.

<div style="margin-left:50%">

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

</div>